# United States Court of Appeals
# For the Fifth Circuit

_____

No. 21-60743

_____

STATE OF TEXAS; GREG ABBOTT, GOVERNOR OF THE STATE OF
TEXAS;
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY;
FASKEN LAND AND MINERALS, LIMITED; and
PERMIAN BASIN LAND AND ROYALTY OWNERS,

*Petitioners*,

*v.*

NUCLEAR REGULATORY COMMISSION;
UNITED STATES OF AMERICA,

*Respondents*.

_____

**INITIAL BRIEF OF PETITIONERS
FASKEN LAND AND MINERALS, LTD. and
PERMIAN BASIN LAND AND ROYALTY OWNERS**

_____

ALLAN KANNER
Attorney
ANNEMIEKE M. TENNIS
Attorney
Kanner & Whiteley, L.L.C.
701 Camp Street
New Orleans, LA. 70130
a.kanner@kanner-law.com
a.tennis@kanner-law.com
(504) 524-5777

# CERTIFICATE OF INTERESTED PERSONS

Case No. 21-60743

STATE OF TEXAS; GREG ABBOTT, GOVERNOR OF STATE OF TEXAS;
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY;
FASKEN LAND AND MINERALS, LIMITED; and
PERMIAN BASIN LAND AND ROYALTY OWNERS,

*Petitioners,*

v.

NUCLEAR REGULATORY COMMISSION;
UNITED STATES OF AMERICA,

*Respondents.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.     Petitioners

     a.     State of Texas

     b.     Greg Abbott, Governor of Texas

     c.     Texas Commission on Environmental Quality

     d.     Fasken Land and Minerals, Ltd.

Petitioner Fasken Land and Minerals, Ltd. is a non-governmental corporate party with no parent corporations.  Fasken Land and Minerals, Ltd. is a limited

partnership organization existing under the laws of Texas. Fasken Land and Minerals, Ltd. is a for-profit organization engaged in oil and gas extraction and production activities. Fasken Land and Minerals, Ltd. is a founding member of the Permian Basin Coalition of Land and Royalty Owners and Operators.

       e.      Permian Basin Land and Royalty Owners

Petitioner Permian Basin Land and Royalty Owners is a non-governmental corporate party with no parent corporations. Permian Basin Land and Royalty Owners is a registered 501(c)(4) non-profit, organized and existing under the laws of the State of Texas and based in Midland, Texas. Permian Basin Land and Royalty Owners is a public welfare organization dedicated to protecting the interests of the Permian Basin and informing the public about threats and risks of spent nuclear fuel in regions ill-suited to the activity.

2.      Counsel for Petitioners

       a.      Michael Abrams, Office of Attorney General, State of Texas

       b.      Ryan Baasch, Office of Attorney General, State of Texas

       c.      Henry Carl Myers, Office of Attorney General, State of Texas

       d.      Allan Kanner, Kanner & Whiteley, L.L.C.

       e.      Annemieke M. Tennis, Kanner & Whiteley, L.L.C.

       f.      Monica Renee Perales

3.      Respondents

    a.     United States Nuclear Regulatory Commission

    b.     United States of America

4.     Counsel for Respondents

    a.     Andrew P. Averbach, U.S. Nuclear Regulatory Commission

    b.     Todd Kim, U.S. Department of Justice

    c.     Jennifer Scheller Neumann, U.S. Department of Justice

    d.     Justin Heminger, U.S. Department of Justice

5.     Respondent-Intervenor

    a.     Interim Storage Partners, LLC

    b.     Orano CIS, LLC

    c.     Orano USA, LLC

    d.     Orano SA, owned by government of France, Mitsubishi, and Japan Nuclear Fuel

    e.     Waste Control Specialists, LLC

    f.     Fermi Holdings, Inc.

    g.     J.F. Lehman & Co.

6.     Counsel for Respondent-Intervenor

    a.     Brad Fagg, Morgan, Lewis & Bockius LLP

Respectfully submitted,

*/s/ Allan Kanner*

Allan Kanner

*Counsel for Petitioners*
*Fasken Land & Minerals, Ltd. and*
*Permian Basin Land and Royalty*
*Owners*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners believe that the legal issues in this case are sufficiently complex, involving complicated subject matter and multiple parties such that oral arguments would be helpful to the Court.  Accordingly, Petitioners respectfully request oral argument on the foregoing matter.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................. v

TABLE OF CONTENTS ........................................................................ vi

TABLE OF AUTHORITIES ................................................................. ix

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................... 3

STATEMENT OF THE CASE ................................................................. 5

I.  DEVELOPMENT OF NEPA AND MANDATORY AGENCY
     COMPLIANCE ................................................................................. 5

     A.  NEPA's Statutory Purposes: Comprehensive Agency Information
          Gathering and Public Disclosure for Meaningful Participation ..... 5

     B.  Environmental Impact Statements Under NEPA ........................... 7

     C.  NRC's NEPA Implementing Regulations - 10 C.F.R. Part 51 ....... 8

II.  CISF PROCEDURAL AND BACKGROUND HISTORY ............................. 10

     A.  WCS's Initial Application and the Substantial Rounds of Revisions That
          Created a Perpetually Moving Target of Review for the Public ................. 10

     B.  NRC Held Only Four Public Meetings and Reopened the EIS Scoping
          Public Comment Period Amid Numerous Requests for Additional
          Information from ISP ............................................................................. 11

     C.  The NRC Closed the Administrative Record and Its ISP Adjudicatory
          Proceeding Prior to Publication of Its Draft EIS and NEPA Required Public
          Comment Period ................................................................................... 14

          i.   The NRC denied any and all filed contentions "terminating" the ISP
               proceeding in December 2019 ............................................................. 14

          ii.  NRC published its draft EIS and opened the public comment period
               months after the COVID-19 pandemic hit ........................................ 15

          iii. Ignoring opposing viewpoints and material information presented in
               opposition, the NRC published its final EIS ...................................... 17

          iv.  The NRC ignored Petitioners' submissions ........................................ 18

SUMMARY OF ARGUMENT ................................................................. 19

STANDARD OF REVIEW ...................................................................19

ARGUMENT .....................................................................................20

I.    THE NRC, IN ABUSE OF ITS DISCRETION, VIOLATED NEPA AND
      THE APA BY ALLOWING A LICENSE CONDITION THAT
      ADMITTEDLY VIOLATES THE NWPA ......................................20

      A.  The NWPA Prohibits the ISP CISF from Storing DOE-Owned SNF .........22

      B.  The NRC is not Authorized to Issue a License that Violates the NWPA....23

      C.  The NRC's Allowance of Illegal NWPA Violating Conditions Tainted Its
          Entire Decision-Making Process in Violation of APA and NEPA .............25

II.   THE NRC'S INCONSISTENT AND UNREASONABLE ASSUMPTIONS
      AS TO A DATE FOR ESTABLISHING A PERMANENT REPOSITORY
      WERE ARBITRARY AND CAPRICIOUS ...................................28

III.  THE NRC ADOPTED AN UNREASONABLY NARROW PURPOSE AND
      NEED STATEMENT AND FAILED TO CONSIDER A SINGLE
      REASONABLE ALTERNATIVE...............................................31

      A.  The NRC's Unreasonably Narrow Purpose and Need Statement Ignored
          Congressional Views in Favor of Private Entities ......................32

      B.  The NRC's Failure to Evaluate a Single Reasonable Alternative is
          Unreasonable and Inconsistent with Its Own Guidance and Regulations
          with Prior Agency EISs.................................................35

          i.   The NRC unreasonably rejected reasonable alternatives .....................37

          ii.  Private Fuel Storage ISFSI ..................................................41

          iii. Holtec CISF .................................................................44

          iv.  The NRC Ignored Obvious and Apparent Cumulative and Synergistic
               Impacts from the Holtec CISF .............................................45

IV.   THE NRC ACTED ARBITRARILY AND CAPRICIOUSLY IN
      VIOLATION OF NEPA AND THE APA IN ACCEPTING ISP'S
      UNREASONABLE SITE SELECTION AND FAILING TO CONSIDER
      SITE-SPECIFIC ENVIRONMENTAL IMPACTS BEFORE ISSUING
      FINAL DECISION ...........................................................47

      A.  NRC's Acceptance of ISP's Unreasonable Site Selection..........................49

B.  The NRC's Use of Variable Radii to Minimize Perceived Impacts Was
    Inconsistent and Failed to Adequately Capture the Scope of Site-Specific
    Impacts ........................................................................................................51

CONCLUSION ....................................................................................................56

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*,
  462 U.S. 87 (1983)................................................................................6, 7

*Bullcreek v. NRC*,
  359 F.3d 536 (D.C. Cir. 2004)............................................... 23, 24, 36

*Cachil Dehe Band of Wintun Indians of Colusa Indian Community v. Zink*,
  889 F.3d 584 (9th Cir. 2018) ....................................................................33

*Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Comm'n*,
  449 F.2d 1109 (D.C. Cir. 1971)........................................................ 9, 18

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991)..................................................................33

*City of Arlington, Texas v. FCC*,
  569 U.S. 290 (2021).....................................................................................21

*City of Shoreacres v. Waterworth*,
  420 F.3d 440 (5th Cir. 2005) ............................................................. 7, 36

*Envt'l Law and Policy Center v. NRC*,
  470 F.3d 676 (7th Cir. 2006) ....................................................................36

*Friends of Southeast's Future v. Morrison*,
  153 F.3d 1059 (9th Cir. 1998) ..................................................................32

*Ind. Mich. Power Co. v. DOE*,
  88 F.3d 1272 (D.C. Cir. 1996).................................................................22

*Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  869 F.2d 719 (3d Cir. 1989) ......................................................................8

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)....................................................................................51

*Mississippi River Basin Alliance v. Westphal*,
  230 F.3d 170 (5th Cir. 2000) ......................................................... passim

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................21

*Nat'l Parks & Conservation Ass'n v. BLM*,
   606 F.3d 1058 (9th Cir. 2010) ...........................................33

*New York v. NRC*,
   681 F.3d 471 (D.C. Cir. 2012) ...........................................47

*Oglala Sioux Tribe v. Nuclear Regulatory Comm'n*,
   896 F.3d 520 (D.C. Cir. 2018) ................................ 9, 18, 47

*Robertson v. Methow Valley*,
   490 U.S. 332 (1989) ..................................................... 5, 6, 7

*Sierra Club v. Morton*,
   510 F.2d 813 (5th Cir. 1975) ..............................................7

*Sierra Club v. Sigler*,
   695 F.2d 957 (5th Cir. 1983) ........................................ 8, 20

*Silva v. Romney*,
   473 F.2d 287 (1st Cir. 1973) ...............................................6

*Simmons v. U.S. Army Corps of Engineers*,
   120 F.3d 664 (7th Cir. 1997) .............................................34

