No. 21-60743

---

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

STATE OF TEXAS, GREG ABBOTT, Governor of Texas,
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,
FASKEN LAND AND MINERALS, LIMITED, and
PERMIAN BASIN LAND AND ROYALTY OWNERS,
*Petitioners,*

v.

NUCLEAR REGULATORY COMMISSION and
UNITED STATES OF AMERICA,
*Respondents.*

---

On Petition for Review of Action
by the Nuclear Regulatory Commission

---

## FEDERAL RESPONDENTS' PETITION FOR REHEARING EN BANC

TODD KIM
*Assistant Attorney General*

JUSTIN D. HEMINGER
*Senior Litigation Counsel*
Environment and Natural
Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-5442
justin.heminger@usdoj.gov

BROOKE P. CLARK
*General Counsel*

ANDREW P. AVERBACH
*Solicitor*
Office of the General Counsel
U.S. Nuclear Regulatory Commission
11555 Rockville Pike
Rockville, MD 20852
(301) 415-1956
andrew.averbach@nrc.gov

# CERTIFICATE OF INTERESTED PERSONS

No. 21-60743

*State of Texas*
*v.*
*Nuclear Regulatory Commission*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Petitioners

    a. State of Texas

    b. Greg Abbott, Governor of Texas

    c. Texas Commission on Environmental Quality

    d. Fasken Land and Minerals, Ltd.

    e. Permian Basin Land and Royalty Owners

2. Counsel for Petitioners

    a. Michael Abrams, Office of Attorney General, State of Texas

    b. Ryan Baasch, Office of Attorney General, State of Texas

    c. Henry Carl Myers, Office of Attorney General, State of Texas

    d.      Lanora Christine Pettit, Office of Attorney General, State of Texas

    e.      Allan L. Kanner, Kanner & Whiteley, L.L.C.

    f.      Annemieke M. Tennis, Kanner & Whiteley, L.L.C.

    g.      Monica Renee Perales. Fasken Land & Minerals Ltd.

3.    Respondents

    a.      United States Nuclear Regulatory Commission

    b.      United States of America

4.    Counsel for Respondents

    a.      Andrew P. Averbach, U.S. Nuclear Regulatory Commission

    b.      Marian L. Zobler, U.S. Nuclear Regulatory Commisssion (retired)

    c.      Brooke P. Clark, U.S. Nuclear Regulatory Commission

    c.      Todd Kim, U.S. Department of Justice

    d.      Jennifer Scheller Neumann, U.S. Department of Justice

    e.      Justin D. Heminger, U.S. Department of Justice

5.    Respondent-Intervenor

    a.      Interim Storage Partners, LLC

    b.      Orano CIS, LLC

c.    Orano USA, LLC

d.    Orano SA, owned by government of France, Mitsubishi, and
      Japan Nuclear Fuel

e.    Waste Control Specialists, LLC

f.     Fermi Holdings, Inc.

g.    J.F. Lehman & Co.

6.    Counsel for Respondent-Intervenor

a.    Brad Fagg, Morgan, Lewis & Bockius LLP

b.    Ryan K. Lighty, Morgan, Lewis & Bockius LLP

c.    Tim P. Matthews, Morgan, Lewis & Bockius LLP

/s/ Andrew P. Averbach
ANDREW P. AVERBACH

Attorney of Record for Respondent
U.S. Nuclear Regulatory
Commission

## INTRODUCTION AND RULE 35(b)(1) STATEMENT

The panel decision reinforces an existing circuit split and creates another on two exceptionally important questions: (1) when the courts of appeals may exercise jurisdiction under the Hobbs Act; and (2) the extent of the Nuclear Regulatory Commission's authority to license the temporary storage of spent nuclear fuel. On both issues, this Court stands alone on the wrong side of the splits. This Court should rehear the case en banc to correct its precedent. *See* Fed. R. App. P. 35(b).

The circuits should enforce jurisdictional rules consistently. Yet here, two circuits (the Tenth Circuit and this Court) reviewed challenges to the *same* agency action raising the *same* question of subject-matter jurisdiction but reached opposite conclusions. In reinforcing an existing circuit split, the panel decision applied a judge-made exception that is contrary to the plain text of the Hobbs Act. Four circuits have expressly rejected the exception, and none have adopted it. Moreover, the panel decision departs from Supreme Court authority.

The circuits also should be consistent when interpreting an agency's statutory authority. This is especially true when that authority lies at the heart of the agency's congressionally assigned mission—here,

the Commission's role to oversee the safe, temporary storage of nuclear material used in generating electricity. The Atomic Energy Act (AEA)'s plain text grants the Commission authority to regulate spent nuclear fuel and does not distinguish between temporary storage at the site of a nuclear reactor or away from a reactor site. For many decades, the Commission has consistently exercised its clear statutory authority to safely regulate spent nuclear fuel. And the D.C. Circuit and Tenth Circuit have both affirmed the Commission's authority to approve temporary offsite storage of spent nuclear fuel. But the panel decision interpreted the same statute to *not* give the Commission that authority.

In sum, the panel decision raises two serious and lopsided conflicts that merit en banc review:

1.     Whether the Hobbs Act allows a judge-made exception to the statute's jurisdictional party-participation requirement. On this issue, the panel decision conflicts with published decisions of the Second, Seventh, Tenth, and Eleventh Circuits, each of which rejected this Court's exception as incompatible with the exclusive judicial-review provision that Congress enacted.

2.      Whether the Commission has authority under the AEA to license the temporary storage of spent nuclear fuel away from the site of a nuclear reactor. On this issue, the panel decision conflicts with published decisions of the D.C. and Tenth Circuits.

En banc review is warranted to address both questions of exceptional importance. *See* Fed. R. App. P. 35(b).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...........................................i

INTRODUCTION AND RULE 35(b)(1) STATEMENT...........................iv

TABLE OF CONTENTS ...........................................................................vii

TABLE OF AUTHORITIES..................................................................viii

STATEMENT OF THE ISSUES MERITING REHEARING
 EN BANC ..............................................................................................1

STATEMENT OF THE CASE .................................................................1

 I. Legal background.......................................................................1

  A. The Atomic Energy Act .....................................................1

  B. The Hobbs Act ...................................................................3

 II. Factual and procedural background.......................................4

ARGUMENT ...........................................................................................6

 I. En banc review is warranted because the panel's
  Hobbs Act holding conflicts with decisions of four
  circuits, including a decision of the Tenth Circuit
  involving the same Commission order....................................6

 II. En banc review is warranted because the panel
  decision creates a circuit split on whether the
  Atomic Energy Act authorizes the Commission to
  license temporary storage of spent nuclear fuel
  away from reactor sites........................................................12

CONCLUSION ......................................................................................19

# TABLE OF AUTHORITIES

## Cases

*American Trucking Ass'ns v. ICC*,
    673 F.2d 82 (5th Cir. 1982) ...................................................3, 7, 8, 9

*Balderas v. NRC*,
    59 F.4th 1112 (10th Cir. 2023) ......................................5, 7, 10, 11

*Baros v. Texas Mexican Ry. Co.*,
    400 F.3d 228 (5th Cir. 2005) ........................................................10

*Bd. of Governors of Federal Reserve System v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991) ........................................................................11

*Bowles v. Russell*,
    551 U.S. 205 (2007) ........................................................................8

*Bullcreek v. NRC*,
    359 F.3d 536 (D.C. Cir. 2004)............................................14, 16, 17

*In re Chicago, Milwaukee, St. Paul & Pac. R.R.*,
    799 F.2d 317 (7th Cir. 1986) .................................................8, 9, 10

*Don't Waste Michigan v. NRC*,
    No. 21-1048, 2023 WL 395030 (D.C. Cir. Jan. 25, 2023).................4

*Erie-Niagara Rail Steering Committee v. STB*,
    167 F.3d 111 (2d Cir. 1999) ........................................................9, 10

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ................................................................10, 11

*Matson Navigation Co. v. Dep't of Transp.*,
    77 F.4th 1151 (D.C. Cir. 2023) .......................................................7

*Nat'l Ass'n of State Util. Consumer Advocates v. FCC*,
457 F.3d 1238 (11th Cir. 2006) ...................................................... 10

*Ohio Nuclear-Free Network v. NRC*,
53 F.4th 236 (D.C. Cir. 2022) ........................................................ 7

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) ........................................................................ 2

*Packard Elevator v. ICC*,
808 F.2d 654 (8th Cir. 1986) ........................................................ 10

*Skull Valley Band of Goshute Indians v. Nielson*,
376 F.3d 1223 (10th Cir. 2004) ................................................ 14, 17

*Wales Transportation v. ICC*,
728 F.2d 774 (5th Cir. 1984) .......................................................... 9

*West Virginia v. EPA*,
142 S. Ct. 2608 (2022) .................................................................. 18

## Statutes

Hobbs Act (Administrative Orders Review Act)
42 U.S.C. § 2344 ................................................................... 3, 6, 9

Atomic Energy Act of 1954
42 U.S.C. § 2011 ............................................................................ 1