*South Louisiana Environmental Council, Inc. v. Sand*,
   629 F.2d 1005 (5th Cir. 1980) .............................................6

*Union of Concerned Scientists v. Nuclear Regulatory Comm'n*,
   920 F.2d 50 (D.C. Cir. 1990) ............................................18

*Westlands Water Dist. v. U.S. Dept. of Interior*,
   376 F.3d 853 (9th Cir. 2004) .............................................32

## Statutes

5 U.S.C. § 702 ..........................................................................2

5 U.S.C. § 706 ................................................................. 20, 21

42 u.s.c.. § 2112 .....................................................................3

28 U.S.C. § 2342 ..................................................................................2

28 U.S.C. § 2343 ..................................................................................2

28 U.S.C. § 2344 ..................................................................................2

42 U.S.C. §§ 131-137, 141-149 ..........................................................24

42 U.S.C. § 2011 ............................................................................ 1, 24

42 U.S.C. § 2099 ..................................................................................8

42 U.S.C. § 2201(h) .............................................................................1

42 U.S.C. § 2239 ..................................................................................2

42 U.S.C. §§ 4321-4347 .......................................................................5

42 U.S.C. § 4332 ............................................................................ 8, 45

42 U.S.C. § 10131(b) .................................................................... 22, 23

42 U.S.C. § 10139 ................................................................................2

42 U.S.C. § 10155 ........................................................................ 24, 34

42 U.S.C. § 10156(a)(1) .....................................................................23

42 U.S.C. § 10164(2) .........................................................................22

42 U.S.C. § 10222(a)(5)(A) ...............................................................23

**Regulations**

10 C.F.R. Part 51 ............................................................................8, 9

10 C.F.R. Part 72 .......................................................................... 2, 24

10 C.F.R. § 2.311 ...............................................................................15

10 C.F.R. § 51.45 .......................................................................... 9, 45

10 C.F.R. § 51.53(c)(3)(iii) ................................................................45

10 C.F.R. § 51.60 ................................................................................9

10 C.F.R. § 51.70 ............................................................... 9, 18, 40

10 C.F.R. § 51.71(d) ............................................................. 38, 45

10 C.F.R. § 51.72 ......................................................................18

10 C.F.R. § 51.73 ........................................................................9

10 C.F.R. § 51.74 ........................................................................9

10 C.F.R. § 51.90 ................................................................. 42, 48

10 C.F.R. § 51.91 ................................................................. 10, 45

10 C.F.R. § 51.92 ......................................................................18

40 C.F.R. § 1500.1(c) ..................................................................6

40 C.F.R. § 1502.14 ..................................................................36

40 C.F.R. § 1502.22(b)(4) ...........................................................8

40 C.F.R. § 1508.7 ....................................................................45

NUREG-1714 (NRC, 2001) ................................................... 41, 43

NUREG-1748 (NRC, 2003) ................................................... 36, 37

NUREG-2157 (NRC, 2014) .........................................................30

## Other Authorities

45 Fed. Reg. 74,693 ..................................................................24

82 Fed. Reg. 14,039 ..................................................................12

83 Fed. Reg. 44,922 ..................................................................12

83 Fed. Reg. 53,115 ..................................................................12

85 Fed. Reg. 44,330 ..................................................................16

*In re Matter of ISP LLC*
CLI-20-14 (December 17, 2020) ........................................... 15, 55

*In re Matter of ISP LLC*
CLI-21-09 (June 22, 2021) ........................................................................17

*Private Fuel Storage,*
  56 N.R.C. 390 (2002)...........................................................................23

## JURISDICTIONAL STATEMENT

Petitioners challenge the United States Nuclear Regulatory Commission's ("NRC") actions that vastly exceed any delegated authority and are not in accordance with the law. Specifically, Petitioners challenge the NRC's refusal to consider relevant and material information regarding the agency's consideration of environmental risks and cumulative impacts associated with the construction and operation of a consolidated interim storage facility ("CISF") for spent nuclear fuel ("SNF") and reactor-related Greater-Than-Class C radioactive waste by Interim Storage Partners, LLC ("ISP") in the NRC's preparation of its final environmental impact statement ("EIS"), associated record of decision and issuance of Materials License No. NMS-2515 ("ISP License"). *Interim Storage Partners, LLC; WCS CISF; Issuance of Materials License and Record of Decision,* 86 Fed. Reg. 51,926 (Sept. 17, 2021), Record I.D. Nos. 125, 129, 130.[1]

The Atomic Energy Act of 1954 ("AEA"), 42 U.S.C. § 2011, *et seq.*, authorizes the NRC to regulate the possession, use and transfer of the constituent materials of SNF. *Id.* at §§ 2073, 2092-93, 2111, 2201(b). The AEA, 42 U.S.C. § 2201(h), generally authorizes the NRC to consider lawful license applications, and

---

[1] References to "C.I." documents herein correspond to Record I.D. Numbers in Respondents' December 6, 2021 Amended Certified Index List in the above-captioned matter, Doc. #00516117700.

1

10 C.F.R. Part 72 grants the NRC subject matter jurisdiction to grant licenses for independent spent fuel installation storage ("ISFSI") facilities for up to forty years.

The Hobbs Act vests this Court with subject matter jurisdiction over "final orders" of the NRC made reviewable by 42 U.S.C. § 2239 (Section 189 of the AEA), including NRC orders granting or amending any license. 28 U.S.C. § 2342(4); 42 U.S.C. § 2239(a)–(b). Under the Hobbs Act, a party aggrieved by a final order must file a petition for review in the court of appeals wherein venue lies within 60 days. 28 U.S.C. § 2344. The NRC's record of decision and issuance of the ISP License are "final orders" for purposes of judicial review by this Court. Petitioners' appeal was timely filed because it was docketed on November 12, 2021, within 60 days of September 13, 2021, the date of the NRC's record of decision and issuance of ISP CISF License. *See* Record I.D. Nos. 125, 129, 130.

This Court has jurisdiction to review the agency's actions at issue under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and jurisdiction to review the NRC's preparation of the record of decision and its EIS pursuant to the APA and the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10139(a)(1)(D).

Provisions of the APA, NWPA and Hobbs Act authorize judicial review and venue is proper in this Circuit because Petitioners reside in and have their principal offices within this Circuit, 28 U.S.C. § 2343 and 42 U.S.C. § 10139(a)(2), and

because the siting of the ISP CISF and epicenter of consequences stemming from the NRC's actions is located in Andrews County, Texas, within this Circuit.[2]

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Did the NRC violate the National Environmental Policy Act ("NEPA") and the APA by refusing to take a good faith objective "hard look" at pertinent factors, opposing viewpoints, reasonable alternatives and/or new and significant information presented to the agency concerning the environmental impacts, risks and need for the ISP CISF in its preparation of the EIS, associated record of decision and issuance of the ISP License?

2.      Did the NRC act unlawfully, in abuse of its discretion, and arbitrarily and/or capriciously in issuing the ISP License contingent on a condition that admittedly violates existing provisions of the NWPA and by refusing to gather or publicly disclose reasonably thorough and comprehensive information on the environmental consequences and economic effects of said condition in its preparation of the EIS and associated record of decision?

---

[2] The State of Texas, et al., was the first to file a Petition for Review challenging the NRC's issuance of its record of decision and the ISP License, which was filed on September 23, 2021, within 10 days of agency publication, and where the agency first filed its record on November 2, 2021. *See* Certified Index of the Record, Doc. #00516077166. Issues relating to 28 U.S.C. § 2112 and this Court's jurisdiction over Fasken and PBLRO's Petition for Review have been fully briefed separately in conjunction with Respondents' Motion to Dismiss. Doc. #0051614195; Doc. #00516129044; Doc. #00516133681.

3.      Did the NRC act properly in closing the administrative record and opportunity for public comments on the EIS scoping and/or draft EIS (i) before ISP fully answered the agency's requests for additional information or (ii) before ISP made substantial revisions to its application documents?

4.      Did the NRC abuse its discretion, and act in violation of the law and arbitrarily and/or capriciously by refusing to independently gather appropriate information and consider the environmental consequences of: (1) a single reasonable alternative to the ISP CISF as mandated by NEPA; (2) adverse risks of terrorist attacks and acts of malice or sabotage to thousands of metric unit tons of SNF; and/or (3) site-specific and cumulative impacts of locating the ISP CISF within the Permian Basin?

5.      Did the NRC act unlawfully, in abuse of its discretion, and arbitrarily and/or capriciously in allowing a severely limited and narrow purpose and need statement for private off-site storage (catering solely to private entity interests without reference to statutory authority or goals), in its preparation of the EIS that eliminates the possibility of any other reasonable alternative to the ISP CISF despite the existence of several feasible and reasonable alternatives?

6.      Did the NRC violate NEPA's core objectives and procedural requirements by failing to appropriately and comprehensively gather or scrutinize information relating to identified environmental consequences of the ISP CISF and

further failing to timely and transparently disclose relevant hard factors and environmental influences to the public, thereby precluding meaningful participation in its decision-making process?

## STATEMENT OF THE CASE

## I. DEVELOPMENT OF NEPA AND MANDATORY AGENCY COMPLIANCE

### A. NEPA's Statutory Purposes: Comprehensive Agency Information Gathering and Public Disclosure for Meaningful Participation

NEPA, 42 U.S.C. §§ 4321-4347, seeks to focus a federal agency's attention on the possible environmental effects of proposed actions, which furthers two crucial purposes: informed decision-making through agency information gathering and timely and transparent public disclosures to foster participation in the process. As the Supreme Court explained in *Robertson,* NEPA:

> ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.

*Robertson v. Methow Valley,* 490 U.S. 332, 349 (1989); *Mississippi River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000) ("NEPA was created to ensure that agencies will base decisions on detailed information regarding significant

environmental impacts and that information will be available to a wide variety of concerned public and private actors."); 40 C.F.R. § 1500.1(c).

To accomplish these purposes, NEPA requires federal agencies to take a "hard look" and examine the environmental consequences of their actions before taking those actions, in order to ensure "that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson,* 490 U.S. at 349; *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983). *South Louisiana Environmental Council, Inc. v. Sand*, 629 F.2d 1005, 1010 (5th Cir. 1980) (stating that the EIS is designed to ensure that the effects of a project on the environment do not go unnoticed).

An agency's obligations under NEPA are "not discretionary, but are specifically mandated by Congress, and are to be reflected in the procedural process by which agencies render decisions." *Silva v. Romney*, 473 F.2d 287, 292 (1st Cir. 1973). Such agency decisions must be considered in the context of the entire decision-making process. *Baltimore Gas & Elec.,* 462 U.S. at 101-103. After-the-fact rationalizations of agency actions or failing to contemporaneously inform the public will not suffice under NEPA. *Westphal*, 230 F.3d at 174 (stating that the information to satisfy the criteria for determining the adequacy of the EIS must be included in the EIS and the conclusions in the EIS must be supported by evidence in the administrative record).