42 U.S.C. § 2014(aa) ................................................................ 13, 16

42 U.S.C. § 2014(z) ...................................................................... 13

42 U.S.C. § 2014(e) ...................................................................... 13

42 U.S.C. § 2013(d) ................................................................... 1, 14

42 U.S.C. § 2073(a) ................................................................... 2, 13

42 U.S.C. § 2073(a)(3) ................................................................15

42 U.S.C. § 2073(a)(4) ...........................................................14, 15

42 U.S.C. § 2093(a)..................................................................2, 13

42 U.S.C. § 2093(a)(3) ................................................................15

42 U.S.C. § 2093(a)(4) ................................................................15

42 U.S.C. § 2111(a)............................................................2, 13, 15

42 U.S.C. § 2111(b)..............................................................15, 16

42 U.S.C. § 2133-2134 ................................................................1, 2

42 U.S.C. § 2201(b)...................................................................13

42 U.S.C. § 2239(a)(1)(A).............................................................3, 7

Nuclear Waste Policy Act of 1982
    42 U.S.C. § 10131-10145 .............................................................3

42 U.S.C. § 10151-10169 ...............................................................3

42 U.S.C. § 10155(h)..................................................................17

Pub. L. No. 85-681, § 1, 72 Stat. 632 (1958) .........................................15

Pub. L. No. 93-584, § 3, 88 Stat. 1917 (1975) .........................................9

## Regulations and Agency Order

10 C.F.R. Part 72................................................... 2, 13, 14, 16, 17

*In the Matter of Private Fuel Storage, L.L.C.,*
    56 N.R.C. 390 (2002) ...............................................................16

## Court Rule

Fed. R. App. P. 35(b)..........................................................iv, vi

## Federal Register Notice

45 Fed. Reg. 74,693 (Nov. 12, 1980)...................................2, 13

## STATEMENT OF THE ISSUES
## MERITING REHEARING EN BANC[1]

1.    Whether the Hobbs Act's jurisdictional party-participation requirement is subject to an *ultra vires* exception allowing non-parties to challenge an agency's order as exceeding its statutory authority.

2.    Whether the Nuclear Regulatory Commission has authority under the Atomic Energy Act to license the temporary storage of spent nuclear fuel away from the site of a nuclear reactor.

## STATEMENT OF THE CASE

## I.    Legal background

### A.    The Atomic Energy Act

Congress enacted the Atomic Energy Act of 1954 (AEA), 42 U.S.C. § 2011 *et seq.*, to promote and regulate the use of nuclear materials. One of the AEA's central objectives is to maximize the use of atomic energy to generate electricity. *See id*. § 2013(d).

To fulfill this objective, the AEA authorizes the Commission to issue two types of licenses: (1) licenses for *facilities* that produce or use nuclear material, including nuclear power reactors, 42 U.S.C. §§ 2133-

---

[1] In an error that does not independently meet the high standard for en banc review, the panel decision also incorrectly held that Texas and Fasken established standing. Op. 10-11.

2134; and (2) licenses to possess, use, and transfer nuclear *material* that poses radiological hazards, *id*. §§ 2073(a), 2093(a), 2111(a). The materials-license provisions give the Commission "exclusive jurisdiction to license the transfer, delivery, receipt, acquisition, possession and use of nuclear materials." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 207 (1983).

Spent nuclear fuel contains all three types of nuclear material over which the Commission has licensing authority. Op. 18. The Commission has consistently exercised that licensing authority to ensure safe, temporary storage of spent fuel.

In the 1970s, the Commission recognized the nuclear power industry would need more space to temporarily store spent fuel. 45 Fed. Reg. 74,693, 74,693 (Nov. 12, 1980). In 1980, the Commission issued new regulations governing materials licenses to store spent fuel, both at and away from reactor sites. *Id.*; *see* 10 C.F.R. Part 72. Since then, the Commission has issued Part 72 licenses permitting temporary storage of spent nuclear fuel away from reactors.

Temporary *storage* is distinct from *disposal* of spent fuel. In the Nuclear Waste Policy Act of 1982 (NWPA), Congress directed the

federal government to permanently *dispose* of spent fuel in a deep geologic repository. 42 U.S.C. §§ 10131-10145. The NWPA also created two discretionary avenues for the Department of Energy to operate facilities to temporarily store spent fuel pending disposal in a repository. *Id.* §§ 10151-10169.

## B.    The Hobbs Act

The AEA allows any person whose interest may be affected to request a hearing before the Commission to challenge the issuance of a license. *See* 42 U.S.C. § 2239(a)(1)(A). If the Commission grants that person intervention as a party to the proceeding, they may seek judicial review of the final order in that proceeding under the Hobbs Act.

A provision of the Hobbs Act applicable to numerous federal agencies—including not only the Commission but also the Federal Communications Commission, Department of Agriculture, Department of Transportation, Federal Maritime Commission, and Surface Transportation Board—authorizes only a "party aggrieved" to obtain judicial review of the agency's final order, including an order denying a person intervention. 28 U.S.C. § 2344; *see American Trucking Ass'ns v. ICC*, 673 F.2d 82, 84-85 (5th Cir. 1982) (per curiam).

## II.    Factual and procedural background

In 2018, Interim Storage Partners applied for a materials license to store spent nuclear fuel at a proposed facility in Andrews County, Texas. Several entities, including two private Petitioners here (collectively, Fasken), sought to intervene in the Commission's adjudicatory proceeding. When the Commission denied intervention, those entities petitioned the D.C. Circuit for review of the orders denying intervention. The D.C. Circuit dismissed or denied those petitions. *Don't Waste Michigan v. NRC*, No. 21-1048, 2023 WL 395030, at *1-3 (D.C. Cir. Jan. 25, 2023) (per curiam).

Texas did not seek to intervene in the Commission's proceeding. Texas did send letters to the Commission during a public comment period for a draft environmental impact statement on the license, and again after the Texas Legislature passed a law prohibiting in-state storage or disposal of spent nuclear fuel.

In 2021, the Commission issued the license. Texas and Fasken petitioned for review of the license in this Court. New Mexico, which (like Texas) was not party to the Commission's proceeding, petitioned for review of the license in the Tenth Circuit.

In February 2023, the Tenth Circuit dismissed New Mexico's petition for lack of Hobbs Act jurisdiction. *Balderas v. NRC*, 59 F.4th 1112 (10th Cir. 2023). In so doing, the Tenth Circuit joined three other circuits in rejecting this Court's *ultra vires* exception to the Hobbs Act's party-aggrieved requirement and concluding that, even if such an exception could exist, it would not be applicable here. *Id.* at 1123-1124.

In September 2023, a panel of this Court granted Texas's and Fasken's petitions. After holding that Texas and Fasken had standing, Op. 8-12, the panel held that the Hobbs Act entitled these non-parties to judicial review under the *ultra vires* exception rejected in *Balderas* and other circuits' decisions. *Id.* at 12-18. Last, in conscious conflict with decisions of the Tenth and D.C. Circuits, the panel held that the AEA and NWPA unambiguously did not authorize the Commission to license away-from-reactor temporary storage of spent nuclear fuel. *Id.* at 18-25. The panel vacated the license.

# ARGUMENT

**I.   En banc review is warranted because the panel's Hobbs Act holding conflicts with decisions of four circuits, including a decision of the Tenth Circuit involving the same Commission order.**

The panel held that a person who was not party to an agency proceeding can seek limited judicial review under the Hobbs Act. But, as four circuits have held—and as the Tenth Circuit recently held in a case involving the same license under review here—the statutory text admits of no exception to the *party*-aggrieved requirement. As the Hobbs Act is the exclusive mechanism for review of many types of orders of many federal agencies, adherence to its text—regardless of a panel's assessment of the underlying merits of the case—is crucial to the orderly development of administrative law. En banc review is necessary to end the circuit split on this question of exceptional importance.

The Hobbs Act grants subject-matter jurisdiction under precise conditions: "Any *party* aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." 28 U.S.C. § 2344 (emphasis added). Courts should give meaning to Congress' intentional choice in the Hobbs Act to require

that a petitioner be a "*party* aggrieved," rather than a "person . . . aggrieved," as in the Administrative Procedure Act's judicial review provision, 5 U.S.C. § 702. *Matson Navigation Co. v. Dep't of Transp.*, 77 F.4th 1151, 1156-1157 (D.C. Cir. 2023).

Neither Texas nor Fasken was a party to the agency proceeding. The Commission denied Fasken intervention, and Fasken properly (albeit unsuccessfully) challenged that intervention order in the D.C. Circuit. Texas never sought to become a party to the proceeding.

The panel speculated that Texas's and Fasken's activities might make them "parties." Op. 13-16. But as the panel noted, other circuits hold that the "degree of participation necessary to achieve party status varies according to the formality with which the proceeding was conducted." Op. 15 (citation omitted). In AEA licensing proceedings, participation requires intervention. *See* 42 U.S.C. § 2239(a)(1)(A) (the Commission "shall admit any such person as a party to such proceeding"); *Balderas*, 59 F.4th at 1116-1119; *Ohio Nuclear-Free Network v. NRC*, 53 F.4th 236, 238-240 (D.C. Cir. 2022). As this Court explained, Congress used the word "party" in the Hobbs Act "in a definitive sense" that "limits the right of appeal to those who actually

participated in the agency proceeding." *American Trucking*, 673 F.2d at 84. Neither Texas nor Fasken "actually participated" in the Commission's proceeding, so the panel lacked jurisdiction over their petitions.