**B.     Environmental Impact Statements Under NEPA**

NEPA requires the preparation of a comprehensive EIS whenever major federal actions significantly affect the quality of human environment. *City of Shoreacres v. Waterworth*, 420 F.3d 440, 450 (5th Cir. 2005). NEPA's "action-forcing" requirement for preparation of an EIS assesses the environmental impacts of the proposed action and weighs the costs and benefits of alternative actions. *Robertson*, 490 U.S. at 350-51. Publication of an EIS provides public assurance that the agency "has indeed considered environmental concerns in its decision-making process." *Baltimore Gas & Elec.*, 462 U.S. at 97.

A central focus of an EIS is "to detail the environmental and economic effects of proposed federal action to enable those who did not have a part in its compilation to understand and consider meaningfully the factors involved, and to compel the decisionmaker to give serious weight to environmental factors in making discretionary choices." *Sierra Club v. Morton*, 510 F.2d 813, 819 (5th Cir. 1975) (internal quotation and citations omitted).

The environmental impacts that must be considered in an EIS include "reasonably foreseeable" impacts which have "catastrophic consequences, even if their probability of occurrence is low . . . ." 40 C.F.R. § 1502.22(b)(4). Specifically, pursuant to 42 U.S.C. § 4332(C), NEPA specifies five issues to be addressed in an EIS, mandating agencies:

include in every recommendation or report . . . significantly affecting the quality of the human environment, a detailed statement . . . on . . . (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

## C.    NRC's NEPA Implementing Regulations - 10 C.F.R. Part 51

The AEA generally requires that the NRC not issue a license that would be "inimical to . . . the health and safety of the public." 42 U.S.C. § 2099. While this goal often coincides with NEPA objectives, that is not always the case. The NRC has separate and distinct duties, aside from the AEA, to comply with NEPA regulations. *See Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n*, 869 F.2d 719, 741 (3d Cir. 1989) (finding the NRC is not exempt from its NEPA obligations by simply complying with AEA requirements).

NEPA requires agencies develop and use environmentally conscious decision-making procedures and mesh the requirements of NEPA with its own governing statute(s). *See Sierra Club v. Sigler,* 695 F.2d 957, 967 (5th Cir. 1983). The NRC recognized its NEPA obligations and NEPA procedural requirements through promulgating its own NEPA implementing regulations. *See generally* 10 C.F.R. Part 51; *see also, Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic*

*Energy Comm'n,* 449 F.2d 1109, 1115 & n.12 (D.C. Cir. 1971); *Oglala Sioux Tribe*

*v. Nuclear Regulatory Comm'n,* 896 F.3d 520, 534 (D.C. Cir. 2018).

In accordance with NRC's implementing regulations, licensees or applicants must compile an Environmental Report with specific information to aid the NRC in preparing its independent analysis of the environmental effects of the proposed licensing action. 10 C.F.R. §§ 51.45, 51.60. The NRC Staff must then issue its own EIS based on a review of information provided by the licensee or applicant, in comments, and obtained by the Staff itself. The NRC may not simply rely on the information provided by the applicant but is required to independently verify and be responsible for the reliability of all information used in the draft EIS. 10 C.F.R. § 51.70.

After the NRC prepares its draft EIS, fulfilling NEPA's information-gathering function, it must solicit comments from the public, including state environmental agencies and other interested parties, to fulfill NEPA's public participation function. *See* 10 C.F.R. §§ 51.73, 51.74. Public participation helps the NRC to fulfill its statutory mandates under both NEPA and the AEA, can enhance regulatory outcomes by helping the agency obtain more comprehensive information on relevant issues outside its area of expertise, and further builds public confidence in its ultimate decision.

To encourage meaningful participation and ensure agency transparency in the process, the NRC's final EIS must respond in turn to comments submitted in response to publication of the NRC's EIS related documents. 10 C.F.R. § 51.91. Specifically, the NRC's final EIS will include responses to any comments on the draft EIS and "will state how the alternative considered in it and decisions based on it will or will not achieve the requirements of . . . 102(1) of NEPA and any other relevant and applicable environmental laws and policies." 10 C.F.R. § 51.91(a)(1), (c).

## II.    CISF PROCEDURAL AND BACKGROUND HISTORY

### A.    WCS's Initial Application and the Substantial Rounds of Revisions That Created a Perpetually Moving Target of Review for the Public

In April 2016, Waste Control Specialist, LLC ("WCS") submitted a license application to the NRC to construct and operate a CISF located in Andrews County, Texas. C.I. 5 and 6. WCS sought an initial license for interim storage of SNF, with a maximum storage capacity of 40,000 MTUs, to be transported over 40 years by the U.S. Department of Energy ("DOE"). *Id.* The license application clearly indicated that DOE would take title to the spent nuclear fuel, would transport it to the proposed CISF and subsequently from the proposed CISF to a permanent repository by 2048, and would be responsible for emergency services and first responder coverage. C.I. 5, ISP ER, Rev. 0 (April 28, 2016) at 1-1 and1-6; C.I. 25, ISP ER, Rev. 1 (March 16, 2017) at 1-2, 1-4, 3-5 to 3-6, and 4-9.

After multiple parties challenged the legality of the WCS license application as violative of the NWPA, which prohibits DOE ownership of SNF prior to the establishment of a permanent repository, and after the NRC had held four public EIS scoping meetings, C.I. 16, 17, 21, and 26, WCS requested that the NRC suspend review of its application. The NRC issued notice of WCS' withdrawal of its application to the public in July 2017. C.I. 2.

Just over a year later, WCS created a joint venture with ISP and submitted a revised application for a CISF license. C.I. 3. ISP's revised application sought the same maximum storage capacity at the WCS site in Texas but was contingent on contracts with either DOE *or* "holders of the title to spent nuclear fuel at commercial nuclear power facilities (SNF Title Holder[s])." C.I. 31, ISP ER, Rev. 2 (July 19, 2018).

### B.    NRC Held Only Four Public Meetings and Reopened the EIS Scoping Public Comment Period Amid Numerous Requests for Additional Information from ISP

The NRC initially held three public EIS scoping meetings in February 2017. C.I. 23. In mid-March 2017, WCS revised its voluminous application documents. C.I. 25.  The NRC subsequently held its fourth and final public EIS scoping meeting, not in the area where the ISP CISF would be located, but in Rockville, Maryland on April 6, 2017. C.I. 24; *see also,* 82 Fed. Reg. 14,039 (March 16, 2017) (extending

closing date for comments until April 28, 2017).  A few months later in July 2017, the NRC announced WCS had withdrawn its application.

In 2018 upon re-submission of the revised ISP CISF application, the NRC briefly reopened the public comment period for EIS scoping for 45 days on September 4, 2018 and then extended the period for additional 30 days until November 19, 2018. 83 Fed. Reg. 44922; 83 Fed. Reg. 53115.[3]

The stated purpose of the NRC's scoping process was to:

- Ensure that important issues and concerns are identified early and are properly studied
- Identify alternatives to be examined
- Identify significant issues to be analyzed in depth
- Eliminate unimportant issues from detailed consideration
- Identify public concerns.

C.I. 125, ISP EIS (July 2021) at 1-4. According to the ISP EIS, the NRC allegedly "considered comments received during this re-opened scoping period along with all comments received during the previous period, in determining the scope of the EIS." *Id.*

After closing the public comment period, but prior to publishing its ISP Scoping Summary Report or draft EIS, the NRC issued multiple sets of requests for additional information ("RAIs") to ISP to address inadequate and incomplete

---

[3] NRC's Federal Register Notices impose different deadlines and preferred agency procedures for its NEPA EIS scoping comments compared to its advertised opportunities to request an agency hearing on the revised ISP license application under the AEA.

information relating to the proposed CISF project and environs. *See, e.g.,* C.I. 40, 51, 62-64, 67-68, 71-74. The information, notably requested after the NRC had already determined and narrowed the scope for the EIS and after closing the public comment period for scoping, but before issuing its report and scoping decisions to the public, was information deemed crucial to the review of environmental impacts by the NRC itself. C.I. 77 at B-5 (responding to concerns that ISP's application contains "missing, misleading, inaccurate and inadequate information and analysis," the NRC stated its standard policy: "[i]f the NRC staff determines that the information provided in the applicant's license application is not sufficient (e.g., missing or inaccurate) or cannot be independently gathered to allow completion of the EIS, the staff will submit requests for additional information (RAIs) to the applicant to request the information.").

On October 10, 2019, the NRC issued notice of a public meeting on its environmental RAIs from ISP to be held on October 24, 2019. C.I. 76. Exactly one week after that meeting, on October 31, 2019, the NRC issued its Summary Report of the EIS Public Scoping Meeting based on the Maryland meeting held two and a half years earlier in April 2017. C.I. 77. The NRC's long-awaited ISP EIS Scoping Report rendered a large portion of public comments, submitted years earlier, as "out of scope," outside its authority or jurisdiction, or unquantifiable / unascertainable information. NRC's actions do not comply with NEPA's requirement for timely and

13

transparent EIS related procedures or NRC's "long-standing practice of conducting

its regulatory responsibilities in an open and transparent manner to keep the public

informed of the agency's regulatory, licensing, and oversight activities and to

involve stakeholders in the regulatory process." C.I. 77 at B-2.  It instead, left the

public in the dark, creating a perpetually moving target for any public participation

in the decision-making process.

### C.    The NRC Closed the Administrative Record and Its ISP Adjudicatory Proceeding Prior to Publication of Its Draft EIS and NEPA Required Public Comment Period

#### i.    The NRC denied any and all filed contentions "terminating" the ISP proceeding in December 2019

Unlike any other adjudicatory proceeding, the NRC's Atomic Safety and

Licensing Board ("ASLB") rejected each and every contention proffered under the

AEA intervention rules and officially terminated the ISP adjudicatory proceeding,

closing the administrative record, five months *before* publication of the NRC's draft

EIS and *before* the agency issued its notice soliciting public comments pursuant to

NEPA.[4]  *See* LBP-19-11, 90 NRC 358, 368 (December 13, 2019) (the ASLB

---

[4] Initially the ASLB and NRC found Petitioners' contention relating to abandoned and improperly plugged wells in the region as a potential contamination migration pathway and known risk for increased subsidence and sinkholes to be partially admissible. The NRC later ruled the contention moot based on subsequent but unverified ISP responses to NRC's RAIs, which narrowed the geographic scope of analysis to ISP's investigation into only those wells on the ISP/WCS property in June 2019. *Id; see also,* C.I. 64.

announcing the ISP "proceeding is terminated" approximately five months before the NRC issued its draft EIS, further instructing appeals to be filed within 25 days "in conformity with 10 C.F.R. § 2.311"); *see also,* C.I. 94, 97.

Before the ISP proceeding was officially terminated, Petitioners had timely filed five contentions alleging NRC violations of NEPA and NRC regulations, with the ASLB denying each one.