Courts have "no authority to create equitable exceptions to jurisdictional requirements." *Bowles v. Russell*, 551 U.S. 205, 214 (2007). Yet the panel held that a judge-made *ultra vires* exception to the party-aggrieved requirement allowed it to consider Texas's and Fasken's arguments that the Commission had exceeded its statutory authority. Op. 16-18.

The exception cannot be squared with the Hobbs Act's text. As the Seventh Circuit explained, an exception that "non-parties may obtain review of orders that 'exceed the power' of the agency is dubious for several reasons." *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 799 F.2d 317, 335 (7th Cir. 1986) (Easterbrook, J.). The exception threatens to eviscerate the "party" limitation because " 'exceeding the power' of the agency may be a synonym for 'wrong,' so that the statute then precludes review only when there is no reason for review anyway." *Id*.

And because Section 2344 is the "source of the court's jurisdiction," a court "may not decide a case just because that would be a good idea." *Id*.

The panel's *ultra vires* exception stems from an obvious mistake this Court made in 1982 and should correct en banc. In a footnote in *American Trucking*, this Court identified "two rare instances" when the Hobbs Act's party-aggrieved requirement is lifted: when the non-party challenges the agency action as (1) exceeding statutory authority, or (2) relying on an unconstitutional statute. 673 F.2d at 85 n.4. Prior to this case, this Court had found the exception applicable only once, in *Wales Transportation v. ICC*, 728 F.2d 774, 776 n.1 (5th Cir. 1984).

Yet *American Trucking* and *Wales Transportation* mistakenly relied on cases involving the Interstate Commerce Commission *before* Congress brought judicial review of its orders within the ambit of the Hobbs Act. *See American Trucking*, 673 F.2d at 85 n.4; *Wales Transp.*, 728 F.2d at 776 n.1; *cf.* Pub. L. No. 93-584, §§ 3, 4, 88 Stat. 1917 (1975). As the Second Circuit has explained, even if the non-Hobbs Act provisions governing the Interstate Commerce Commission's orders allowed non-parties to sue, "there is no compelling support for the proposition that, despite the plain statutory language to the contrary"

9

in the Hobbs Act, "such petitions remain valid today." *Erie-Niagara Rail Steering Comm. v. STB*, 167 F.3d 111, 112 (2d Cir. 1999) (per curiam).

Members of this Court have recognized as much. In *Baros v. Texas Mexican Railway Co.*, the panel acknowledged the *ultra vires* exception rested on a mistake and had been "squarely rejected" by other circuits. 400 F.3d 228, 238 n.24 (5th Cir. 2005). By now, four circuits have squarely rejected the exception, and none have adopted it. *Balderas*, 59 F.4th at 1123-1124; *Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 457 F.3d 1238, 1249 (11th Cir. 2006); *Erie-Niagara*, 167 F.3d at 112-113; *In re Chicago*, 799 F.2d at 335; *cf. Packard Elevator v. ICC*, 808 F.2d 654, 656 (8th Cir. 1986) (concluding that if the exception existed, it did not apply).

To be sure, the Supreme Court in a different context has recognized an exceedingly narrow *ultra vires* exception to statutory limits on judicial review of agency action. In *Leedom v. Kyne*, the Court held that district courts may exercise jurisdiction when (1) Congress granted a statutory right, (2) "there is no other means" to "protect and enforce that right," and (3) the "inference (is) strong that Congress

10

intended the statutory provisions governing the general jurisdiction of those courts to control." 358 U.S. 184, 190 (1958). But this exception does not apply when the applicable statute provides a "meaningful and adequate opportunity for judicial review" or when Congress has spoken clearly and directly to judicial review. *Bd. of Governors of Federal Reserve System v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991). Both are true here, as the Tenth Circuit explained in rejecting New Mexico's reliance on *Leedom* to challenge the same license at issue here. *Balderas,* 59 F.4th at 1124.

The persistence of this Court's *ultra vires* exception to Hobbs Act review would be exceptionally important even if it applied only to Commission proceedings like this one. But the panel's reasoning threatens to expand judicial review of all orders subject to the Hobbs Act beyond the bounds Congress set.

The exception incentivizes litigants to avoid an agency's proceeding and then ambush the agency by attacking its authority—or dressing up a more mundane argument as an attack on agency authority—once the proceeding concludes. By waiting until the Commission issued the license, Texas deprived the Commission of the

opportunity to interpret and explain its statutory authority, thereby also depriving this Court of the Commission's contemporaneous, reasoned explanation. In another case, giving the Commission that opportunity could have avoided litigation altogether, or at least focused the issues for judicial review. In any event, even if the limits on Hobbs Act review were not good policy, this Court's role is to enforce the policy that Congress adopted.

## II.    En banc review is warranted because the panel decision creates a circuit split on whether the Atomic Energy Act authorizes the Commission to license temporary storage of spent nuclear fuel away from reactor sites.

The panel's holding that the Commission cannot authorize temporary storage of spent fuel away from nuclear reactors conflicts with the AEA's plain language, contravenes the Commission's longstanding exercise of that authority, and creates a split with two circuits. This is an exceptionally important question because the panel decision invalidates a core and vital statutory authority the Commission has exercised for many decades.

The AEA's plain text authorizes the Commission to issue the license. The AEA provides for licenses to possess three types of

material—"special nuclear material," 42 U.S.C. § 2073(a), "source material," *id*. § 2093(a), and "byproduct material," *id*. § 2111(a); *see also id*. §§ 2014(aa), (z), (e) (defining the terms). Spent nuclear fuel contains each of these materials. Op. 18. Tying these three provisions together, the AEA authorizes the Commission to issue regulations governing the "possession and use of special nuclear material, source material, and byproduct material as the Commission may deem necessary or desirable . . . to protect health or to minimize danger to life or property." 42 U.S.C. § 2201(b).

The Commission has for decades consistently exercised its materials licensing authority to ensure the safe, temporary storage of spent nuclear fuel. In 1980, recognizing the need for more storage, the Commission relied on all four statutory provisions to issue the Part 72 regulations providing a definitive framework for temporary storage of spent nuclear fuel, both at nuclear reactors and offsite. *See* 45 Fed. Reg. at 74,699.

Two decades later, the D.C. and Tenth Circuits considered challenges by Utah to prevent the Commission from licensing a private facility to store spent nuclear fuel away from reactors. Both circuits

held that the AEA gave the Commission authority to issue such licenses and that the NWPA did not repeal that authority. *See Bullcreek v. NRC*, 359 F.3d 536, 538-543 (D.C. Cir. 2004); *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1232 (10th Cir. 2004).

The panel decision misinterprets the AEA's plain text and creates a circuit split with *Bullcreek* and *Skull Valley*. The panel held that the AEA permits the Commission to issue licenses only for specific enumerated purposes, including for "certain types of research and development." Op. 19.

The panel's cramped reading of the AEA is incorrect. The AEA authorizes the Commission to license special nuclear material "for such other uses as the Commission determines to be appropriate to carry out the purposes" of the AEA. 42 U.S.C. § 2073(a)(4). A central purpose of the AEA is maximizing the generation of electricity from nuclear material. *See id.* § 2013(d). The Commission acted consistently with that purpose by promulgating the Part 72 regulations covering licensing of temporary storage of spent fuel both at reactors and away from reactors.

Similarly, the AEA authorizes the Commission to issue licenses to any qualified applicant to possess source material "for any other use approved by the Commission as an aid to science or industry." 42 U.S.C. § 2093(a)(4). Allowing nuclear reactor operators to store spent fuel, whether at or away from reactor sites, aids the electric-generation industry.

The panel dismissed both those provisions as catchall provisions limited to the uses listed elsewhere in their respective statutory sections. Op. 19. But Congress added Section 2073(a)(4) to the AEA in 1958 to *expand* the purposes for which special nuclear material licenses could be issued *beyond* those set forth in Section 2073(a)(1)-(3). Pub. L. No. 85-681, § 1, 72 Stat. 632 (1958). The panel decision also overlooked the statutory context that should inform interpretation of Sections 2073(a)(4) and 2093(a)(4), including other provisions that authorize licenses to use special nuclear material and source material under a license to operate a nuclear reactor. 42 U.S.C. §§ 2073(a)(3), 2093(a)(3).

The Commission's authority also extends to licensing possession of the byproduct materials contained in spent nuclear fuel. 42 U.S.C. § 2111(a). But the panel mistakenly focused on Section 2111(b), which

concerns *disposal* of certain radioactive waste, not temporary *storage* of the nuclear materials covered by the license here. Op. 20. Thus, the panel's comparison of radium-226 with plutonium is misguided. *Id.* Radium-226 is waste that may be *disposed* of under Section 2111(b). Because plutonium is special nuclear material, 42 U.S.C. § 2014(aa), the Commission has authority to license its possession and temporary storage.