On January 21, 2020, Petitioners filed a motion to reopen the closed ISP record along with a motion to amend its previously filed September 2018 contention relating to ISP's mischaracterizations of groundwater at the WCS site based on new information that ISP provided in its responses to NRC's RAIs. *See* C.I. 79, ISP Responses to RAIs (Nov. 21, 2019) (not publicly released by the NRC until January 6, 2020). The ASLB denied the motions, and the NRC affirmed the denial in its December 2020 Order. *Matter of Interim Storage Partners, LLC*, Docket No. 72-1050-ISFSI, CLI-20-14 (December 17, 2020), *available at:* https://www.nrc.gov/docs/ML2035/ML20352A359.pdf

### ii.    NRC published its draft EIS and opened the public comment period months after the COVID-19 pandemic hit

In May 2020, months after closing the ISP proceeding and record, in the beginning months of the nation's struggle with the COVID-19 pandemic, the NRC first issued public notice regarding availability of its draft EIS, soliciting public

comments to same by September 4, 2020. C.I. 94.  In response to the "pandemic health emergency" and its "unique challenges for all stakeholders . . . to be able to participate in the public comment process" the NRC extended the draft EIS comment period until November 3, 2020. 85 Fed. Reg. 44330. NRC's requests for public comments to its draft EIS occurred while NRC was still issuing and receiving ISP's responses to RAIs and updating its license application documents. *See* C.I. 95, 100-102. Another moving target.

Given the pandemic, NRC did not hold in-person meetings. C.I. 125, ISP EIS at 1-5. Nevertheless, the public overwhelmingly commented in opposition to the ISP CISF, with several hundred unique public comments. *See* C.I. 1128-1619. Common themes in opposition quickly became apparent, and commentors identified fundamental flaws and technical deficiencies with the NRC's draft EIS. Numerous commentors expressed concerns about the illegality of the CISF under the NWPA, that "interim storage" would become *de facto* permanent storage in the absence of a repository, that transporting the nuclear waste multiple times creates unnecessary public risks and that the location in the middle of the nation's most productive oil hubs is illogical, posing a threat to national security and energy and potentially devastating impacts to regional economies.

Petitioners timely filed a second motion to reopen the proceeding based on new and material information disclosed for the first time in the NRC's May 2020

publication of its draft EIS relating to unanalyzed or inadequately analyzed transportation impacts, safety risks, costs and benefits and that rural remote communities in west Texas and southeast New Mexico would be responsible for training, equipping and financing first responder and emergency training for the ISP CISF in the event of a radiological incident. This attempt to reopen the record was also summarily denied by the NRC. Matter of Interim Storage Partners, LLC, Docket No. 72-1050-ISFSI, CLI-21-09 (June 22, 2021), *available at:* https://www.nrc.gov/docs/ML2117/ML21173A148.pdf.

### iii. Ignoring opposing viewpoints and material information presented in opposition, the NRC published its final EIS

Paying only lip service to opposing viewpoints and comments submitted in response to the NRC's draft EIS, the agency issued its final EIS in July 2021. C.I. 125. The NRC did not change any material aspect in its decision-making process or preparation of the EIS in response to the hundreds of timely comments submitted by the public pursuant to NRC-imposed deadlines and procedures required by NEPA and APA.

Agencies, like the NRC, have a continuing duty to consider new and relevant information pertinent to environmental impacts after publishing a scoping report or draft EIS, and even after publishing a final EIS, when significant impacts or factors arise that may impact its analyses, conclusions, and/or underlying premises. *See Calvert Cliffs',* 449 F.2d 1109; *Oglala Sioux Tribe,* 896 F.3d 520; *see also Union of*

*Concerned Scientists v. Nuclear Regulatory Comm'n,* 920 F.2d 50, 55-56 (D.C. Cir. 1990) (emphasizing in dicta the importance of NRC not foreclosing new issues and new information in context of adjudicatory proceedings and late-filed contentions).[5]

### iv.    The NRC ignored Petitioners' submissions

Petitioners participated throughout the EIS process, in virtual meetings and by timely submitting their comments, factual evidence and identification of substantial omissions and flaws during the scoping process and in response to the NRC's publication of the draft and final EIS.  C.I. 128, 536, 537, 984, 1477, 1522, 1560. Throughout the process, the NRC disregarded evidence Petitioners presented, refusing to incorporate their opposing viewpoints or offer any meaningful responses for declining to do so. Instead, the NRC opted to issue the same boilerplate response to nearly every public comment submitted in its final EIS: "[n]o changes were made to the EIS in response to these comments." *See generally* Rec. Doc. No. 125, ISP EIS at Appendix D.

---

[5] The NRC's NEPA-implementing regulations require it to prepare supplements if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 10 C.F.R. §§ 51.72, 51.92. The NRC's regulations further recognize the Commission's "continuing obligation to conduct its domestic licensing and related regulatory functions in a manner . . . receptive to environmental concerns." 10 C.F.R.§ 51.70.

## SUMMARY OF ARGUMENT

The NRC must act in accordance with the law and implement NEPA objectives to the "fullest extent possible," i.e., with comprehensive and thorough information gathering, timely and transparent public disclosures, to foster meaningful participation in its decision-making process and the proper weighing of costs and benefits of alternative actions.  The NRC violated NEPA by failing to take the requisite hard look, abusing its discretion and acting arbitrarily and capriciously by: (i) placing private entity objectives above Congressional directives in narrowly defining the scope of the proposed project to  unreasonably eliminate consideration of a single reasonable alternative; (ii) refusing to gather or present any comparative information to the public regarding a single reasonable alternative; (iii) failing to consider the cumulative and synergistic impacts of proposed Holtec International (Holtec") CISF; (iv) employing improper, inconsistent and fundamentally flawed assumptions to reach its recommendation (*e.g.,* assuming without justification or verifying that third parties would adequately manage other environmental risks and potential adverse impacts); (v) accepting an unreasonable site selection process and then failing to comprehensively consider site-specific environmental consequences; and (vi) acting on a pre-determined result in a thinly veiled attempt to force Congress's hand to alter the NWPA.  *See e.g.,* C.I. 128, 984, 1477, 1522, 1560.

## STANDARD OF REVIEW

The Court's role in reviewing the adequacy of the EIS is governed by the APA, which requires the Court to "hold unlawful and set aside any agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Westphal*, 230 F.3d at 174. This Circuit has set forth three criteria for determining the adequacy of an EIS:

> (1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives; (2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

*Id.*

In applying these criteria, the Court is concerned with the integrity of the NEPA-EIS process used by the NRC to make its decision, rather than the merits of the decision. *Sigler*, 695 F.2d at 965. The Court should apply the test of reasonableness generally applied to NEPA decisions.

## ARGUMENT

## I.    THE NRC, IN ABUSE OF ITS DISCRETION, VIOLATED NEPA AND THE APA BY ALLOWING A LICENSE CONDITION THAT ADMITTEDLY VIOLATES THE NWPA

It goes without saying that federal agencies must act in accordance with applicable law in fulfilling their obligations, including their NEPA obligations. *City*

*of Arlington, Texas v. FCC,* 569 U.S. 290, 1864-65 (2021) (stating that agencies' "power to act and how they act is authoritatively prescribed by Congress" and determinations as to the validity of agency actions "always [turn on] whether the agency has gone beyond what Congress permitted it to do . . ."). The APA imposes a basic obligation on agencies to act in accordance with applicable state and federal laws and provides that courts can "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C), (D). Courts have found arbitrary and capricious or otherwise held unlawful, actions where:

> The agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

Here, the ISP License issued by the NRC undeniably contains a condition violating the NWPA. In granting such a License, the NRC acted arbitrarily, capriciously and/or otherwise not in accordance with the law.

## A.     The NWPA Prohibits the ISP CISF from Storing DOE-Owned SNF

Congress passed the NWPA to address the problems posed by a quickly amassing inventory of SNF at civilian reactor sites located across the country, laying the groundwork for a national nuclear policy. The NWPA represents Congressional intent to provide for permanent disposal of highly radioactive waste in a deep geologic repository, 42 U.S.C. § 10131(b), and corresponding desire to create a national "comprehensive scheme for interim storage and permanent disposal . . . ." *Ind. Mich. Power Co. v. DOE,* 88 F.3d 1272, 1273 (D.C. Cir. 1996).

Under the NWPA, federal interim storage of civilian generated nuclear waste was to be temporary and statutorily limited, not a substitute for ultimate disposal in a permanent repository. *See* 42 U.S.C. §§ 131-137, 141-149. It was made clear that Congress feared that federal interim storage "would detract from efforts to develop a permanent repository" and "lead to increased transportation of fuel, and [] utilities' avoiding taking initiative to solve their own spent fuel storage problems."[6] *Private*

---

[6] Provisions of the NWPA are geared towards minimizing transportation of SNF and related radioactive wastes. 42 U.S.C. § 10164(2) (requiring potential federal interim storage sites under NWPA to ". . . minimize the impacts of transportation and handling of such fuel and waste"); *see also* "Spent Nuclear Fuel: Legislative, Technical and Societal Challenges to its Transportation," GAO 16-121 (October 2015) at pp. 3-4 (acknowledging the complexities and decades of planning required to transport SNF depending on variables like "distance, quantity of material, mode of transport, rate of shipment, level of security, and coordination with state and local authorities" as well as routes and "critical elements of infrastructure and equipment to be designed and deployed.").

*Fuel Storage,* 56 N.R.C. 390, 404 (2002) (citing 128 Cong. Rec. 28,032-33 (1982));

*aff'd Bullcreek v. NRC,* 359 F.3d 536 (D.C. Cir. 2004).

The NWPA framework that Congress laid out (i) expressly prohibits the federal government from assuming responsibility for storage and taking title to SNF until "commencement of operation of a repository," 42 U.S.C. § 10222(a)(5)(A), with limited exceptions;[7] and (ii) expressly limits construction of federal interim storage facilities to the DOE, 42 U.S.C. §§ 10131(b)(2) (for Interim Storage facilities); 10168(b) (for Monitored Retrievable Storage ("MRS") facilities).

## B.   The NRC is not Authorized to Issue a License that Violates the NWPA

The NRC initially began to regulate spent fuel storage in 1980, with regulations governing the storage of SNF at reactor sites and "away-from-reactor" sites known as ISFSIs. *See* 45 Fed. Reg. 74,693; *see generally* AEA, 42 U.S.C. §§ 2011, *et seq.* Subsequent passage of the NWPA substantially altered the framework, impact and implementation of NRC's Part 72 regulations.