The panel compounded its interpretive errors when it turned to the NWPA. Op. 22-25. First, the panel failed to address the Commission's Part 72 regulations or the Commission's longstanding interpretation of the NWPA, which the D.C. Circuit discussed in *Bullcreek. See In the Matter of Private Fuel Storage, L.L.C.*, 56 N.R.C. 390 (2002).

Second, the panel incorrectly concluded that the NWPA created a "comprehensive statutory scheme for addressing spent nuclear fuel accumulation." Op. 25. The NWPA established *federal* storage and disposal programs in which the Department of Energy plays a significant role. Given these *new* programs, Congress precisely delineated the NWPA's scope and "left untouched" the Commission's

preexisting AEA authority. *Bullcreek*, 359 F.3d at 539, 542; *see* 42 U.S.C. § 10155(h).

When Congress passed the NWPA, it was aware of the Commission's Part 72 regulations and, as part of a legislative compromise permitting public and private storage programs to exist in parallel, Congress left the "pre-existing regulatory scheme as it found it." *Bullcreek*, 359 F.3d at 543. Thus, the NWPA did *not* disturb the Commission's preexisting AEA authority. *See id.* at 542-543; *Skull Valley*, 376 F.3d at 1232.

On this issue, the panel held the opposite—that the NWPA forbids the Commission from licensing private, away-from-reactor temporary storage. Op. 22, 25. But the panel cited no provision of the NWPA that either eliminates or restricts the Commission's AEA authority over temporary storage of spent nuclear fuel. There is none. Likewise, no provision of the AEA or NWPA confines the Commission's authority to license the storage of spent fuel to onsite facilities. The panel's holding is erroneous and consciously creates a circuit split with the D.C. and Tenth Circuits.

The panel's brief discussion of the major-questions doctrine, Op. 25-26, is off base. In *West Virginia v. EPA*, the Supreme Court recognized a small category of "extraordinary cases in which the history *and* the breadth of the authority that the agency has asserted, *and* the economic *and* political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." 142 S. Ct. 2587, 2608 (2022) (cleaned up; emphasis added). The panel touched on just one of these elements in a paragraph finding that "disposal of nuclear waste is an issue of great 'economic and political significance.'" Op. 26.

Yet the license is for temporary *storage*, not disposal. And unlike situations where the Supreme Court and (until now) this Court have applied the major-questions doctrine, the safe, temporary storage of spent nuclear fuel lies at the core of the Nuclear Regulatory Commission's expertise and statutory role. Further, the Commission has routinely exercised this authority for decades. Two circuits have affirmed that this authority includes temporary offsite storage. The panel's contrary ruling presents a question of exceptional importance, but it does not involve a "major question."

The panel decision has serious repercussions for the nuclear power industry and the Commission. The panel's holding upends private, market-based solutions for temporarily storing spent nuclear fuel before a permanent repository is available for disposal. And the panel's holding undermines the Commission's authority over spent nuclear fuel, despite Congress' clear intent in the AEA that the Commission exclusively oversee the safe, temporary storage of that nuclear material.

## CONCLUSION

Rehearing en banc should be granted.

Respectfully submitted,

/s/ *Justin D. Heminger*
TODD KIM
*Assistant Attorney General*

JUSTIN D. HEMINGER
*Senior Litigation Counsel*
Environment and Natural
   Resources Division
U.S. Department of Justice

October 24, 2023

/s/ *Andrew P. Averbach*
BROOKE P. CLARK
*General Counsel*

ANDREW P. AVERBACH
*Solicitor*
U.S. Nuclear Regulatory Commission

# CERTIFICATE OF SERVICE

I certify that on October 24, 2023, I served a copy of the foregoing upon counsel for the parties in this action by filing the document electronically through the CM/ECF system.

/s/ *Andrew P. Averbach*
ANDREW P. AVERBACH

Attorney of Record for Respondent
U.S. Nuclear Regulatory
Commission

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit set forth in Fed. R. App. P. 35(b)(2)(A) and Fifth Circuit Rule 35.5 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 3,856 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Andrew P. Averbach*
ANDREW P. AVERBACH

Attorney of Record for Respondent
U.S. Nuclear Regulatory
Commission

ATTACHMENT

Slip opinion, *State of Texas v. Nuclear Regulatory Commission* (5th Cir. Aug. 25, 2023)

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 25, 2023

Lyle W. Cayce
Clerk

No. 21-60743

---

STATE OF TEXAS; GREG ABBOTT, *Governor of the State of Texas*; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; FASKEN LAND AND MINERALS, LIMITED; PERMIAN BASIN LAND AND ROYALTY OWNERS,

*Petitioners*,

*versus*

NUCLEAR REGULATORY COMMISSION; UNITED STATES OF AMERICA,

*Respondents*.

---

Appeal from the Nuclear Regulatory Commission
Agency No. 72-1050

---

Before JONES, HO, and WILSON, *Circuit Judges*.

JAMES C. HO, *Circuit Judge*:

Nuclear power generation produces thousands of metric tons of nuclear waste each year. And such waste has been accumulating at nuclear power plants throughout the United States for decades. Congress has mandated that such waste be permanently stored in a geologic repository. But the development, licensing, and construction of that repository has stalled.

No. 21-60743

To address this problem, the Nuclear Regulatory Commission has asserted that it has authority under the Atomic Energy Act to license temporary, away-from-reactor storage facilities for spent nuclear fuel. Based on that claim of authority, the Commission has issued a license for Interim Storage Partners, LLC, a private company, to operate a temporary storage facility on the Permian Basin, in Andrews County, Texas. Fasken Land and Minerals, Ltd., a for-profit organization working in oil and gas extraction, and Permian Basin Land and Royalty Owners ("PBLRO"), an association seeking to protect the interests of the Permian Basin, have petitioned for review of the license.[1] So has the State of Texas, which argues, *inter alia*, that the Atomic Energy Act doesn't confer authority on the Commission to license such a facility.

Texas is correct. The Atomic Energy Act does not confer on the Commission the broad authority it claims to issue licenses for private parties to store spent nuclear fuel away-from-the-reactor. And the Nuclear Waste Policy Act establishes a comprehensive statutory scheme for dealing with nuclear waste generated from commercial nuclear power generation, thereby foreclosing the Commission's claim of authority. Accordingly, we grant the petition for review and vacate the license.

## I.

This case is the latest development in a decades-long debate over nuclear power and waste regulation. Accordingly, we provide a brief overview of relevant historical and technical background before delving into the specifics of the licensing proceedings challenged here.

---

[1] For the remainder of this opinion, we use the term "Fasken" to refer to Fasken Land and Minerals, Ltd. and PBLRO collectively, unless addressing an issue where it's necessary to distinguish them.

**A.**

The United States began producing nuclear waste in the 1940s, first as a byproduct of nuclear weapons development and then as a byproduct of the commercial nuclear power industry. Blue Ribbon Commission on America's Nuclear Future, Report to the Secretary of Energy 19 (Jan. 2012) https://www.energy.gov/sites/prod/files/2013/04/f0/brc_finalreport_jan2012.pdf [hereinafter BRC Report]. The first nuclear reactor was demonstrated in 1942, and Congress authorized civilian application of atomic power through the Atomic Energy Act of 1946. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 206 (1983).

The Act granted regulatory authority over nuclear energy to the Atomic Energy Commission. *See Union of Concerned Scientists v. NRC*, 735 F.2d 1437, 1443 n.1 (D.C. Cir. 1984). But the Energy Reorganization Act of 1974 disbanded that agency and redistributed its authority, as relevant here, to the Nuclear Regulatory Commission. *Id.* After Congress passed the Atomic Energy Act, commercial production of nuclear energy boomed.

Commercial nuclear energy is produced through a series of industrial processes, which include the mining and processing of nuclear fuel, the use of the fuel in a reactor, and the storage and ultimate disposal or reprocessing of that fuel. BRC Report at 9. Once nuclear fuel has been used in a reactor for about four to six years, it can no longer produce energy and is considered used or spent. *Id.* at 10. That spent fuel is removed from the reactor. *Id.*

Spent nuclear fuel is "fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing." 42 U.S.C. § 10101(23). It's "intensely radioactive" and "must be carefully stored." *Pac. Gas & Elec. Co.*, 461 U.S. at 195. The spent fuel is first placed in wet pool storage for cooling, where it

remains for at least five years, but may remain for decades. BRC REPORT at 11. Once the spent nuclear fuel has cooled sufficiently in wet storage, it's generally transferred to dry cask storage. *Id.*

At first, there was little concern regarding storage for spent fuel. *See* BRC REPORT at 19–20; *Idaho v. DOE*, 945 F.2d 295, 298–99 (9th Cir. 1991). There was a widespread belief within the commercial nuclear energy industry that spent fuel would be reprocessed. *Idaho*, 945 F.2d 295, 298–99 (9th Cir. 1991). But the private reprocessing industry collapsed in the 1970s, *id.*, and growing concerns led President Ford to issue a directive deferring commercial reprocessing and recycling, which President Carter later extended. BRC REPORT at 20. Although President Reagan reversed that policy, "for a variety of reasons, including costs, commercial reprocessing has never resumed." *Id.*

After years of accumulating spent nuclear fuel in nuclear power plants throughout the country, *see* 42 U.S.C. § 10131(a)(3), Congress enacted the Nuclear Waste Policy Act in 1982. That Act sought to "devise a permanent solution to the problems of civilian radioactive waste disposal." *Id.* It tasked the Department of Energy with establishing "a repository deep underground within a rock formation where the waste would be placed, permanently stored, and isolated from human contact." *Nat'l Ass'y of Regul. Util. Comm'rs v. DOE*, 680 F.3d 819, 821 (D.C. Cir. 2012). Yucca Mountain in Nevada was chosen as the only suitable site for the repository. *See* 42 U.S.C. § 10172. The decision drew widespread opposition in Nevada. BRC REPORT at 22.