Under 10 C.F.R. Part 72, the NRC is authorized to license privately-owned and operated away-from-reactor interim facilities for storage of private SNF,

---

[7] This exception exists only if reactor licensees could demonstrate a lack of onsite storage capacity that was both severe enough to disrupt ongoing operations and incapable of a timely remedy. 42 U.S.C. § 10155(b). The exception is further limited to maximum storage capacity of only 1,900 MTUs, for maximum of only three years, and any contracts entered between reactor licensees and DOE must have been entered prior to January 1990. 42 U.S.C. § 10156(a)(1).

*Bullcreek,* 359 F.3d at 542, and is also authorized to license federal government-owned and operated MRS facilities for limited interim storage of SNF.

Not only is there a glaring absence of any NRC delegated authority or regulation that authorizes the NRC to license privately-owned or operated away-from-reactor interim facilities for the storage of federal government-owned SNF, but the NWPA expressly prohibits it.[8]  Nevertheless, that is what the NRC has done. As discussed in Part II (A), *supra*, WCS's original application provided only for DOE to take title of and transport SNF, and ISP's revised application maintained this illegal condition but added the unrealistic option for private entities taking title to and responsibility for SNF.  The addition of a legal option does nothing to rectify the continued existence of the illegal option contained in the ISP CISF License, which allows ISP to enter contracts with either DOE or SNF Title Holder(s) before commencing operation of the CISF. C.I. 130, ISP License at ¶ 19 ("Prior to commencement of operations, [ISP] shall have an executed contract with the [DOE] or other SNF Title Holder(s) stipulating that the DOE or the other SNF Title Holder(s) is/are responsible for funding operations required for storing the material"); *id.* at ¶ 15(1) (such contracts must "include provisions requiring clients

---

[8] Similarly, NRC regulations are silent as to any explicit NRC authority to license a CISF. In fact, nowhere in 10 C.F.R. Part 72, or any other NRC promulgated regulation, is the term "consolidated interim storage facility" defined or even mentioned.

to retain title to the material . . . and include provisions allocating legal and financial liability among the Licensee and the client(s).”). The inclusion of a condition allowing the ISP CISF to store DOE-titled SNF violates the plain language of the NWPA.  Indeed, the NRC itself has openly admitted that the CISF license application contains a condition that violates existing NWPA law. Oral Arguments in the *Matter of Interim Storage Partners*, LLC, Docket No. 72-1050-ISFSI (July 10, 2010) at pp. 25-26 (J. Ryerson speculating as to future changes in the NWPA law and stating “there’s certainly a possibility that DOE – Congress could make DOE a lawful customer here,” while further explaining that “whether there are, in fact, private entities out there that want to contract with this [ISP CISF] facility, that’s not primarily our concern, as long as the NRC is assured that this will be constructed safely, and if operated, operated safely.”)

### C.   The NRC’s Allowance of Illegal NWPA Violating Conditions Tainted Its Entire Decision-Making Process in Violation of APA and NEPA

The NRC abused its discretion in knowingly preparing a final EIS and associated record of decision and issuing the ISP License contingent on a hypothetical condition that violates the plain language of the NWPA. C.I. 130, ISP License at ¶ 19. The NRC’s allowance for such unlawful NWPA violating conditions have precluded any good faith or objective hard look at the environmental impacts of the ISP CISF or alternatives by concealing the environmental influences, serious

and significant risks, real costs and benefits, and adverse environmental and cumulative impacts, as discussed herein. In sum, the NRC's preparation of the EIS and record of decision are tainted by inclusion of either a License contingent condition that is undeniably unlawful or a License contingent condition that has not been fully or comprehensively analyzed, for which relevant factors have not been identified or disclosed to the public, which heavily favors private entity interests, and which do not make business sense. The NRC's actions are not in accordance with law and permeate its entire decision-making process to the detriment of meaningful public participation and informed government choices in violation of the APA and NEPA.

The NRC's solution to this and other issues was to proclaim such issues to be outside the scope of the EIS. The NRC's publication of its EIS Scoping Summary, published two and half years after NRC held less than a handful of public meetings to discuss ISP CISF impacts, summarily states without any justification or support that: "[i]ssues relating to title to spent fuel are primarily outside the scope of this EIS because who holds title will likely not influence the environmental impacts of the proposed action." The NRC further stated that whether or not the federal government

versus a private entity is responsible for administering nuclear storage "is a matter of policy and is outside the scope of [the ISP] EIS." C.I. 77 at B-17.[9]

This is not true and is misleading to the public. Whoever administers nuclear storage, holds title to SNF, and is responsible for transporting nuclear waste has very substantial and significant impacts on the benefits, costs, safety and transportation risks of the ISP CISF project. The impacts will be different, depending on whether that person is the DOE or a private entity. *See* C.I. 125, ISP EIS at D-131 (NRC responding to concerns relating to cost considerations and liability for accidents that "ISP has a proposed license condition addressing liability and financial assurance with its customers that would be applicable to events"); *id.* at 2-22 (the NRC eliminated storage at government-owned CISF as a reasonable alternative because it is only in the "planning stages" and "SNF transportation options and details" for DOE's operation "that would be needed for a comparison of environmental impacts" were not provided); *id.* at D.2.9.7; D.2.9.12; D.2.9.13; D.2.9.16; D.2.9.19. Contrary to its own statements in the ISP EIS indicating that differences do indeed exist depending on ISP's "customer," the NRC refused to analyze or present any

---

[9] The NRC used this same tactic to avoid its NEPA obligations with respect to the purpose and need statement of the EIS, stating that it "has no role in the planning decisions of private entities." *Id.* at D.2.2.17; C.I. 77 at B-14. Similarly, responding to comments in opposition to the draft EIS relating to feasibility or position of SNF Title Holders with respect to the ISP CISF, it stated, "the NRC has no role in the planning decisions of private entities." C.I. 125, ISP EIS at D.2.5.1.

information on these pertinent differences in impact, summarily stating that issues of title and transport are "outside the scope" or will "likely have no impact" on the ISP EIS.

The NRC, under NEPA, cannot refuse to gather information or fail to analyze environmental impacts or costs and benefits because the proposed action is being operated by private entities. Nor can the NRC, under its own regulations, entirely omit discussion of relevant factors. *See* 51 C.F.R. § 51.71(d) (requiring at least qualitative discussion for factors that cannot be quantified). The complete absence of information or discussion relating to comparative differences of environmental impacts depending on the entity responsible for transport of SNF fails the first two criteria of this Court's test to determining the adequacy of an EIS. The NRC has not taken a hard look (or any comparative look) at the environmental consequences and its failure to provide such information prevents those not participating in the preparation of the EIS to understand and consider the pertinent environmental influences and relevant factors in play in the equation.

## II. THE NRC'S INCONSISTENT AND UNREASONABLE ASSUMPTIONS AS TO A DATE FOR ESTABLISHING A PERMANENT REPOSITORY WERE ARBITRARY AND CAPRICIOUS

The NRC's fatally flawed assumption as to a date when a permanent repository will be established defy common sense, runs contrary to the NRC's own public statements, flies in the face of agency allocated budgetary constraints, and is

inconsistent throughout the EIS and its rationalizations for use of underlying assumptions and data to project future risks and costs. This is unacceptable under NEPA and the NRC's own regulations and conceals relevant factors influencing potential impacts to the public. There is glaring absence of any good faith or objectivity here – central to an EIS.

On the one hand, and for certain environmental impacts, the NRC claims that its preparation of the EIS is limited to the 40-year license term, C.I. 125 at iii, with the stated need centered on the ISP CISF's actions in providing off-site storage *before a permanent repository is established, id.* at 1-3 (emphasis added). Yet throughout the EIS, it relies on various underlying assumptions and dates for establishing a permanent repository, the most common of which is 2048—a date that is clearly within the 40-year ISP license timeframe and subject to the NRC's analysis for purposes of the EIS and NEPA. *Id.* at D.2.6.5; D26 to D27; 2-2 ("[b]y the end of the license term of the proposed CISF, the NRC staff expects that the SNF stored at the proposed facility would have been shipped to a permanent geologic repository" consistent with NUREG-2157 and the NRC's conclusion that "the reasonable period for the development of a repository is approximately 25 to 35 years (i.e., the repository is available by 2048") (citing NUREG-2157 (NRC, 2014)). On the other hand, the NRC claims it need not complete or present any evaluation or assessments associated with the safety risks, impacts or costs of SNF transport to a permanent

repository for purposes of the ISP EIS. C.I. 77 at B-13 (NRC noting that the environmental analysis for the EIS "assumes that fuel will be transported away at the end of the initial 40-year license period" but that evaluation of impacts of SNF disposal or indefinite storage are "outside the scope of this EIS" because "consistent with current national policy, disposal in a permanent repository is feasible.") (citing NUREG-2157 (NRC, 2014)).

The NRC has provided no additional support or evidence for its assumption that a permanent repository will be established by 2048.[10] This is a fundamentally flawed premise refuted by countless commentators, including Petitioners and their experts, throughout the ISP decision-making process. *See e.g.,* C.I. 127; 128 (noting "interim" status is "deliberately misleading . . . since a permanent repository does not exist to eventually accept the waste, nor is there a reasonable evidentiary basis for NRC to so find."); 984; 1128; 1295; 1560 (asserting the "assumption is at best counterfactual"); *see also,* C.I. 77 at B-13 (NRC listing "large number of comments expressing concern that the proposed CISF would not be an interim storage facility" but instead become a *de facto* permanent facility because of the lack of intention to

---

[10] It is worth noting that the NRC's EIS in the Public Fuel Storage proceeding in 2001, used as underlying support for analysis and certain sections of NUREG-2157, asserted that a "permanent geologic repository is projected to be completed by DOE and could begin receiving commercial reactor SNF by 2010." PFS EIS at xxxiii.

move SNF twice, unlikelihood of additional funding for constructing a repository and absence of existing repository currently).

There is no good faith objectivity with respect to the NRC's assertion that a repository will be established by 2048. The NRC cannot reconcile its position that a repository will be established within the 40-year time frame of the ISP license, contrary to the stated objective in the purpose and need statement to provide off-site storage *before a permanent repository is established*, with NRC's refusal to consider transportation impacts and adverse effects of connected activity of transporting SNF from the ISP CISF to a permanent repository.

The NRC's improper segmentation and piecemeal approach to the indispensable connected activity of transporting radioactive waste to the CISF for storage and inconsistent reliance on various historical evaluations and other agency evaluations with disparate underlying assumptions paints a painfully distorted picture of the cumulative impacts of the proposed ISP action or worse leaves an entirely blank canvas, failing to evaluate relevant risks and impacts or alternatives entirely.

## III.  THE NRC ADOPTED AN UNREASONABLY NARROW PURPOSE AND NEED STATEMENT AND FAILED TO CONSIDER A SINGLE REASONABLE ALTERNATIVE

The NRC accepted ISP's purpose and need statement, which was narrowly written to consider only the interest of private entities and allowed the NRC to

eliminate reasonable alternatives from consideration. The EIS considered only the impacts of the proposed action and no action. C.I. 125 at iii ("After weighing the impacts of the proposed action and comparing to the No-Action alternative the NRC staff . . . sets forth its [NEPA] recommendation regarding the proposed action."). The NRC's recommendation was not based on a reasoned decision between any alternatives.