Decades of delay ensued. Despite a Congressional mandate that the Department of Energy start accepting waste from the States by January 31, 1998, *see* 42 U.S.C. § 10222(a)(5)(B), "by the mid-1990s, the Department of Energy made clear that it could not meet the 1998 deadline, and it came and

went without the federal government accepting any waste." *Texas v. U.S.*, 891 F.3d 553, 555–56 (5th Cir. 2018).

In 2008, the Department of Energy finally submitted its license application for the Yucca Mountain repository to the Commission. *In re Aiken Cnty.*, 725 F.3d 742, 258 (D.C. Cir. 2013). But the Commission "shut down its review and consideration" of the application. *Id.* By its own admission, the Commission had no intention of reviewing the application, *id.*, even though the Nuclear Waste Policy Act mandates a decision be made within three years of submission. *See* 42 U.S.C. § 10134(d).

In light of the delays and controversy, the Obama Administration decided to halt the work on the Yucca Mountain repository. BRC REPORT at vi. The Obama Administration instead formed the Blue Ribbon Commission on America's Nuclear Future, which concluded that a consent-based approach to siting nuclear waste storage facilities would be preferred to the Yucca Mountain policy. *See id.* at vii–x.

Spent nuclear fuel continues to accumulate at reactor sites across the country. Some estimates suggest the U.S. inventory of spent nuclear fuel may exceed 200,000 metric tons by 2050. BRC REPORT at 14. The commercial nuclear power industry as a whole is estimated to generate between 2,000 and 2,400 metric tons of spent nuclear fuel each year. *Id.* And there are thousands of metric tons of spent fuel in various sites where commercial reactors no longer operate. *Id.*

## B.

After the Blue Ribbon Commission embraced a consent-based approach for siting nuclear waste storage facilities, the governments of Texas and New Mexico expressed support for establishing facilities within the states. Then-Governors Rick Perry of Texas and Susana Martinez of New Mexico wrote letters supporting the establishment of facilities within their

respective states. And Andrews County—a rural community located near the Texas-New Mexico border—passed a resolution in support of siting a spent nuclear fuel facility there.

Based in part on these expressions of support, Waste Control Specialists, LLC applied to the Commission for a license to operate a consolidated interim storage facility for high-level spent nuclear fuel in Andrews County. Andrews County is located within the Permian Basin, one of the country's largest oil basins and a top global oil producer.

The Commission began its environmental review of the proposed facility in accordance with the National Environmental Policy Act. *See* 42 U.S.C. § 4321 *et seq.* But the application anticipated that the Department of Energy would take title to the spent nuclear fuel. Some stakeholders challenged the legality of that provision as prohibited by the Nuclear Waste Policy Act. Waste Control Specialists then asked the Commission to suspend its review.

Approximately a year later, Interim Storage Partners, LLC—a partnership between the original applicant, Waste Control Specialists, and another company—asked the Commission to resume its review of the now-revised license application. In its summary report on the scoping period, the Commission noted that it had received comments expressing concerns that the facility would become a *de facto* permanent disposal facility and that the license would be illegal under existing regulations. The Commission responded that such comments were outside the scope of the environmental impact statement.

In December 2019, the Atomic Safety and Licensing Board—the independent adjudicatory division of the Commission—terminated an adjudicatory proceeding regarding the license application. Before the proceeding was terminated, Fasken timely filed five contentions alleging that the

No. 21-60743

Commission violated the National Environmental Policy Act and its own regulations. The Board denied each one. The following month, Fasken filed a motion to reopen the record along with a motion to amend a previously filed contention. The Board denied the motions.

The Commission published a draft environmental impact statement in May 2020. The Commission received approximately 2,527 unique comments on the draft environmental impact statement, and many opposed the facility. One comment was a letter from Texas Governor Greg Abbott urging the Commission to deny the license application because of the lack of a permanent repository and the importance of the Permian Basin to the nation's energy security and economy. The Texas Commission on Environmental Quality submitted a comment that the licensing lacks public consent and doesn't properly account for the possibility that Texas would become the permanent solution of spent nuclear fuel disposal if the permanent repository isn't developed by the expiration of the facility's 40-year license term.

Fasken also submitted various comments. Its comments noted the uniqueness of the Permian Basin, the danger of transporting spent nuclear fuel to the facility, the lack of community consent, and the possibility that the facility could become a *de facto* permanent facility. Based on the draft environmental impact statement, Fasken also filed a second motion to reopen the adjudicatory proceeding. The Board once again denied the request.

The Commission issued the final environmental impact statement in July 2021. It recommended the license be issued, and noted that concerns regarding Yucca Mountain and the need for a permanent repository fell outside its scope. In an appendix, the Commission responded to timely comments, including those from Petitioners. The Commission responded to concerns that the facility would become a *de facto* permanent repository by noting the application was only for a temporary facility.

The following September, the Texas Legislature passed H.B. 7.  The statute makes it illegal to "dispose of or store high level radioactive waste" in Texas.  Governor Abbott sent a letter to the Commission with a copy of H.B. 7.  He reiterated that "the State of Texas has serious concerns with the design of the proposed ISP facility and with locating it in an area that is essential to the country's energy security."  The next day, Fasken submitted an environmental analysis critiquing various aspects of the final environmental impact statement.

A few days later, the Commission issued the license.

Texas and Fasken have now petitioned this court for review of the license.  Texas asks that the license be set aside.  And Fasken asks that we suspend all further activities on the facility and remand to the Commission for a hard look analysis.  While this case was pending before this court, Fasken and others who sought but were denied intervention in the agency adjudication had a petition for review pending before the D.C. Circuit appealing the denials of their intervention.  *See Don't Waste Michigan v. NRC*, 2023 WL 395030 (Jan. 25, 2023).  The petition was denied in January 2023.  *Id.* at *1.  Interim Storage Partners, LLC intervened in this case to represent its interests.

## II.

We begin with jurisdiction.  The Commission challenges this court's jurisdiction to hear the petitions for review for lack of both constitutional standing and statutory standing.  We consider each argument in turn and find neither succeeds.

## A.

As a preliminary matter, the Commission suggests that Petitioners forfeited constitutional standing by failing to argue it in their opening briefs. We disagree.

No. 21-60743

Neither Petitioner argued constitutional standing beyond their general jurisdictional statements. Generally, a petitioner is required "to present specific facts supporting standing through citations to the administrative record or affidavits or other evidence attached to its opening brief, *unless standing is self-evident.*" *Sierra Club v. EPA*, 793 F.3d 656, 662 (6th Cir. 2015) (emphasis added, quotation omitted). A petitioner may reasonably believe standing to be self-evident when "nothing in the record alerted [the] petitioners to the possibility that their standing would be challenged." *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). That's the case here.

From the earliest stages of this proceeding, the Commission has challenged jurisdiction on statutory standing grounds only. It twice moved to dismiss, but neither motion challenged constitutional standing. Accordingly, Petitioners could reasonably assume it was self-evident. *Cf. Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 n.4 (5th Cir. 2019) ("overlook[ing] Petitioners' decision to include only a cursory discussion of standing because . . . they had a good-faith (though mistaken) belief that standing would be both undisputed and easy to resolve"). And—once constitutional standing was challenged—both Petitioners provided well-developed legal arguments with citations to the record and evidence to show their standing. Petitioners haven't forfeited constitutional standing.

The "irreducible constitutional minimum" of standing requires that Petitioners "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The causation elements of the constitutional standing analysis are easily met: Petitioners' alleged injuries directly result from the issuance of the license (traceability), and an order from this court could vacate the license (redressability). So only injury in fact is at issue.

No. 21-60743

The Commission argues that the licensing and eventual operation of the storage facility doesn't injure either Texas or Fasken. We disagree. Because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," we may proceed even if only one of the Petitioners has standing. *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006). But here both Petitioners successfully assert an injury resulting from the license.

Texas meets the injury-in-fact requirement because the license preempts state law. Texas has "a sovereign interest in the power to create and enforce a legal code." *Tex. Off. of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (quotation omitted) (holding that Texas has standing to challenge the FCC's assertion of authority over an aspect of telecommunications regulation that the State believed it controlled). And we have held that the preemption of an existing state law can constitute an injury. *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015). "A state has standing based on a conflict between federal and state law if the state statute at issue regulates behavior or provides for the administration of a state program, but not if it simply purports to immunize state citizens from federal law." *Id.* (cleaned up). Here the issuance of the license and resulting operation of the facility directly conflicts with H.B. 7.