### A. The NRC's Unreasonably Narrow Purpose and Need Statement Ignored Congressional Views in Favor of Private Entities

"EIS discusses the purpose and need for the proposed action to establish a range of reasonable alternatives, in addition to the proposed action, that can satisfy the underlying need." C.I. 77 at B-14. An analysis of the range of reasonable alternatives starts with a determination of whether the purpose and need statement was reasonable. *Westlands Water Dist. v. U.S. Dept. of Interior,* 376 F.3d 853, 865 (9th Cir. 2004). Courts evaluate statements of purpose and need under a reasonableness standard. *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1066-67 (9th Cir. 1998). An agency cannot define its objectives in unreasonably narrow terms such that only one alternative would accomplish the goals of the project. *Cachil Dehe Band of Wintun Indians of Colusa Indian Community v. Zink,* 889 F.3d 584, 603 (9th Cir. 2018).

The EIS' statement of purpose and need indicates that the proposed CISF is needed to provide away-from-reactor storage capacity before a permanent repository

is available and further states that this away-from-reactor storage capacity is needed

so that stored SNF at decommissioned reactor sites may be removed and the land at

these sites could be made available for other uses. C.I. 125 at 1-3. The NRC

wholesale adopted ISP's purpose and need statement, which serves solely private

entity interests (as opposed to agency interests) for off-site storage. The NRC has

failed in gathering any information of such private entity interests or independently

verifying or analyzing the veracity of purported interests, purposes or need. This is

particularly troublesome here, where the NRC lacks explicit statutory or regulatory

authority to license a CISF in the first place. *Cf. Bullcreek,* 359 F.3d at 538 (courts

have recognized that AEA confers authority for NRC to license and regulate storage

and disposal of SNF).

     While some courts have held that agencies must acknowledge private goals,

"[r]equiring agencies to consider private objectives, however, is a far cry from

mandating that those private interests define the scope of the proposed project."

*Nat'l Parks & Conservation Ass'n v. BLM,* 606 F.3d 1058, 1072 (9th Cir. 2010)

(quoting *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C. Cir.

1991)); *see also Simmons v. U.S. Army Corps of Engineers,* 120 F.3d 664 (7th Cir.

1997). When considering purpose and need statements, agencies must first and

foremost "always consider the views of Congress, expressed, to the extent that the

agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives." *Nat'l Parks,* 606 F.3d at 1070.

And Congress has suggested in the NWPA that its directives are not meant "to encourage, authorize or require" private off-site storage. *See* 42 U.S.C. § 10155 (with respect to storage of SNF that "nothing in this chapter shall be construed to encourage, authorize, or require the private or Federal use, purchase, lease, or other acquisition of any storage facility located away from the site of a civilian nuclear power reactor and not owned by the Federal Government on January 7, 1983"). Making land at decommissioned sites available for other uses is not one of the goals of the NRC or Congress in enacting the NWPA or AEA, and the NRC did not point to any such goal in support of its purpose and need statement in the EIS.

Numerous commentors have challenged the scope and fit of ISP's purpose and need statement to the ISP CISF project, imploring the NRC to draft a statement that accurately and realistically reflects the goals of the agency and Congressional directives (as opposed to private entity interests) that, consistent with NEPA, presents alternatives and permits reasoned decision-making between those options. *See, e.g.,* C.I. 128, 175, 1560.

True to form, each and every comment was met with the same response by the NRC ("no changes were made in the EIS in response to these comments"), reiterations that the NRC does not get involved in private business decisions, and

persistent refusal to engage in any meaningful comparative analysis of commercial feasibility and alternatives. *Id.;* Rec. I.D. Doc. 125 at D.2.5.1.

The NRC has not presented any information or investigated the reliability of the underlying premise for the stated private entity need or that decommissioning sites to make them available for other uses would be economically beneficial or even possible. And the need for private off-site storage is contrary to Congressional policy and not a need of the NRC as an agency. As such, the EIS's purpose and need statement should be rejected.

**B.    The NRC's Failure to Evaluate a Single Reasonable Alternative is Unreasonable and Inconsistent with Its Own Guidance and Regulations with Prior Agency EISs**

!

The NRC's adoption of ISP's narrow purpose and need statement here allowed the agency to improperly reject a number of reasonable alternatives to the proposed CISF action in its EIS. As a result, there was no hard look taken of the environmental consequences of the proposed action as compared to alternatives and no ability to make a reasoned choice among different courses of action. Courts have duly noted that "blindly adopting the applicant's goal is 'a losing proposition' because it does not allow for the full consideration of alternatives required by NEPA." *Envt'l Law and Policy Center v. NRC,* 470 F.3d 676, 683 (7th Cir. 2006). The NRC's own guidance document indicates that the purpose and need statement

"should not be written merely as a justification for the proposed action, nor to alter the choice of alternatives." NUREG-1748 (NRC, 2003) at 5-2.

The importance of the alternatives analysis is reflected in the first criteria of the Fifth Circuit's three-part test for evaluating the adequacy of an EIS—whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives. *City of Shoreacres,* 420 F.3d at 450.

> An essential feature of an EIS is its analysis of alternatives to the proposed action. This alternatives analysis, described by the relevant regulation as 'the heart of the environmental impact statement[,]' must '[r]igorously explore and objectively evaluate all reasonable alternatives' to the proposed action, including the 'no-action alternative' in which it is assumed that the project does not go forward.

*Id.* (quoting 40 C.F.R. § 1502.14).

Similarly, NRC's guidance and regulations clearly recommend that all alternatives, including the "no action" alternative, should receive equal and objective treatment. *See* NUREG 1748, Section 5.2 (NRC further recommending discussion of alternatives in parallel with similar types of descriptions and presentations to make comparisons clearer for the reader).

NRC violated its own guidance and regulations in its failure to consider a single reasonable alternative and to analyze the no action alternative.

### i.    The NRC unreasonably rejected reasonable alternatives

The EIS considered only the proposed action and the no action alternative.[11]
While there is no magic number of reasonable alternatives designated, NRC's
complete lack of consideration for any alternatives hopelessly fails the good faith
objectivity test here and flies in the face of central premise of conducting a NEPA
EIS. First, NRC refused to evaluate a single reasonable alternative to the ISP CISF,
despite existence of an already licensed CISF with the same stated purpose and need.
Second, NRC disregarded the proposed Holtec CISF as an alternative with an almost
identical stated purpose and need. Finally, the absence of evaluation of a single
reasonable alternative in the EIS analysis is inconsistent with agency's prior NRC
EISs for ISFSIs.

Issues and concerns relating to alternatives were initially raised by several
commentors, including Petitioners, during the initial scoping process. *See, e.g.,* C.I.
77 at B-17 to B-19 (commentors noting CEQ guidance requires NRC to evaluate
reasonable alternatives, including those not proposed by the applicant and outside

---

[11] The no action alternative is included in the EIS as a baseline. NUREG-1748 §
5.2.3. It is not a true "alternative" because it cannot achieve, through alternative
means, the same objectives as the proposed project. *Id.* at § 5.2. Moreover, the
increased risk of severe environmental consequences from moving an acceptable
status quo to the more dangerous path of moving thousands of metric unit tons of
SNF (at least twice) is never justified and runs contrary to Congressional directives
under NWPA to minimize transport of such materials.

the jurisdiction of NRC; NRC responding that it will evaluate the potential environmental impacts of the proposed ISP CISF and the "no-action" alternative as a baseline, alternative technologies suggested in comments are outside the scope as "only those alternatives that are currently available are considered reasonable and feasible" and no meaningful response provided to comments suggesting alternatives to the proposed site location in the Permian Basin). For example, in response to hardened on site storage as an alternative, NRC responded that its "safety and environmental review is limited to an evaluation of the proposed CISF as described in ISP's license application" and proposed alternative concepts "are not being analyzed in detail because they do not meet the purpose and need of the proposed action (construction and operation of a CISF)."  C.I. 77 at B-18.

Similar comments and points of view were presented to the agency in response to the draft EIS. C.I. 1560 at 70 (pointing out draft EIS lacks cost and benefit analysis of credible alternatives contrary to NRC regulations (10 C.F.R. § 51.71(d)) and NRC guidance requiring analysis of alternatives); *id.* at 76 (without a comparative analysis between ISP and Holtec CISFs, NRC lacks rationale for choosing to license only one and public is unable to determine which it prefers, draft EIS offers only qualitative discussion and mere speculation); *id.* at 5 (noting ISP and Holtec CISFs are proceeding along NRC tracks that essentially deny the relevance of the other); *id.* (suggesting complete and total absence of any cost and benefit analyses for

reasonable alternatives fails to inform the NRC and the public and this error occurred in part because the baseline is improperly treated as if it were a bona fide alternative which cannot be so because it cannot substantially achieve the purpose and goals of the CISF); *id.* at 37-38 (identifying at least three alternatives that should have been included in cost benefit analysis: multiple CISFs, defueling to another CISF instead of a permanent repository and storage for longer periods of time than proposed in application).

Petitioners also submitted expert comments from Great Ecology in response to the NRC's publication of the final EIS identifying additional deficiencies: noting NRC's analysis and responses to alternatives "do[] not explicitly state objective criteria to eliminate alternatives . . . [include] [n]arrowly written purpose and need . . . designed to limit alternative review . . . [and] fail[] to adequately acknowledge the possibility that the ISP project may in fact become *de facto* permanent storage without better assurances to the contrary." C.I. 128, Great Ecology at 6.

> [The ISP EIS] does not explicitly state objective criteria used to eliminate alternatives instead eliminating some alternatives based on the stage of development, speculative nature of technologies, or the failure of an alternative to meet the proposed action's purpose and need. If an alternative is eliminated from further consideration because it "does not meet the purpose and need," the lead agency must adequately

explain how or why this alternative doesn't meet the purpose and need (USDOT 2021).

*Id.*

The NRC did not identify any objective criteria up-front that would be used to eliminate alternatives, offering only after-the-fact rationalizations for its elimination of reasonable and existing alternatives to the ISP CISF. Further, NRC's arbitrary elimination of all reasonable alternatives fails to identify and quantify the significant and relevant external environmental impacts in violation of NEPA's core purposes. *See generally* C.I. 1560 (assessing risks and costs for potential alternatives separately and devoid of comparative and proper cost and benefit analyses for alternatives or consideration of economic, technical and other benefits and costs of the alternatives).