The Texas Legislature has enacted legislation that prevents the storage of high-level radioactive waste, including spent nuclear fuel, within the State except at currently or formerly operating nuclear power reactors. The legislation also amends Texas statutes to add that "a person, including the compact waste disposal facility license holder, may not dispose of or store high level radioactive waste in this state." Tex. Health & Safety Code § 401.072. Although a non-binding, declaratory state statute would not be enough to confer standing, here there's an enforceability conflict between the license and operation of the facility, which authorizes storage of

high-level radioactive waste in Texas, and H.B. 7, which proscribes such storage. *Cf. Virginia v. Sebelius*, 656 F.3d 253, 270 (4th Cir. 2011) (a state statute that is merely a "non-binding declaration [and] does not create any genuine conflict . . . creates no sovereign interest capable of producing injury-in-fact"). That's enough for Texas to assert an injury.

Fasken also has standing based on its proximity to radioactive materials. To establish injury in an environmental case, there's a "geographic-nexus requirement." *Biological Diversity*, 937 F.3d at 538. "The Supreme Court has ruled that geographic remoteness forecloses a finding of injury when no further facts have been brought forward showing that the impact in those distant places will in some fashion be reflected where the plaintiffs are." *Id.* (cleaned up). *See also id.* at 540 ("when a person visits an area for aesthetic purposes, pollution interfering with his aesthetic enjoyment may cause an injury in fact," if "the aesthetic experience was actually offensive to the plaintiff"). Fasken has provided evidence of its members' geographic proximity to the facility. Some of Fasken's members own land within four miles of the facility, draw water from wells beneath the facility, drive within a mile of the facility, use rail lines the facility would use, and travel on highways within a few hundred feet of the rail lines that transport spent nuclear fuel to the facility. In the context of radioactive materials, such proximity is sufficient to establish injury. *See Duke Power Co. v. Caroline Env't Study Grp., Inc.*, 438 U.S. 59, 74 (1978) ("[T]he emission of non-natural radiation into appellees' environment would also seem a direct and present injury."). *See also Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir. 2004) (finding a petitioner living 18 miles from Yucca Mountain had standing); *Kelley v. Selin*, 42 F.3d 1501, 1509 (6th Cir. 1995) (finding petitioners who "own[] land in close proximity to . . . the proposed site for spent fuel storage" had "alleged sufficient injury to establish standing").

PBLRO also has associational standing. "Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members." *Biological Diversity*, 937 F.3d at 536 (quoting *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)). Each of those elements is met. First, some of its members have an injury because they live, work, or regularly drive close the facility. And as we've already noted, *see supra*, the causation elements are met. Next, "the germaneness requirement is undemanding and requires mere pertinence between the litigation at issue and the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (quotations omitted). This factor is easily met because PBLRO was created specifically to oppose the facility. Last, there's no reason to believe that PBLRO is unable to represent its members' interests without their individual participation. *See id.* at 551–53 (noting this prong usually isn't met when the relief sought is damages for individual members or the claim requires fact-intensive-individual inquiry).

## B.

Petitioners seeking to challenge a final order from the Commission also need standing under the Administrative Orders Review Act, generally known as the Hobbs Act. *See Reytblatt v. NRC*, 105 F.3d 715, 720 (D.C. Cir. 1997) ("[T]he Hobbs Act requires (1) 'party' status (i.e., that petitioners participated in the proceeding before the agency), and (2) aggrievement (i.e., that they meet the requirements of constitutional and prudential standing).") (citation omitted).

The Hobbs Act vests "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or determine the validity of . . . final orders of the"

Commission on the federal courts of appeals. 28 U.S.C. § 2342. (The Act actually refers to the Atomic Energy Commission. But the Energy Reorganization Act of 1974 abolished that agency and transferred its licensing and related regulatory functions to the Nuclear Regulatory Commission. *See* 42 U.S.C. § 5841(a), (f).)

Under the Act, "[a]ny party aggrieved by the final order may . . . file a petition to review the order in the court of appeals wherein venue lies." 28 U.S.C. § 2344. Courts "have consistently held that the phrase 'party aggrieved' requires that petitioners have been parties to the underlying agency proceedings, not simply parties to the present suit." *ACA Int'l v. FCC*, 885 F.3d 687, 711 (D.C. Cir. 2018). *See also Am. Trucking Ass'ns v. ICC*, 673 F.2d 82, 84 (5th Cir. 1982) (per curiam) ("The word 'party' is used in a definite sense in the [Hobbs Act], and limits the right to appeal to those who actually participated in the agency proceeding."). The Commission argues that neither Texas nor Fasken has standing under the Hobbs Act because neither is a "party aggrieved."

"To be an aggrieved party, one must have participated in the agency proceeding under review." *Wales Transp., Inc. v. ICC*, 728 F.2d 774, 776 n.1 (5th Cir. 1984). Here, both Petitioners participated in the agency proceeding—Texas commented on its opposition of the issuance of the license and Fasken attempted to intervene and filed contentions. But according to the Commission, neither form of participation is sufficient to confer party status under the Hobbs Act.

The Commission argues that Texas doesn't have party status because "participating in the appropriate and available administrative procedures is the statutorily prescribed prerequisite to invocation of the Court's

jurisdiction," and submitting comments doesn't accord with the degree of formality of the proceedings in this license adjudication.[2]

The Commission takes a different approach with Fasken. It argues that, as a party denied intervention, Fasken may only challenge the order denying it intervention. From the Commission's perspective, if a putative intervenor has failed to obtain party status, it can't later seek review of the final judgment on the merits.

The plain text of the Hobbs Act merely requires that a petitioner seeking review of an agency action be a "party aggrieved." 28 U.S.C. § 2344. The

---

[2] In the alternative, the Commission argues that "even if this Court were to determine that dismissal of [Texas's] Petition for Review is not required as a matter of jurisdiction, the same result is nonetheless required as a matter of non-jurisdictional, mandatory exhaustion." Not so. The Commission relies on *Fleming v. USDA*, which held that "even nonjurisdictional exhaustion requirements . . . forbid judges from excusing non-exhaustion" and that "if the government raises [such an] exhaustion requirement, the court must enforce it." 987 F.3d 1093, 1099 (D.C. Cir. 2021). But neither the Hobbs Act nor the Atomic Energy Act impose a mandatory exhaustion requirement. The Commission's argument implicitly equates the exhaustion requirements in the Horse Protection Act and the Prison Litigation Reform Act—both of which are discussed in *Fleming*—to the Hobbs Act and Atomic Energy Act. These statutes aren't comparable. Both the Horse Protection Act and the Prison Litigation Reform Act have explicit exhaustion requirements. *See* 7 U.S.C. § 6912(e) ("[A] person shall exhaust all administrative appeal procedures established by the Secretary [of Agriculture] or required by law before the person may bring an action in a court of competent jurisdiction."); 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such an administrative remedies as are available are exhausted."). But neither the Hobbs Act nor the Atomic Energy Act do. *See* 28 U.S.C. § 2344 (no exhaustion requirement); 42 U.S.C. § 2239(b) (same).

It's also worth noting that caselaw suggests that so long as the petitioner is a "party aggrieved" and the basis for the challenge was brought before the agency by *some* party—*even if* not the by the petitioner—that's enough for the case to move forward. *See Reythlatt*, 105 F.3d at 720–21; *Cellnet Commc'n, Inc. v. FCC*, 965 F.2d 1106, 1109 (D.C. Cir. 1992). It'd make little sense to interpret the Hobbs Act as imposing an exhaustion requirement while allowing a petitioner to bring a claim it did not itself bring before the agency.

No. 21-60743

text makes no distinction between different kinds of agency proceedings. *See Gage v. AEC*, 479 F.2d 1214, 1218 (D.C. Cir. 1973). Nor does it suggest that a petitioner who went through the procedures to intervene in an adjudication can't be a party aggrieved. In fact, it's clear that the function of the "party aggrieved" status requirement is to ensure that the agency had the opportunity to consider the issue that petitioners are concerned with. *See, e.g., id.* at 1219 ("The 'party' status requirement operates to preclude direct appellate court review without a record which at least resulted from the factfinder's focus on the alternative regulatory provisions which petitioners propose.") (emphases omitted).

In sum, the plain text of the Hobbs Act requires only that a petitioner have participated—in some way—in the agency proceedings, which Texas did through comments and Fasken did by seeking intervention and filing contentions. But caselaw suggests that's not enough.