The NRC cannot retrospectively eliminate required NEPA assessments of impacts by claiming they are "outside the scope," would be speculative, or are the responsibility of another party. NRC's own NEPA implementing regulations mandate that DEIS and FEIS "will identify any methodologies used and sources relied upon, and will be supported by evidence that the necessary environmental analyses have been made." 10 C.F.R. §§ 51.70(b), 51.90. Such evaluations demand agency transparency. The NRC has a responsibility to the public and statutorily defined duties to meaningfully assess the risks and impacts of the proposed action and it has failed to do so here.

ii.    **Private Fuel Storage ISFSI**

The NRC granted a license to Private Fuel Storage ("PFS") to operate as an

ISFSI in nearby Utah.[12] PFS Materials License No. SNM-2513, *available at:*

https://www.nrc.gov/docs/ML0604/ML060450438.pdf; *see also,* Final EIS for the

Construction and Operation of an ISFSI on the Reservation of the Skull Valley Band

of Goshute Indians and the Related Transportation Facility in Tooele County, Utah,

Docket No. 72-22, NUREG-1714, Vol. 1 (Dec. 2001) at iii, *available at:*

https://www.nrc.gov/docs/ML0201/ML020150217.pdf

The PFS EIS, like the ISP EIS, involved private entity interim storage facility

operators focused on the needs of the nuclear power reactor licensees. They serve

essentially the same overlapping purpose and need. PFS EIS at xxxii – xxxiii (stated

purpose to "serve as a safe, efficient, and economical alternative to continued SNF

storage at reactor sites," noting as part of rationale for need that "permanently shut-

---

[12] Respondents here have repeatedly drawn comparisons between NRC's actions
with respect to ISP and the PFS ISFSI (and for further justification of CISFs). *See*
Respondents' Motion to Dismiss, Doc. #00516114195 (Dec. 2, 2021) at 6.
However, there are several points of departure worth noting here. Unlike the ISP
CISF, the PFS ISFSI: (i) never proposed interim storage for DOE or federal
government owned SNF; (ii) agreements to remove SNF from PFS facility "not
dependent upon availability of a permanent geologic repository" meaning reactor
licensees remain responsible to move the nuclear waste from site if PFS license is
terminated, PFS EIS at xxxii; (iii) EIS considered several reasonable alternatives to
the proposed action, including alternative site locations; (iv) EIS contemplated
intermodal transfer facilities; and (v) no-action alternative was evaluated and
compared with other alternatives.

down reactors could be decommissioned sooner, resulting in savings to the reactor licensees and earlier use of the land for other activities"). *Cf.* ISP EIS at xviii (stated purpose to "provide an option for storing SNF, GTCC, and a small quantity of MOX from nuclear power reactors before a permanent repository is available" with need for additional away-from-reactor storage "so that stored SNF at decommissioned reactor sites may be removed so the land at these sites is available for other uses" and carefully noting that "NRC has no role in a company's business decision to submit a license application to operate a CISF at a particular location."). NRC, being the agency that licensed PFS, had information at its fingertips to conduct the comparative analysis but failed to do so and failed to provide justification for same.

Despite the NRC being the agency responsible for licensing PFS, it misrepresented the present status of the PFS license as "terminated" in its publication of the draft ISP EIS. It was not until NRC's subsequent publication of the final EIS that it acknowledged "that the NRC license for the PFS facility (Material License No. SNM-2513) has not been terminated." C.I. 125 at D.2.33.1, D-162; *id.* at 1-3 ("NRC has previously licensed a [CISF] installation (the Private Fuel Storage facility in Toelle County, Utah)"). However, NRC's late recognition of its already licensed PFS that serves overlapping purpose and need was not included in NRC's consideration of reasonable alternatives nor was any justification given for its

decision to eliminate PFS as a reasonable alternative. *Id.* ("No changes were made to the EIS as a result of these comments.")

The absence of evaluation of a single reasonable alternative in the EIS analysis is inconsistent with the agency's prior preparation of the PFS EIS. Unlike here, with the PFS EIS, the NRC considered three alternatives reasonable to the stated need and purpose, gathering comprehensive information on costs and benefits of same in its analysis of environmental consequences. NUREG-1714 (NRC, Dec. 2001); *see also,* C.I. 128 at 6 (noting the inconsistencies in NRC's evaluations of alternatives in that NRC "compiled an FEIS for a proposed CISF storage facility in Utah that incorporated three different alternatives for analysis, including alternatives for technology, sites, and transportation options").

Highlighting its NEPA obligations, the NRC's PFS EIS clearly demonstrates there is substantial federal agency overlap in the responsibilities and assessment of impacts from the proposed ISFSI and the "environmental issues that each of these agencies must evaluate pursuant to [NEPA] are interrelated; therefore, the agencies have cooperated in the preparation of this [FEIS], and this document serves to satisfy each agency's statutory responsibilities under NEPA." NUREG-1714 (NRC, Dec. 2001). Despite this, the NRC has repeatedly failed to consult with state and federal organizations in its preparation of the ISP EIS. *See e.g.,* C.I. 125 at D.2.1.13 (lack of consultation with Texas Bureau of Economic Geology); *id.* at D.2.1.10 ("NRC

expects that all licensees will abide by all other applicable Federal, State and local regulations, however the NRC may only take enforcement action within the scope of its regulatory jurisdiction"); 137, 534, 1128.

### iii.    Holtec CISF

In March 2017, Holtec submitted a license application seeking to construct and operate a CISF with ultimate maximum storage capacity of 100,000 MTUs in Lea County, New Mexico, located less than 50 miles from the ISP CISF. C.I. 125 5-6 to 5-7.

The NRC arbitrarily and capriciously refused to consider the proposed Holtec CISF as a reasonable alternative to the ISP CISF and failed to provide any meaningful comparative information for same, despite their nearly verbatim stated purpose and need and the agency's exclusive access to comprehensive information on the environmental impacts.

As Petitioners presented in their comments, while the NRC considered potential impacts of the Holtec CISF from the perspective of private entities (i.e., on potential demand for use of storage at the ISP CISF and potential delays in transporting SNF to the ISP CISF), it fails to disclose the full breadth of environmental consequences and particularly those impacts felt within the immediate region. C.I. 125; 128 (noting operational factors and transportation related issues depending on who retains title and responsibility for the waste should

have been considered, including but not limited to: "operating protocols on shipment safety," "level of emergency preparedness along likely shipping routes," "requisite coordination and communication with affected states, tribes and other important stakeholders," and "analysis of the impact on shipment numbers and safety of using any of the variety of transportation casks that are licensed for use").

### iv. The NRC Ignored Obvious and Apparent Cumulative and Synergistic Impacts from the Holtec CISF

Cumulative impacts under NEPA are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or nfon-federal) or person undertakes such actions." 40 C.F.R. § 1508.7.

NEPA and NRC's own implementing regulations further require the Commission to consider "the alternatives available for reducing or avoiding adverse environmental and other effects." 10 C.F.R. § 51.71(d) (incorporated by reference in 10 C.F.R. § 51.90); *see also,* 42 U.S.C. § 4332I(ii)-(iii); 10 C.F.R. § 51.45(b)(2)(3). Likewise, agencies preparing a site specific EIS, must consider "alternatives for reducing adverse impacts" to mitigate severe accidents (or SAMAs). 10 C.F.R. § 51.53(c)(3)(iii).

As with PFS, the NRC is the agency responsible for licensing the Holtec CISF and has comprehensive information for comparison and synergistic impact purposes

at its fingertips. Given its close proximity, inevitable competition for remote rural resources and water, and use of a single rail line with access to both facilities, the NRC is without justification for refusing to consider the Holtec CISF as a reasonable alternative and presenting a comparative analysis on the impacts. At a minimum, the NRC is tasked with taking a hard look at the cumulative site-specific impacts and synergistic effects of the proposed Holtec CISF.

The NRC has selectively and inexplicably discounted the cumulative impacts and synergistic effects of locating the proposed Holtec CISF within 50 miles of the ISP CISF. C.I. 125 at 5-6 to 5-7 (NRC acknowledging that "detailed information about the Holtec proposal is available" and that the Holtec CISF is a "reasonably foreseeable future action" but including this information in its discretion "where appropriate" in the ISP EIS). For example, the EIS "assumes all transportation impacts would be incremental over time" but impacts of nationwide transport of SNF to two facilities in the Permian Basin region and its importance as storage destination will result in more than incremental impacts. C.I. 128 at 10. The EIS further "downplays the nationwide extent" and "sensitive receptors near the rail networks" in addition to transport needs requiring "both well-maintained infrastructure and highly specialized emergency response equipment and personnel that can quickly respond to an incident at the facility or on transit routes." *Id.*

46

The NRC's refusal to consider alternatives and untimely admissions defy NEPA requirements for timely and transparent decision making. NRC's actions further fail the Fifth Circuit's good faith objectivity requirement.

## IV. THE NRC ACTED ARBITRARILY AND CAPRICIOUSLY IN VIOLATION OF NEPA AND THE APA IN ACCEPTING ISP'S UNREASONABLE SITE SELECTION AND FAILING TO CONSIDER SITE-SPECIFIC ENVIRONMENTAL IMPACTS BEFORE ISSUING FINAL DECISION

NEPA does not "permit an agency to act first and comply later." *Oglala Sioux Tribe*, 896 F.3d at 523. Thus, it is well-established that whether the NRC's environmental impacts "analysis is generic or site-by-site, it must be thorough and comprehensive." *New York v. NRC,* 681 F.3d 471, 481 (D.C. Cir. 2012). As the NRC itself recognizes, even when applying a generic EIS, like its Continued Storage analysis, to the EIS, "when it comes to 'size, operational characteristics, and *location of the facility*, the NRC will evaluate the *site-specific impacts* of the construction and operation of any proposed facility as part of that facility's licensing process." C.I. 125, ISP EIS at 5-15 (emphasis added).

Much like the NRC's wholesale acceptance of ISP's private entity interest favored purpose and need statement that unreasonably precluded analysis of alternatives, the NRC has also blindly accepted ISP's site-selection process, which unreasonably precluded NRC's evaluation of alternative site locations to mitigate potential impacts. C.I. 125 at D.2.7.3 (NRC defending the site selection process as

reasonable because it "included factors (i.e., criteria) related to socioeconomics, land use and environmental protections) . . . and determined the ISP process appears reasonable").

This allowed ISP to present its version of reasonable alternative technologies and reasonable alternative site locations and its rationale for eliminating same. But the NRC has yet to present its good faith objective evaluation on alternatives or site-specific impacts.  The NRC's failure to comprehensively and independently consider site-specific impacts such as socioeconomics, land use, transportation and ecological effects prevent the NRC from taking the required hard look at the environmental consequences of the ISP CISF project. And the NRC cannot remedy its failure to gather comprehensive information early-on during the planning stages as to the site and design of the ISP CISF with its later failure to analyze site-specific impacts.