Precedent from other circuits suggests that neither Texas nor Fasken are parties aggrieved for Hobbs Act purposes. The D.C. Circuit has read the Hobbs Act to contemplate participation in "the appropriate and available administrative procedures." *Id.* at 1217. And it has interpreted this to mean that the "degree of participation necessary to achieve party status varies according to the formality with which the proceeding was conducted." *Water Transp. Ass'n v. ICC*, 819 F.2d 1189, 1192 (D.C. Cir. 1987). *But see ACA Int'l*, 885 F.3d at 711–712 (noting that in at least some limited circumstances commenting may be enough in certain non-rulemaking proceedings). The D.C. Circuit and at least one other circuit apply this heightened participation requirement. *See Ohio Nuclear-Free Network v. NRC*, 53 F.4th 236, 239 (D.C. Cir. 2022); *Alabama Power Co. v. ICC*, 852 F.2d 1361, 1368 (D.C. Cir. 1988). *See also State ex rel. Balderas v. NRC*, 59 F.4th 1112, 1117 (10th Cir. 2023). The D.C. Circuit has also said that, when an agency requires intervention, those who sought but were denied intervention lack standing to seek judicial

review. *Water Transp. Ass'n*, 819 F.2d at 1192. *See also NRDC v. NRC*, 823 F.3d 641, 643 (D.C. Cir. 2016) ("To challenge the Commission's grant of a license renewal . . . a party must have successfully intervened in the proceeding by submitting adequate contentions under [the Commission's regulations].").

The D.C. Circuit embraces readings of the Hobbs Act that impose an extra-textual gloss by requiring a degree of participation not contemplated in the plain text of the statute. We think the fairest reading of the Hobbs Act doesn't impose such additional requirements. But we ultimately don't need to resolve that tension, because the Fifth Circuit recognizes an exception to the Hobbs Act party-aggrieved status requirement that's dispositive of this issue here.

This circuit recognizes an *ultra vires* exception to the party-aggrieved status requirement. In *American Trucking Associations, Inc. v. ICC*, this court noted "two rare instances" where a "person may appeal an agency action even if not a party to the original agency proceeding"—(1) where "the agency action is attacked as exceeding [its] power" and (2) where the person "challenges the constitutionality of the statute conferring authority on the agency." 673 F.2d at 85 n.4 (quotation omitted).[3]

---

[3] The Commission's various arguments that this exception isn't applicable are unavailing. It's true that we've recognized the exception is "exceedingly narrow." *Merchants Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 922 (5th Cir. 1993). And it's also true that other circuits have refused to adopt it. *See Balderas*, 59 F.4th at 1123–24; *Nat'l Ass'n of State Util. Consumer Advocs. v. FCC*, 457 F.3d 1238, 1250 (11th Cir. 2006); *Erie-Niagara Rail Steering Comm. v. STB*, 167 F.3d 111, 112–13 (2d Cir. 1999); *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 799 F.2d 317, 334–35 (7th Cir. 1986). But the exception remains good law in this circuit. Neither the Commission nor the court have identified any case overturning the exception. And to the extent that the Commission claims the exception was mere dicta in *American Trucking*, that argument fails because we've since applied the

No. 21-60743

This exception only allows us to reach those portions of the Petitioners' challenges that argue the Commission acted beyond its statutory authority. *See Wales Transp.*, 728 F.2d at 776 n.1 (allowing petitioner to proceed despite not having participated in the agency proceeding on only those claims that challenged the agency's authority under the statute). Accordingly, we must consider which, if any, of the Petitioners' challenges fall within that category.

Texas makes three merits arguments: (1) the Commission lacks the statutory authority to license the facility; (2) the license issuance violated the Administrative Procedure Act; and (3) the Commission violated the National Environmental Policy Act by failing to assess the risks of a potential terrorist attack. The first argument falls within the exception. It attacks the Commission for licensing a facility without the authority to do so under the Atomic Energy Act, and in conflict with the Nuclear Waste Policy Act.

Fasken makes four merits arguments: (1) the Commission violated the National Environmental Policy Act and Administrative Procedure Act by allowing a licensing condition that violates the Nuclear Waste Policy Act; (2) the Commission's assumptions about when the permanent repository will be operational are arbitrary and capricious; (3) the Commission adopted an unreasonably narrow purpose statement; and (4) the Commission violated the National Environmental Policy Act and Administrative Procedure Act by

---

exception in *Wales Transportation, Inc. v. ICC*, 728 F.2d 774, 776 n.1 (5th Cir. 1984). Under our circuit's rule of orderliness, we are bound to follow *American Trucking* and *Wales Transportation* because they haven't been overturned by the en banc court. The Commission is also wrong in suggesting the exception is limited to challenges of ICC orders. While it's true that both *American Trucking* and *Wales Transportation* involved challenges to ICC orders, neither case limits the exception's application to the ICC. *See Am. Trucking*, 673 F.2d at 85 n.4 (referring to agency proceedings, not ICC proceedings); *Wales Transp.*, 728 F.2d at 776 n.1 (same).

accepting the applicant's unreasonable site selection. The first of these challenges falls within the exception. Fasken's argument centers on the contention that the Commission acted beyond its statutory authority by issuing a license with a condition expressly prohibited by the Nuclear Waste Policy Act.

## III.

The Commission has no statutory authority to issue the license. The Atomic Energy Act doesn't authorize the Commission to license a private, away-from-reactor storage facility for spent nuclear fuel. And issuing such a license contradicts Congressional policy expressed in the Nuclear Waste Policy Act. This understanding aligns with the historical context surrounding the development of these statutes.

## A.

Under the Atomic Energy Act, the Commission retains jurisdiction over nuclear plant licensing and regulation. *See* 42 U.S.C. § 5842. It has authority to regulate the construction and operation of nuclear power plants. *See* 42 U.S.C. §§ 2011–2297h-13. *See also Union of Concerned Scientists*, 735 F.2d at 1438–39 (summarizing the two-step licensing procedure for nuclear power plant operation).

The Act also confers on the Commission the authority to issue licenses for the possession of "special nuclear material," *see* 42 U.S.C. § 2073, "source material," *see id.* § 2093, and "byproduct material," *see id.* § 2111. *See also* 42 U.S.C. §§ 2014(aa), (z), (e) (defining each term, respectively). Special nuclear material, source material, and byproduct material are constituent materials of spent nuclear fuel. *See Bullcreek v. NRC*, 359 F.3d 536, 538 (D.C. Cir. 2004). The Commission argues that, because it has authority to issue licenses for the possession of these constituent materials, that means it has broad authority to license storage facilities for spent nuclear fuel.

No. 21-60743

But this ignores the fact that the Act authorizes the Commission to issue such licenses only for certain enumerated purposes—none of which encompass storage or disposal of material as radioactive as spent nuclear fuel.

Sections 2073 and 2093 specify that licenses may be issued for various types of research and development, *see* 42 U.S.C. §§ 2073(a)(1)–(a)(2), 2093(a)(1)–(a)(2). It also permits such other uses that the Commission either "determines to be appropriate to carry out the purposes of th[e] chapter," *id.* § 2073(a)(4), or "approves . . . as an aid to science and industry," *id.* § 2093(a)(4). Principles of statutory interpretation require these grants be read in light of the other, more specific purposes listed—namely for certain types of research and development. *Cf. U.S. v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("When Congress provides specific statutory obligations, we will not read a 'catchall' provision to impose general obligations that would include those specifically enumerated.").

Both these sections also allow the agency to issue licenses "for use under a license issued pursuant to section 2133 of th[e] title." *Id.* 42 U.S.C. §§ 2073(a)(3), 2093(a)(3) (same). Section 2133 details the Commission's authority to issue licenses for "utilization or production facilities for industrial or commercial purposes." *Id.* § 2133(a). Utilization and production have specific definitions under the statute. *See id.* §§ 2014 (cc) (defining utilization facilities); 2014(v) (defining production facilities). And the definitions of utilization and production facilities are about nuclear reactors and fuel fabrication or enrichment facilities—not storage or disposal, as the Commission admits in its briefing. *See id.* Neither § 2073 nor § 2093 confers a broad grant of authority to issue licenses for any type of possession of special nuclear material or source material.

The same is true for § 2111. That section authorizes the Commission "to issue general or specific licenses to applicants seeking to use byproduct

material for research or development purposes, for medical therapy, industrial uses, agricultural uses, or such other useful applications as may be developed." *Id.* § 2111(a). It also specifies conditions under which certain types of byproduct material may be disposed. *Id.* § 2111(b). And the types of byproduct material covered by § 2111(b) emit radiation for significantly less time than spent nuclear fuel.

That section cross-references the definition of byproduct materials in § 2014(e)(3)–(4), which refers to radium-226 and other material that "would pose a threat similar to the threat posed by . . . radium-226 to the public health and safety." That's important because some of the isotopes in spent nuclear fuel have much longer half-lives than radium-226. The "intensity of radiation from radioactive materials decreases over time" and the "time required for the intensity to decrease by one-half is referred to as the 'half-life.'" NRC, Frequently Asked Questions (FAQs) Regarding Radium-226 § A.1, https://scp.nrc.gov/narmtoolbox/radium%20faq102008.pdf. Radium-226 has a half-life of 1600 years. *Id.* Spent nuclear fuel, on the other hand, is composed of a variety of radioactive isotopes of elements produced in the nuclear fission process. NRC, Radioactive Waste Backgrounder 1, https://www.nrc.gov/docs/ML0501/ML050110277.pdf. Some of these isotopes—strontium-90 and cesium-137—have half-lives of about 30 years. But others "take much longer to decay." *Id.* One of these isotopes is plutonium-239, which "has a half-life of 24,000 years"—fifteen times that of radium-226. *Id.* There's no plausible argument that spent nuclear fuel, which contains radioactive isotopes with half-lives much longer than radium-226, is the type radioactive material contemplated in the disposal provision in § 2111(b).