NRC cannot blindly accept locating consolidated nuclear storage in the middle of the nation's most productive oil hub, without thoroughly investigating the risks and benefits. The NRC's EIS fails to comprehensively evaluate the risks of transporting high-level nuclear waste into and out of the region and presents no analysis or consideration of terrorist or attacks of malice and sabotage.  As discussed below, NRC's rubber-stamped approval of ISP's site selection and use of arbitrary and variable radii to evaluate "site-specific" cumulative impacts are outcome-oriented, pre-determined to conclude no effect or very little effect and fail to capture

the scope and geography of the impacts.  Further, NRC has ignored its continuing duty to consider new and material information relevant to site selection and evaluation, for example, multiple resolutions passed banning the transport and/or storage of nuclear waste in the region or passage of legislation which prohibits required permits for the ISP CISF.

In sum, the NRC has not taken a hard look at the environmental impacts to the region or made any good faith effort to analyze the site-specific impacts of the ISP CISF sites in the heart of the Permian Basin.

## A.    NRC's Acceptance of ISP's Unreasonable Site Selection

NRC's EIS assessments first and foremost failed to consider major viewpoints and opposing viewpoints in violation of NEPA and NRC's own regulations implementing NEPA. *See e.g.,* 10 C.F.R. § 51.91(b) ("[final EIS] will discuss any relevant responsible opposing view not adequately discussed in the [draft EIS] or in any supplement to the [draft EIS], and respond to the issues raised").

Without justification, the NRC inexplicably deemed ISP's site selection process as "reasonable" while blatantly disregarding fierce oppositions from the governors and host communities. C.I. 127, 1128, and 1295. It is unreasonable for NRC to find ISP's process and the preferred selection of Andrews County as "reasonable" when the primary selection criteria is the willingness and support of hosting community in light of the acknowledged and overwhelming opposition

demonstrated over past several years, the countless resolutions passed by counties and cities opposing the transport of nuclear waste and CISFs generally within the region and the recent unanimously passed bipartisan vote on House Bill 7.

Beyond the primary criteria of community support sorely lacking here, secondary considerations of ISP's site selection process would further preclude selection of Andrews County given the geologic unsuitability of placing a possible *de facto* permanent nuclear waste storage facility amidst the nation's valuable mineral resources given the potentially devastating adverse impacts it could have on extensive and ongoing extraction operations serving as the cornerstones of regional economies. Governor Abbott expressed opposition "to forcing states with low-level radioactive waste to accept more highly radioactive waste and its accompanying hazards without the consent of the state." Texas Governor Abbott Letter to then President Trump, (Sept. 30, 2020) (noting associated CISF risks of "lack of permanent storage facility" and highlighting the "importance of the Permian Basin to the economy and energy security.")

Not only has Andrews County passed a resolution banning the transportation of high-level radioactive waste in the County, in September 2021, the Texas legislature passed House Bill 7, which, effective immediately, bans the storage and disposal of SNF in Texas and prohibits issuance of certain permits necessary to the operation and construction of the ISP CISF. *See* C.I. 127 (reiterating that "the

proposed ISP facility is unacceptable to the State of Texas" and highlighting "serious concerns with the design" of the ISP CISF and "with locating it in an area that is essential to the country's energy security").

The NRC has a continuing duty to investigate new and material information that could impact environmental consequences of a proposed action. Yet the NRC has blatantly ignored and brushed aside the importance of these legal developments. *See* C.I. 137. This new information and potential state law impeding the construction and operation of the ISP CISF would clearly impact myriad of perceived costs and benefits of the project. The EIS does not address or discuss how the ISP CISF could operate given these legal conflicts.

**B.      The NRC's Use of Variable Radii to Minimize Perceived Impacts Was Inconsistent and Failed to Adequately Capture the Scope of Site-Specific Impacts**

Because the government stands by the reliability of the information and conclusions in its EISs, they are often used as references for a broad array of decisions. As such, NEPA requires reasonably thorough and comprehensive information gathering with one key purpose of preparing an EIS to ensure that federal agencies "*will not act on incomplete information, only to regret [their] decision after it is too late to correct." Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) (emphasis added).

NRC's use of variable radii to assess cumulative impacts is improper and inconsistent, failing to thoroughly evaluate the impacts in the proper vicinity of the ISP CISF. As noted by Great Ecology, NRC's use of radii for cumulative impacts "are variable and are not applied across all categories" with "many cumulative impacts [] evaluated across geographic scales that do not accurately represent the scope and scale of potential impacts or underlying social, ecological, geological or hydrological processes." C.I. 128, Great Ecology Report at 7.

Table 1: Variable Radii for Environmental and Cumulative Impacts Analysis, ISP FEIS

| Impact Type* | NEPA Category | Radius of Evaluation |
|---|---|---|
| Environmental | Ecology | 2 miles |
| | Air Quality | |
| | Historical & Cultural Resources | |
| | Visual & Scenic Resources | |
| | Land Use | 5 miles |
| | Transportation | |
| | Geology & Soils | |
| | Water Resources | |
| | Environmental Justice | 50 miles |
| | Public & Occupational Health | |
| | Waste Management | |
| | Socioeconomic | Andrews County and Gaines County, TX; Lea County, NM |
| Cumulative | Land Use | 5 miles |
| | Ecology | |
| | Air Quality | 6 miles |
| | Noise | |
| | Visual & Scenic Resources | |
| | Historical & Cultural Resources | 10 miles |
| | Groundwater | 20 miles |
| | Transportation | 50 miles |
| | Geology & Soils | |
| | Water Resources | |
| | Environmental Justice | |
| | Public & Occupational Health | |
| | Waste Management | |
| | Socioeconomic | Andrews County and Gaines County, TX; Lea County, NM |

Throughout the process Petitioners have presented multiple forms of evidence to support the common-sense notion that storage of nuclear waste should not be in the Permian Basin, which have been repeatedly ignored by the NRC. C.I. 128, 984,

Comments of PBLRO member and Fasken representative Tommy Taylor (Nov. 19, 2018) (Fasken owning "approximately one-eighth of the surface land and minerals that make up Andrews County" highlighting fictious representations as to consent; ISP failure to present methodology for specific risks to land, minerals and agriculture as well as any objective analysis of impacts on those values should a leak or exposure occur; and opposing the granting of NRC license based on ISP application "that is an exercise in self-study and self-assessment" that lacks objectivity and sufficient data); 1477, 1522, 1560

It is also well understood that historical land use and reasonable future land use in the Permian Basin will inevitably involve mineral resource extraction and production operations that are incompatible with storage of nuclear waste. Despite the extensive regional operations in the area, the NRC's EIS, without rationale justification to choose to limit its assessment of cumulative impacts for land use to mere 10km (6.2mi). C.I. 125, ISP EIS at 5-15 ("cumulative impacts on land use were not assessed beyond 10km . . . because, at that distance, land uses would not be anticipated to influence or be influenced by the proposed CISF project").

Use of unnecessarily narrow radii of 5 miles to evaluate impacts on geology and soils and land use for the proposed project, given the connected activity of multiple rounds of nationwide transport of nuclear waste and given past, present and reasonable future industry operations with subsurface extraction operations is

wholly inappropriate. Merely looking at the near vicinity of the project area in a vacuum misses the point, ignores the landscape and land uses in the region where nuclear waste will inevitably be travelling and fails to take a "hard look" at the impacts over the lifetime of the project (which may be indefinitely).

Further, limiting impact evaluations to this limited area also fails to adequately address the status or risk assessment for the over 600 boreholes in the vicinity of the ISP site which have the potential to cause sinkholes, substantial subsidence and potential groundwater pathways for contaminants. *See* CLI-20-14; C.I. 1386.

NRC's arbitrary use of variable radii to assess different categories of cumulative and environmental impacts fails to capture bigger picture and improperly minimizes the perceived adverse impacts for the proposed action in violation of NEPA and NRC guidance policies. *See* C.I. 1560 at 7-9.  Analyzing land-use impacts at a 5-mile radius while assessing socioeconomic impacts in a "region of influence" and 50-mile radius fails to capture the adverse impacts the proposed project will have on local industries' land use, while relying on local industries' establishment of labor and existing infrastructure when looking at the bigger picture. *See* C.I. 125, ISP EIS at 3-80. NRC and the applicant cannot pick and choose its perspective when assessing a proposed action of this magnitude that is inextricably to transport of storage within the Permian Basin.

# CONCLUSION

The NRC is without discretion to comply with anything less than all the mandates of NEPA and it has failed in a spectacular fashion to do so here. The agency's purported look into the environmental consequences of the ISP CISF is glaringly absent, incomplete, inadequate, and/or inconsistent, incorporating fundamentally flawed generic assumptions and ignoring site-specific cumulative impacts, and lacking any foundation for the public or government to make reasoned choices between alternatives or mitigation measures. As such, this Court should suspend further activities on the ISP License until the NRC complies with applicable law, and remand to the NRC to make a record on relevant hard factors and influences on environmental impacts and a NEPA appropriate comparative analysis of reasonable alternatives, including a reopening of the record to allow for meaningful public participation after full disclosure.

Dated: February 7, 2022        Respectfully submitted by:

**KANNER & WHITELEY, LLC**

*/s/ Allan Kanner*
Allan Kanner, Esq.
Annemieke M. Tennis, Esq.
701 Camp Street
New Orleans, Louisiana 70130
(504) 524 - 5777
a.kanner@kanner-law.com
a.tennis@kanner-law.com
Counsel for Petitioners Fasken Land and
Minerals, Ltd. and Permian Basin Land and
Royalty Owners

# CERTIFICATE OF SERVICE

I certify that on 7th day of February 2022, I electronically filed the foregoing Brief of Petitioners Fasken Land and Minerals, Ltd.; and Permian Basin Land and Royalty Owners upon counsel for the parties in this action by filing the document electronically through the CM/ECF system. This method of service is calculated to serve counsel at the following e-mail addresses:

Andrew P. Averbach
Andrew.averbach@nrc.gov

Michael Abrams
Michael.Abrams@oag.texas.gov, hollis.duncan@oag.texas.gov,
katrina.shanks@oag.texas.gov, ryan.baasch@oag.texas.gov

Ryan Baasch
Ryan.baasch@oag.texas.gov

Henry Carl Myers
carl.myers@oag.texas.gov, david.laurent@oag.texas.gov,
laura.courtney@oag.texas.gov

Justin Heminger
justin.heminger@usdoj.gov, efile_app.enrd@usdoj.gov

Arnold Bradley Fagg
brad.fagg@morganlewis.com

/s/ Allan Kanner
Allan Kanner
Counsel for Petitioners Fasken Land and
Minerals, Ltd. and Permian Basin Land
and Royalty Owners

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I certify that this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 12,866 words, excluding the parts of the document exempted under Fed. R. App. P. 32(f).

I certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in 14-point Time New Roman, a proportionally spaced font.

Dated:  February 7, 2022                    /s/Allan Kanner
                                            Allan Kanner
                                            Counsel for Fasken Land and
                                            Minerals, Ltd. and Permian Basin
                                            Land and Royalty Owners