So these provisions do not support the Commission's claim of authority. In response, the Commission and Interim Storage Partners, LLC point to two cases from sister circuits. Both are unpersuasive.

No. 21-60743

In *Bullcreek v. NRC*, the D.C. Circuit denied petitions for review of the Commission's Rulemaking Order and held that the Nuclear Waste Policy Act did "not repeal or supersede the [Commission]'s authority under the Atomic Energy Act to license private away-from-reactor storage facilities." 359 F.3d at 537–38. The D.C. Circuit essentially assumed that the Atomic Energy Act had granted the Commission authority to license away-from-reactor storage facilities, despite explicitly recognizing that the Act "does not specifically refer to the storage or disposal of spent nuclear fuel." *Id.* at 538. Rather than focus on the text of the statute, it merely noted that "it has long been recognized that the [Atomic Energy Act] confers on the [Commission] authority to license and regulate the storage and disposal of such fuel." *Id.* But none of the cases the D.C. Circuit cited provide a textual analysis of the Atomic Energy Act and whether it allows away-from-reactor spent nuclear fuel storage. Each of those cases dealt with separate questions of preemption and the role of states in this scheme. *See generally Pac. Gas. & Elec. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983); *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103 (3d Cir. 1985); *Illinois v. Gen. Elec. Co.*, 683 F.2d 206 (7th Cir. 1982). They are irrelevant to the question before us.

So the D.C. Circuit provided no textual basis for its assumption that the statute authorized the Commission to issue such licenses. *See id.* (discussing the Atomic Energy Act). *Bullcreek* may be correct that the Nuclear Waste Policy Act didn't repeal portions of the Atomic Energy Act since "repeals by implication are not favored," but it doesn't actually address what authority the Commission had under the Atomic Energy Act. *Morton v. Mancari*, 417 U.S. 535, 549 (1974).

The other case the Commission cites—*Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223 (10th Cir. 2004)—is just as unhelpful. It merely relies on *Bullcreek* to "not revisit the issues surrounding the

[Commission]'s authority to license away-from-reactor [spent nuclear fuel] storage facilities." *Skull Valley*, 376 F.3d at 1232. It too assumes the Commission's authority without analyzing the statute.

## B.

Moreover, the Commission's argument cannot be reconciled with the Nuclear Waste Policy Act.

Spent nuclear fuel wasn't a concern in the 1940s and 1950s when the Atomic Energy Act was passed and amended. "Prior to the late 1970's, private utilities operating nuclear reactors were largely unconcerned with the storage of spent nuclear fuel." *Idaho*, 945 F.2d at 298. "It was accepted that spent fuel would be reprocessed." *Id.* "In the mid-70's, however, the private reprocessing industry collapsed for both economic and regulatory reasons." *Id.* "As a consequence, the nuclear industry was confronted with an unanticipated accumulation of spent nuclear fuel, inadequate private facilities for the storage of the spent fuel, and no long term plans for managing nuclear waste." *Id. See also* BRC REPORT at 20 (noting these problems and describing passage of the Act as "mark[ing] the beginning of a new chapter in U.S. efforts to deal with the nuclear waste issue"). This led Congress to pass the Nuclear Waste Policy Act in 1982.

The Nuclear Waste Policy Act provides a comprehensive scheme to address the accumulation of nuclear waste. Congress recognized that "Federal efforts during the [prior] 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal ha[d] not been adequate" and that "State and public participation in the planning and development of repositories is essential in order to promote public confidence in the safety of disposal of such waste and spent fuel." 42 U.S.C. § 10131(a)(3), (6). "The Act made the federal government responsible for permanently disposing of spent nuclear fuel and high-level radioactive waste produced by civilian

nuclear power generation and defense activities." *Nat'l Ass'n of Regul. Util. Comm'rs v. DOE*, 680 F.3d 819, 821 (D.C. Cir. 2012). *See also* 42 U.S.C. § 10131(a)(4) ("[T]he Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment.").

The Act also tasked the Department of Energy with establishing "a repository deep underground within a rock formation where the waste would be placed, permanently stored, and isolated from human contact." *Nat'l Ass'n of Regul. Util Comm'rs*, 680 F.3d at 821. *See also* 42 U.S.C. §§ 100133–34 (tasking the Energy Secretary with site characterization and public hearing duties related to the Yucca Mountain site selection). Yucca Mountain was chosen as the only suitable site for the repository when the Act was amended in 1987. *See* 42 U.S.C. § 10172 (selection of Yucca Mountain site). But the project stalled, even though the Nuclear Waste Policy Act "is obviously designed to prevent the Department [of Energy] from delaying the construction of Yucca Mountain as the permanent facility while using temporary facilities." *Nat'l Ass'n of Regul. Util. Comm'rs v. DOE*, 736 F.3d 517, 519 (D.C. Cir. 2013) (citing 42 U.S.C. § 10168(d)(1)).

In addition to the establishment of the permanent repository, *see* 42 U.S.C. §§ 10131–10145, the Nuclear Waste Policy Act also established other measures to deal with spent nuclear fuel.[4]

---

[4] All these measures are subject to the proviso in 42 U.S.C. § 10155(h), which states that "nothing in this chapter shall be construed to encourage, authorize, or require the private or Federal use, purchase, lease, or other acquisition of any storage facility located away from the site of any civilian nuclear power reactor and not owned by the Federal Government on" the date of enactment.

No. 21-60743

One is temporary storage. *See id.* §§ 10151–10157. The Act places "primary responsibility for providing interim storage of spent nuclear fuel" on "the persons owning and operating civilian nuclear power reactors." *Id.* § 10151(a)(1). It tasks the Commission and the Secretary of Energy to "take such actions as . . . necessary to encourage and expedite the effective use of available storage, and the necessary additional storage, *at the site* of each civilian nuclear power reactor." *Id.* § 10152 (emphasis added). *See also id.* § 10153 ("The establishment of such procedures shall not preclude the licensing . . . of any technology for the storage of civilian spent nuclear fuel *at the site* of any civilian nuclear power reactor.") (emphasis added). It further tasks the Secretary of Energy with "provid[ing] . . . capacity for the storage of spent nuclear fuel from civilian nuclear power reactors." *Id.* § 10155(a)(1). Moreover, the Act provides that "the Federal Government has the responsibility to provide . . . not more than 1,900 metric tons of capacity for interim storage of spent nuclear fuel for civilian nuclear power reactors that cannot reasonably provide adequate storage capacity" where it is necessary for the "continued, orderly operation of such reactors." *Id.* § 10151(a)(3). Here, the license permits storage of at least 5,000 and as much as 40,000 metric tons of nuclear waste.

The other measure is monitored retrievable storage. *See id.* § 10161–10169. *See also id.* § 10101(34) (defining "monitored retrievable storage facility"). Under the statute, "[t]he Secretary [of Energy] is authorized to site, construct, and operate one monitored retrievable storage facility subject to the conditions described [in the relevant sections of statute]." *Id.* § 10162(b). And one of those conditions is that "[a]ny license issued by the Commission for a monitored retrievable storage facility under [the statute] shall provide that . . . construction of such facility may not begin until the Commission has issued a license for the construction of a repository [i.e., Yucca Mountain]." *Id.* § 10168(d)(1).

No. 21-60743

Reading these provisions together makes clear that the Nuclear Waste Policy Act creates a comprehensive statutory scheme for addressing spent nuclear fuel accumulation. The scheme prioritizes construction of the permanent repository and limits temporary storage to private at-the-reactor storage or at federal sites. It plainly contemplates that, until there's a permanent repository, spent nuclear fuel is to be stored onsite at-the-reactor or in a federal facility.

In sum, the Atomic Energy Act doesn't authorize the Commission to license a private, away-from-reactor storage facility for spent nuclear fuel. And the Nuclear Waste Policy Act doesn't permit it. Accordingly, we hold that the Commission doesn't have authority to issue the license challenged here.

When read alongside each other, we find these statutes unambiguous. And even if the statutes were ambiguous, the Commission's interpretation wouldn't be entitled to deference.

Last year, the Supreme Court directed that, "[w]here the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted" and whether there are "reason[s] to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607–08 (2022) (quotations omitted) (adopting the major questions doctrine).

Disposal of nuclear waste is an issue of great "economic and political significance." *Id.* at 2608. What to do with the nation's ever-growing accumulation of nuclear waste is a major question that—as the history of the Yucca Mountain repository shows—has been hotly politically contested for over a half century. Congress itself has acknowledged that "high-level

radioactive waste and spent nuclear fuel have become major subjects of public concern."  42 U.S.C. § 10131(a)(7) (findings section of the Nuclear Waste Policy Act).  "A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to *clear* delegation from that representative body."  *West Virginia*, 142 S. Ct. at 2616 (emphasis added).  Here, there's no such clear delegation under the Atomic Energy Act.  And the Nuclear Waste Policy Act belies the Commission's arguments to the contrary.

\* \* \*

We grant the petitions for review, vacate the license, and deny the Commission's motions to dismiss.