No. 21-60743

# In the United States Court of Appeals
## FOR THE FIFTH CIRCUIT

STATE OF TEXAS; GREG ABBOTT, GOVERNOR OF THE STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; FASKEN LAND AND MINERALS, LIMITED; PERMIAN BASIN LAND AND ROYALTY OWNERS,

*Petitioners*

v.

NUCLEAR REGULATORY COMMISSION; UNITED STATES OF AMERICA,

*Respondents*

On Petition for Review of Action by the United States Nuclear Regulatory Commission

## PETITION FOR REHEARING EN BANC BY INTERVENOR INTERIM STORAGE PARTNERS, LLC

BRAD FAGG
TIMOTHY P. MATTHEWS
RYAN K. LIGHTY
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-3000
brad.fagg@morganlewis.com
timothy.matthews@morganlewis.com
ryan.lighty@morganlewis.com

*Counsel for Interim Storage Partners, LLC*

## CERTIFICATE OF INTERESTED PERSONS

### No. 21-60743

STATE OF TEXAS; GREG ABBOTT, GOVERNOR OF THE STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; FASKEN LAND AND MINERALS, LIMITED; PERMIAN BASIN LAND AND ROYALTY OWNERS,

*Petitioners*

v.

NUCLEAR REGULATORY COMMISSION;
UNITED STATES OF AMERICA,

*Respondents*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## Petitioners

- State of Texas; Greg Abbott, Governor of the State of Texas; and Texas Commission on Environmental Quality (collectively "Texas")

    o Counsel for Texas:

    Michael Abrams
    Ryan Baasch
    OFFICE OF THE ATTORNEY GENERAL, STATE OF TEXAS

- Fasken Land and Minerals, Limited; Permian Basin Land and Royalty Owners (together, "Fasken")

  o Counsel for Fasken:

  Allan Kanner
  Annemieke M. Tennis
  KANNER & WHITELEY, L.L.C.

## Federal Respondents

- U.S. Nuclear Regulatory Commission

  o Counsel for U.S. Nuclear Regulatory Commission:

  Andrew Paul Averbach
  U.S. NUCLEAR REGULATORY COMMISSION

- United States of America

  o Counsel for United States of America:

  Justin Heminger
  U.S. DEPARTMENT OF JUSTICE

## Intervenor-Respondent

- Interim Storage Partners, LLC

Interim Storage Partners, LLC is a limited liability company organized and existing under the laws of the State of Delaware with principal offices in Andrews, Texas. The sole purpose of Interim Storage Partners, LLC is to license, design, construct and operate the Consolidated Interim Storage Facility at the Waste Control Specialists site in Andrews County, Texas. Interim Storage Partners, LLC is jointly owned by Orano CIS, LLC (51%) and Waste Control Specialists, LLC (49%). No other publicly held company has 10 percent or more equity interest in Interim Storage Partners, LLC.

Orano CIS, LLC is owned 100% by Orano USA, LLC. Orano CIS, LLC and Orano USA, LLC are both limited liability companies formed in

the State of Delaware. Orano USA, LLC is 100% owned by Orano SA, a French entity. Orano SA is ultimately majority (90%) owned and controlled by the French State, through two French government entities. Two Japanese entities (Mitsubishi and Japan Nuclear Fuel) each own a 5% (non-voting) interest in Orano SA.

Waste Control Specialists, LLC is wholly-owned by Fermi Holdings, Inc., an investment affiliate of J.F. Lehman & Co. The full ownership chain includes several other privately held J.F. Lehman & Co. investment affiliates, with no individual shareholders owning more than 25% of any of the entities.

     o Counsel for Interim Storage Partners, LLC:

     Brad Fagg
     Timothy P. Matthews
     Ryan K. Lighty
     MORGAN, LEWIS & BOCKIUS LLP

Dated: October 23, 2023     <u>s/ Brad Fagg</u>
     *Counsel for Interim Storage Partners, LLC*

## RULE 35(b) STATEMENT

The panel vacated a license issued to Interim Storage Partners, LLC ("ISP") by the United States Nuclear Regulatory Commission ("NRC"), which authorized the temporary possession of spent nuclear fuel at an installation to be constructed by ISP, until acceptance of that fuel for permanent disposal by the United States Department of Energy ("DOE"). The license had been duly issued under regulations promulgated under the Atomic Energy Act ("AEA") pursuant to notice and comment rulemaking in 1980. Rehearing en banc is warranted for at least two essential reasons.

*First*, the panel's decision holding that the NRC did not have authority to issue the license under the AEA and its long-standing regulations seriously disrupts industry expectations, creates confusion, and creates a question of exceptional importance by departing from at least two other authoritative decisions in other Circuits holding that the NRC does, in fact, have the authority to issue the type of license granted to ISP. *Bullcreek v. NRC*, 359 F.3d 536, 543 (D.C. Cir. 2004); *Skull Valley Band of Goshute Indians v. Neilson*, 376 F.3d 1223, 1232 (10th Cir. 2004).

*Second,* the panel decision conflicts with the Supreme Court's decision in *West Virginia v. Environmental Protection Agency*, 142 S.Ct. 2587, 2608-2614 (2022), by abruptly and retroactively invalidating a decades-old, well-settled core regulatory function of the NRC, despite the absence from this case of multiple of the prerequisites that the Supreme Court has held must be present in order to constitute the sort of "extraordinary case" that can justify the "distinct" heightened scrutiny of agency authority under the "major questions doctrine" invoked by the panel to invalidate the agency action here.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................ i

RULE 35(b) STATEMENT ..................................................... iv

TABLE OF AUTHORITIES ................................................... vii

STATEMENT OF ISSUES ..................................................... 1

STATEMENT OF THE COURSE OF PROCEEDINGS AND
    DISPOSITION OF THE CASE ........................................ 1

STATEMENT OF FACTS ..................................................... 4

ARGUMENT .................................................................. 10

    I.    Congress intended to grant to the NRC the authority to
        regulate the temporary possession of spent nuclear fuel
        by a private party at a location away from an existing
        power reactor. ..................................................... 10

    II.    The panel decision conflicts with *West Virginia v. EPA*,
        by expanding the application of that case to
        circumstances where the necessary prerequisites do
        not exist. ......................................................... 14

CONCLUSION .............................................................. 18

CERTIFICATE OF SERVICE ............................................... 19

CERTIFICATE OF COMPLIANCE ....................................... 20

ADDENDUM ................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bullcreek v. NRC,*
    359 F.3d 536 (D.C. Cir. 2004) ..................................................... *passim*

*Crabb v. Zerbst,*
    99 F.2d 562 (5th Cir. 1938) ................................................................ 11

*Don't Waste Mich. v. NRC,*
    No. 21-1048, 2023 WL 395030 (D.C. Cir., Jan. 25, 2023) ............... 2, 9

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ........................................................................... 16

*FTC v. Bunte Bros., Inc.,*
    312 U.S. 349 (1941) ........................................................................... 15

*Illinois v. Gen. Elec. Co.,*
    683 F.2d 206 (7th Cir. 1982) ............................................................. 13

*In the Matter of Private Fuel Storage, LLC,*
    56 NRC 390, 2002 WL 32074598 (2002) ........................................... 12

*Ind. Mich. Power Co. v. United States,*
    422 F.3d 1369 (Fed. Cir. 2005) ........................................................... 9

*Nastase v. Barr,*
    964 F.3d 313 (5th Cir. 2020) ............................................................. 11

*Ohio Nuclear-Free Network v. NRC,*
    53 F.4th 236 (D.C. Cir. 2022) ............................................................. 3

*Skull Valley Band of Goshute Indians v. Neilson,*
    376 F.3d 1223 (10th Cir. 2004) ................................................. iv, 3, 12

*State ex rel. Balderas v. NRC,*
    59 F.4th 1112 (10th Cir. 2023) ........................................................ 2, 3

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Texas v. NRC,*
  891 F.3d 553 (5th Cir. 2018) ................................................................. 9

*United States v. Rayo-Valdez,*
  302 F.3d 314 (5th Cir. 2002) ............................................................. 11

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ............................................................. *passim*

## STATUTES

42 U.S.C.
  § 2011 ................................................................................. 4
  § 2012 ................................................................................. 4
  § 2073 ............................................................................. 5, 10
  § 2092 ................................................................................. 5
  § 2093 ........................................................................... 5, 6, 10
  § 2111 ........................................................................... 5, 6, 10
  § 2201 ............................................................................. 5, 10
  § 10153 ............................................................................... 9
  § 10155 ............................................................................... 9

Atomic Energy Act, Pub. L. No. 83-703, 68 Stat. 919 (codified as
  amended at 42 U.S.C. ch. 14 § 2011 *et seq.*) ............................... *passim*

Energy Reorganization Act of 1974, Pub. L. No. 93-438, 88 Stat. 1233 .. 6

Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201
  (codified as amended at 42 U.S.C. § 10101 *et seq.*) .......................... 3, 8

## RULES & REGULATIONS

10 C.F.R. Part 72 ...................................................................... 7, 8, 9, 13

# TABLE OF AUTHORITIES
(continued)

Page(s)

Fed. R. App. P.
28 ...................................................................................... 8
28 ...................................................................................... 8
35 .................................................................................... iv

General Electric Co.; Renewal of Materials License for the Storage of
   Spent Fuel, 47 Fed. Reg. 20,231 (May 11, 1982) ................................. 7

Licensing Requirements for the Storage of Spent Nuclear Fuel in an
   Independent Spent Fuel Storage Installation: Final Rule, 45 Fed.
   Reg. 74,693 (Nov. 12, 1980) ...................................................... 7, 8, 12

Private Fuel Storage, Limited Liability Company; Notice of Issuance of
   Materials License SNM-2513 for the Private Fuel Storage Facility,
   71 Fed. Reg. 10,068 (Feb. 28, 2006) ............................................... 7

Public Service Co. of Colorado; Issuance of Materials License SNM-
   2504, Ft. St. Vrain Independent Spent Fuel Storage; Installation at
   the Ft. St. Vrain Nuclear Generating Station, 56 Fed. Reg. 57,539
   (Nov. 12, 1991) .......................................................................... 7

Storage of Spent Nuclear Fuel in an Independent Spent Fuel Storage
   Installation (ISFSI): Proposed Rule, 43 Fed. Reg. 46,309 (Oct. 6,
   1978) .......................................................................................... 6

## OTHER AUTHORITIES

S. Rep. No. 97-282 (1981) ........................................................................ 8

*U.S. Independent Spent Fuel Storage Installations (ISFSI)*, NRC (June
   2023), https://www.nrc.gov/docs/ML2316/ML23165A245.pdf ............. 8

## STATEMENT OF ISSUES

1.    Whether, as two other Circuits have held, Congress intended to grant to the NRC the authority under the AEA to issue a license to a private party to temporarily possess spent nuclear fuel at a location away from an operating power reactor, pursuant to regulations to that effect that were promulgated in 1980.

2.    Whether, under *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587 (2022), a court may apply heighted scrutiny to retroactively jettison an agency's long-standing exercise of statutory authority under the "major questions doctrine," when the necessary prerequisites for application of that doctrine identified by the Supreme Court are not present.

## STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

In April 2016, one of ISP's joint venture members submitted an application (subsequently assumed and pursued by ISP) to the NRC for a license to temporarily store spent nuclear fuel from civilian nuclear power facilities at a consolidated interim storage facility, to be constructed adjacent to an existing low-level waste radiological facility in Andrews County, Texas.  In August 2018 the NRC provided notice of its

consideration of the license application in the Federal Register pursuant to its regulations, along with instructions regarding how interested parties and entities could petition for a hearing and intervene in the NRC proceedings.

A number of parties made various filings with the NRC between September and November 2018. Texas elected not to participate in the NRC adjudicatory proceedings pursuant to the NRC's rules, but submitted letters to the NRC regarding a draft Environmental Impact Statement and, on the eve of the issuance of the license, objecting upon the basis of a just-passed Texas law prohibiting the storage of spent nuclear fuel in the state. The State of New Mexico, like Texas, also did not participate in the NRC adjudicatory process, but filed a challenge to the license in the 10th Circuit, which that court dismissed on jurisdictional grounds due to New Mexico's failure to participate as required at the agency level. *State ex rel. Balderas v. NRC*, 59 F.4th 1112 (10th Cir. 2023). Various of the groups that had sought to participate in the NRC adjudicatory process filed petitions in the D.C. Circuit, which ultimately dismissed or denied all of those petitions on the merits. *Don't Waste Mich. v. NRC*, No. 21-1048, 2023 WL 395030 (D.C. Cir., Jan. 25, 2023).

Texas and two other parties filed petitions directly in this Court, challenging the NRC's issuance of the license on multiple grounds. The panel rejected the NRC's standing and jurisdictional challenges to the Texas petition, declining to follow contrary precedent in the D.C. and at least one other circuit. Panel Op. 8-18; *see Ohio Nuclear-Free Network v. NRC*, 53 F.4th 236, 239 (D.C. Cir. 2022); *Balderas*, 59 F.4th at 1117. The panel therefore determined to reach the merits issues, which had not been presented to, or addressed by, the agency.

The panel then held that the AEA does not authorize the Commission to license a private, away-from reactor storage facility for spent nuclear fuel, dismissing contrary rulings by the D.C. Circuit (in *Bullcreek*, 359 F.3d at 538), and the 10th Circuit (in *Skull Valley*, 376 F.3d at 1232), as "unpersuasive" based upon a lack of "textual analysis" of the AEA in those decisions. Panel Op. 18-22. The panel further held that the Nuclear Waste Policy Act "doesn't permit" the activity authorized by the ISP license. *Id.* at 22-25. Finally, the panel held that its conclusions were compelled by *West Virginia*, 142 S. Ct. at 2607-08. Panel Op. 25-26. The panel vacated the ISP license.

## STATEMENT OF FACTS

The Atomic Energy Act, Pub. L. No. 83-703, 68 Stat. 919 (codified as amended at 42 U.S.C. ch. 14 § 2011 *et seq.*) was originally passed in 1954, less than ten years after Hiroshima.  The purposes of the AEA included "development, use, and control of atomic energy . . . so as to make the maximum contribution to the general welfare," 42 U.S.C. § 2011(a), and to "improve the general welfare, increase the standard of living, and strengthen free competition in private enterprise."  42 U.S.C. § 2011(b). Congress found that the development, utilization, and control of atomic energy was "vital to the common defense and security," that "the processing and utilization of source, byproduct, and special nuclear material affect interstate and foreign commerce and must be regulated in the national interest," and that the "processing and utilization of source, byproduct, and special nuclear material must be regulated in the national interest and in order to provide for the common defense and security and to protect the health and safety of the public."  42 U.S.C. §§ 2012 (a), (c), and (d).

The AEA created a brand-new agency, the Atomic Energy Commission, which was broadly tasked to "establish by rule, regulation, or order,

such standards and instructions to govern the possession and use of spe-
cial nuclear material, source material, and byproduct material as the
Commission may deem necessary or desirable to promote the common
defense and security or to protect health or to minimize danger to life or
property." 42 U.S.C. § 2201(b).

Spent nuclear fuel is composed of "special nuclear material,"
"source material," and "byproduct material." As noted, Section 2201(b)
of Title 42 charged the Commission with developing rules and regulations
for the possession and use of such materials deemed "necessary or desir-
able" by the agency for the common defense, to protect health, or to min-
imize danger to life or property. "Domestic distribution" of each of the
constituent elements of spent nuclear fuel was also addressed in separate
sections of the statute, which authorized the Commission to issue li-
censes to private parties to possess such materials for various purposes.
42 U.S.C. §§ 2073, 2092, 2093, 2111. The enumerated purposes for li-
censing of special nuclear material and source material included research
and development, use in certain production and utilization facilities, and
"such other uses as the commission determines to be appropriate to carry
out the purposes of this chapter" (§ 2073(a)(4)) and "for any other use

approved by the Commission as an aid to science or industry."
(§ 2093(a)(4)). The identified purposes for licensing of byproduct materi-
als included research and medical uses, as well as "industrial uses" and
"such other useful applications as may be developed." 42 U.S.C.
§ 2111(a).

The AEA was amended in 1974 to create the Nuclear Regulatory
Commission, an independent regulatory commission which assumed the
broad authority under the AEA to regulate the civilian possession and
use of radioactive materials. Energy Reorganization Act of 1974, Pub. L.
No. 93-438, 88 Stat. 1233. That amendment also created a completely
separate agency, the Department of Energy, which assumed developmen-
tal functions from the Atomic Energy Commission.

In 1978, pursuant to the above-noted provisions of the AEA, the
NRC issued a proposed rule for notice and public comment, which explic-
itly provided for the possession of spent nuclear fuel "at installations built
specifically for this [storage] that are not coupled to either a nuclear
power plant or a fuel reprocessing plant." Storage of Spent Nuclear Fuel
in an Independent Spent Fuel Storage Installation (ISFSI): Proposed
Rule, 43 Fed. Reg. 46,309 (Oct. 6, 1978). After extensive public comments

(none of which challenged the authority of the agency to promulgate such a rule), a final rule to that effect was promulgated in 1980. Licensing Requirements for the Storage of Spent Nuclear Fuel in an Independent Spent Fuel Storage Installation: Final Rule, 45 Fed. Reg. 74,693 (Nov. 12, 1980). Those regulations, therefore, have been on the books at 10 C.F.R. Part 72 for more than forty years.

In the many decades since, the NRC has been open, public, and transparent about its exercise of the authority to license interim away-from-reactor storage of spent nuclear fuel. *E.g.*, General Electric Co.; Renewal of Materials License for the Storage of Spent Fuel, 47 Fed. Reg. 20,231 (May 11, 1982) (renewal of materials license SNM-2500 for away-from-reactor spent fuel storage facility in Morris, Illinois); Public Service Co. of Colorado; Issuance of Materials License SNM-2504, Ft. St. Vrain Independent Spent Fuel Storage; Installation at the Ft. St. Vrain Nuclear Generating Station, 56 Fed. Reg. 57,539 (Nov. 12, 1991) (materials license issued under 10 C.F.R. Part 72 at site of decommissioning reactor); Private Fuel Storage, Limited Liability Company; Notice of Issuance of Materials License SNM-2513 for the Private Fuel Storage Facility, 71 Fed. Reg. 10,068 (Feb. 28, 2006) (materials license for away-from-reactor

spent fuel storage facility in Tooele County, Utah). *See also Bullcreek*, 359 F.3d at 543 (noting the existence of three "private away-from-reactor storage facilities" at the time of the passage of the Nuclear Waste Policy Act in 1983); 45 Fed. Reg. at 74,693, 74,698. Post-argument submissions solicited by the panel confirmed that there are at least twelve existing, away-from-reactor sites currently licensed by the NRC for the storage of spent nuclear fuel (the legal status of which may now be subject to question, in light of the panel ruling).[1]

Two years after Part 72 of Title 10 of the C.F.R. was promulgated by the NRC, Congress passed the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (codified as amended at 42 U.S.C. § 10101 *et seq.*) ("NWPA"). Congress was fully aware of the NRC's Part 72 away-from-reactor spent nuclear fuel storage regulations, and that the NRC had asserted authority under the AEA to license such possession of spent nuclear fuel, at the time of the consideration of the NWPA. *E.g.*, S. Rep. No. 97-282, at 44 (1981). Although the AEA is mentioned several times

---

[1]  *See U.S. Independent Spent Fuel Storage Installations (ISFSI)*, NRC (June 2023), https://www.nrc.gov/docs/ML2316/ML23165A245.pdf; Doc. No. 164 at p.4 (Fasken Rule 28(j) letter, dated September 1, 2022); Doc. No. 165 at p.1 (ISP Rule 28(j) letter, dated September 7, 2022).

in the text of the NWPA (e.g., 42 U.S.C. §§ 10153(a),(b)(3), 10155(a)(1)(A)(i)), there is no reference to, much less a revocation of, the NRC's Part 72 authority under the AEA to license away-from-reactor storage of spent nuclear fuel.

The NWPA created a comprehensive scheme for the ownership and permanent disposal of spent nuclear fuel by DOE, not private parties. It created acceptance and disposal duties regarding spent nuclear fuel on the part of DOE, not the NRC. *See Don't Waste Mich.*, 2023 WL 395030 at *1 ("Storage and disposal, however, are different concepts.") And, as everyone understands, DOE is in breach of its acceptance and disposal obligations under the NWPA, *e.g., Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1372 (Fed. Cir. 2005) ("partial breach"), and private parties are therefore being forced to store spent nuclear fuel for longer than just about anyone would have liked. *E.g., Texas v. NRC*, 891 F.3d 553, 555 (5th Cir. 2018).

# ARGUMENT

## I.    Congress intended to grant to the NRC the authority to regulate the temporary possession of spent nuclear fuel by a private party at a location away from an existing power reactor.

Congress intended for the NRC to have, and to exercise, the authority to grant a license to a private party to temporarily possess spent nuclear fuel at locations other than existing power plants, such as the license granted to ISP in this case.  The statutory language of the AEA quite comfortably accommodates that authority: Section 161(b) of the AEA, 42 U.S.C. § 2201(b), broadly confers upon the agency the responsibility to "establish by rule, regulation, or order" the standards to possess all of the constituent elements of spent nuclear fuel deemed "necessary or desirable" by the agency.  Similarly, sections 2073, 2093, and 2111 of title 42 broadly contemplate the agency issuing licenses for the possession of each of the constituent elements of spent nuclear fuel for "uses as the Commission determines to be appropriate to carry out the purposes of this chapter" (Section 2073(a)(4)), "any other use approved by the Commission as an aid to science or industry" (Section 2093(a)(4)), and for "industrial uses" and "such other useful applications as may be developed." (Section 2111(a).)  The identification in the statute of other potential,

non-power related purposes for which licenses might be issued, such as certain types of medical or other research and development, does not (contrary to the suggestion of the panel) render the statutory provisions that contain fundamental grants of general authority to the agency meaningless, nor constrain the plain meaning of their terms. *E.g., Crabb v. Zerbst*, 99 F.2d 562, 564 (5th Cir. 1938) ("The doctrine noscitur a sociis in the interpretation of statutes does not operate to render general words meaningless.") (citations omitted); *Nastase v. Barr*, 964 F.3d 313, 317 (5th Cir. 2020) ("when interpreting a statute, it is necessary to give meaning to all of its words and to render none superfluous") (quoting *United States v. Rayo-Valdez*, 302 F.3d 314, 318 (5th Cir. 2002).

The context and history of the AEA, both as passed and over the decades since, further confirm this congressional intent. At the time of its passage and for the several years thereafter, atomic energy was a brand-new, world-altering technology, and development of the specific rules and standards that would apply to that nascent new industry plainly required the sort of flexibility and dedicated expertise that Congress intended to be exercised by a specialized scientific agency. When the NRC determined to formalize its procedures regarding away-from-

reactor storage of spent nuclear fuel in 1978, it did so in the most public,
deliberate, and transparent way possible—extensive formal notice and
comment rulemaking, explicitly citing the above-noted AEA statutory
provisions as its authority for doing so.  The public record and comments
covered almost every conceivable issue, including policy debates regard-
ing "at-reactor versus away-from-reactor siting" of storage installations
(45 Fed. Reg. at 74,693, 74,696), but there was no suggestion regarding
any lack of NRC authority over the latter under the AEA.  Those regula-
tions were promulgated in 1980, and have been on the books and applied
as needed, both prior to the passage of the NWPA in 1982 and for the
more than four decades since.

And, other Circuits have confirmed that congressional intent.  In
the *Bullcreek* proceedings, both at the agency level and before the court
of appeals, the vigorously-contested issues were all about whether the
NRC's existing authority under the AEA to license away-from-reactor
storage of spent nuclear fuel had been abrogated by the NWPA.  *See In
the Matter of Private Fuel Storage, LLC*, 56 NRC 390, 395-96, 2002 WL
32074598 (2002); *Bullcreek*, 359 F.3d at 539-40; *see also Skull Valley*,
376 F.3d at 1232.  If there was any legitimate doubt about the existence

of the NRC's predicate authority in the first place, that most certainly would have been resolved at that time and in those proceedings, rather than—necessarily—conceded. *Bullcreek*, 359 F.3d at 541; *see also Illinois v. Gen. Elec. Co.*, 683 F.2d 206, 214-15 (7th Cir. 1982) ("the state does not, and could not, question the Commission's authority to regulate the storage of spent nuclear fuel."). But, there was no legitimate doubt then, and there is no legitimate doubt now.

Finally, there is nothing in the text of any provision of the NWPA that abrogates the NRC's existing authority under the AEA, nor was it correct for the panel to discern such a prohibition from the structure, context, or history and purposes of the NWPA. That is especially true in light of the explicit pre-enactment public recitation of that NRC authority in the Code of Federal Regulations at Part 72 of Title 10, and the demonstrable congressional awareness of that asserted authority at the time of passage of the NWPA in 1982. *E.g.*, *Bullcreek*, 359 F.3d at 542. Rehearing is warranted, in order to resolve the panel's departure from the D.C. and Tenth Circuits.

II.    **The panel decision conflicts with *West Virginia v. EPA*, by expanding the application of that case to circumstances where the necessary prerequisites do not exist.**

In *West Virginia v. EPA*, the Supreme Court articulated a "distinct" level of heightened scrutiny regarding certain agency actions, separate and apart from "routine statutory interpretation." 142 S. Ct. at 2608-09. Such cases involve a "different approach," in which there should be "reason to hesitate" before concluding that Congress meant to confer a newly-asserted agency power, even where there is a colorable textual basis in the statute. *Id.* at 2608. Significantly, however, the Court made clear in *West Virginia* that the principles it was applying were reserved for "certain extraordinary cases." *Id.* The Court described at great length a number of prerequisites that could cause an action to be deemed such an "extraordinary case," and thereby justify application of the "major questions doctrine." None of the required factors are present here, and the panel's invocation of *West Virginia* in support of its conclusions therefore represents a substantial expansion of, and conflict with, that Supreme Court precedent.

*First*, the cited linchpin of the Supreme Court's decision in West Virginia was the "newness" of the rule there challenged—"things

changed" upon promulgation of the new agency rule, *id.* at 2604, and the circumstances departed from "established practice" by the agency. *Id.* at 2610 (citing *FTC v. Bunte Bros., Inc.,* 312 U.S. 349, 352 (1941)). Here, as described above, it is quite the opposite: there is nothing "new" about what the NRC did in this case. The rule providing for the issuance of the license to ISP has been on the books, and consistently applied in analogous circumstances by the NRC, for decades.

*Second*, the challenged agency action in *West Virginia* fell far outside of the sort of core regulatory function historically exercised by the agency—there, the Environmental Protection Agency deciding "how Americans will get their energy," in an "unprecedented" manner by which the agency had "never regulated" before, and without "comparative expertise." 142 S. Ct. at 2611, 2613. An agency, in other words, straying well outside of its established regulatory lane. Here, once again, it is the opposite—deciding how, by whom, and under what conditions nuclear materials can safely be possessed by private parties on a temporary basis has been a central mission of the NRC (and its predecessor agency) for more than half a century.

*Third*, the Supreme Court in *West Virginia* emphasized the "ancillary nature" of the "obscure, never-used section of the law," in which the agency "claimed to discover . . . an unheralded power." *Id.* at 2602, 2610 (citations omitted). Here, again, it is the opposite: the formal regulations allowing for the issuance of the license to ISP in this case were publicly adopted by the agency more than forty years ago, and explicitly based upon oft-invoked statutory provisions that have supported the NRC's long-standing exercise of authority to license the possession of spent nuclear fuel and its constituent components.

*Fourth*, the Court in *West Virginia* underscored that the new rule in that case allowed the agency to "adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." *Id.* at 2610 (citations omitted); *see also id.* at 2614 ("we cannot ignore that the regulatory writ EPA newly uncovered conveniently enabled it to enact a program that, long after the dangers posed by greenhouse gasses 'had become well known, Congress considered and rejected' multiple times.") (*quoting FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000)). There is nothing like that here and, once again, this case is the opposite. Congress has not only never rejected any proposal to grant the

NRC the authority to license temporary away-from-reactor possession of spent nuclear fuel, but, to the contrary, was fully aware of that authority—and did not disturb it—when it passed comprehensive legislation addressing permanent disposal of spent nuclear fuel in the NWPA. *See Bullcreek*, 359 F.3d at 542.

*Fifth* and finally, the record in the *West Virginia* proceedings established that what was at issue in that case was nothing less than an "aggressive transformation in the domestic energy industry," "billions of dollars in compliance costs," elimination of "tens of thousands of jobs across various sectors," and a "restructuring [of] the Nation's overall mix of electricity generation," all through a "transformative expansion" of the agency's regulatory authority. *Id.* at 2604, 2607, 2610 (citations omitted). The record here contains nothing like that at all. It is true enough that many people care deeply about all things nuclear, and that issues regarding disposal and storage of nuclear waste have been "hotly politically contested." Panel Op. 26. It is also true that people care deeply about and hotly contest much, if not most, of what Congress does and does not do. But, under *West Virginia*, not every purported challenge to agency au-

thority that merely concerns a hotly contested subject is an "extraordinary case" to which the "major questions doctrine" can be applied. And, this is plainly not an extraordinary case. Rehearing en banc is warranted in order to correct the panel's substantial expansion of *West Virginia*.

## CONCLUSION

The petition for rehearing en banc should be granted.


Dated:  October 24, 2023          Respectfully submitted,

                                        s/ Brad Fagg
                                        BRAD FAGG
                                        TIMOTHY P. MATTHEWS
                                        RYAN K. LIGHTY
                                        MORGAN, LEWIS & BOCKIUS LLP
                                        1111 Pennsylvania Avenue, N.W.
                                        Washington, D.C. 20004
                                        (202) 739-3000
                                        brad.fagg@morganlewis.com
                                        timothy.matthews@morganlewis.com
                                        ryan.lighty@morganlewis.com

                                        *Counsel for Interim Storage Partners, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2023, I electronically filed the foregoing Petition for Rehearing En Banc by Intervenor Interim Storage Partners, LLC with the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all other parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Justin D. Heminger
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
justin.heminger@usdoj.gov

*Counsel for the United States of America*

Andrew P. Averbach
Office of the General Counsel
U.S. Nuclear Regulatory Commission
11555 Rockville Pike
Rockville, MD 20852
andrew.averbach@nrc.gov

*Counsel for the U.S. Nuclear Regulatory Commission*

Michael R. Abrams
Ryan S. Baasch
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711
michael.abrams@oag.texas.gov
ryan.baasch@oag.texas.gov

*Counsel for Petitioners State of Texas, Governor Greg Abbott, and Texas Commission on Environmental Quality*

Allan Kanner
Annemieke M. Tennis
Kanner & Whiteley, L.L.C.
701 Camp Street
New Orleans, LA. 70130
a.kanner@kanner-law.com
a.tennis@kanner-law.com

*Counsel for Petitioners Fasken Land and Minerals, Ltd. and Permian Basin Land and Royalty Owners*

s/ Brad Fagg
BRAD FAGG

19

## CERTIFICATE OF COMPLIANCE

1.    This petition complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because this brief contains 3,752 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook font, a proportionally spaced typeface using Microsoft Word, in 14-point font size and in plain, roman style.

s/ Brad Fagg

BRAD FAGG

ADDENDUM

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 25, 2023

Lyle W. Cayce
Clerk

No. 21-60743

STATE OF TEXAS; GREG ABBOTT, *Governor of the State of Texas*;
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; FASKEN
LAND AND MINERALS, LIMITED; PERMIAN BASIN LAND AND
ROYALTY OWNERS,

*Petitioners,*

*versus*

NUCLEAR REGULATORY COMMISSION; UNITED STATES OF
AMERICA,

*Respondents.*

Appeal from the Nuclear Regulatory Commission
Agency No. 72-1050

Before JONES, HO, and WILSON, *Circuit Judges*.

JAMES C. HO, *Circuit Judge*:

Nuclear power generation produces thousands of metric tons of nuclear waste each year. And such waste has been accumulating at nuclear power plants throughout the United States for decades. Congress has mandated that such waste be permanently stored in a geologic repository. But the development, licensing, and construction of that repository has stalled.

No. 21-60743

To address this problem, the Nuclear Regulatory Commission has asserted that it has authority under the Atomic Energy Act to license temporary, away-from-reactor storage facilities for spent nuclear fuel. Based on that claim of authority, the Commission has issued a license for Interim Storage Partners, LLC, a private company, to operate a temporary storage facility on the Permian Basin, in Andrews County, Texas. Fasken Land and Minerals, Ltd., a for-profit organization working in oil and gas extraction, and Permian Basin Land and Royalty Owners ("PBLRO"), an association seeking to protect the interests of the Permian Basin, have petitioned for review of the license.[1] So has the State of Texas, which argues, *inter alia*, that the Atomic Energy Act doesn't confer authority on the Commission to license such a facility.

Texas is correct. The Atomic Energy Act does not confer on the Commission the broad authority it claims to issue licenses for private parties to store spent nuclear fuel away-from-the-reactor. And the Nuclear Waste Policy Act establishes a comprehensive statutory scheme for dealing with nuclear waste generated from commercial nuclear power generation, thereby foreclosing the Commission's claim of authority. Accordingly, we grant the petition for review and vacate the license.

## I.

This case is the latest development in a decades-long debate over nuclear power and waste regulation. Accordingly, we provide a brief overview of relevant historical and technical background before delving into the specifics of the licensing proceedings challenged here.

_____

[1] For the remainder of this opinion, we use the term "Fasken" to refer to Fasken Land and Minerals, Ltd. and PBLRO collectively, unless addressing an issue where it's necessary to distinguish them.

No. 21-60743

## A.

The United States began producing nuclear waste in the 1940s, first as a byproduct of nuclear weapons development and then as a byproduct of the commercial nuclear power industry. Blue Ribbon Commission on America's Nuclear Future, Report to the Secretary of Energy 19 (Jan. 2012) https://www.energy.gov/sites/prod/files/2013/04/f0/brc_finalreport_jan2012.pdf [hereinafter BRC Report]. The first nuclear reactor was demonstrated in 1942, and Congress authorized civilian application of atomic power through the Atomic Energy Act of 1946. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 206 (1983).

The Act granted regulatory authority over nuclear energy to the Atomic Energy Commission. *See Union of Concerned Scientists v. NRC*, 735 F.2d 1437, 1443 n.1 (D.C. Cir. 1984). But the Energy Reorganization Act of 1974 disbanded that agency and redistributed its authority, as relevant here, to the Nuclear Regulatory Commission. *Id.* After Congress passed the Atomic Energy Act, commercial production of nuclear energy boomed.

Commercial nuclear energy is produced through a series of industrial processes, which include the mining and processing of nuclear fuel, the use of the fuel in a reactor, and the storage and ultimate disposal or reprocessing of that fuel. BRC Report at 9. Once nuclear fuel has been used in a reactor for about four to six years, it can no longer produce energy and is considered used or spent. *Id.* at 10. That spent fuel is removed from the reactor. *Id.*

Spent nuclear fuel is "fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing." 42 U.S.C. § 10101(23). It's "intensely radioactive" and "must be carefully stored." *Pac. Gas & Elec. Co.*, 461 U.S. at 195. The spent fuel is first placed in wet pool storage for cooling, where it

remains for at least five years, but may remain for decades. BRC REPORT at 11. Once the spent nuclear fuel has cooled sufficiently in wet storage, it's generally transferred to dry cask storage. *Id.*

At first, there was little concern regarding storage for spent fuel. *See* BRC REPORT at 19–20; *Idaho v. DOE*, 945 F.2d 295, 298–99 (9th Cir. 1991). There was a widespread belief within the commercial nuclear energy industry that spent fuel would be reprocessed. *Idaho*, 945 F.2d 295, 298–99 (9th Cir. 1991). But the private reprocessing industry collapsed in the 1970s, *id.*, and growing concerns led President Ford to issue a directive deferring commercial reprocessing and recycling, which President Carter later extended. BRC REPORT at 20. Although President Reagan reversed that policy, "for a variety of reasons, including costs, commercial reprocessing has never resumed." *Id.*

After years of accumulating spent nuclear fuel in nuclear power plants throughout the country, *see* 42 U.S.C. § 10131(a)(3), Congress enacted the Nuclear Waste Policy Act in 1982. That Act sought to "devise a permanent solution to the problems of civilian radioactive waste disposal." *Id.* It tasked the Department of Energy with establishing "a repository deep underground within a rock formation where the waste would be placed, permanently stored, and isolated from human contact." *Nat'l Ass' of Regul. Util. Comm'rs v. DOE*, 680 F.3d 819, 821 (D.C. Cir. 2012). Yucca Mountain in Nevada was chosen as the only suitable site for the repository. *See* 42 U.S.C. § 10172. The decision drew widespread opposition in Nevada. BRC REPORT at 22.

Decades of delay ensued. Despite a Congressional mandate that the Department of Energy start accepting waste from the States by January 31, 1998, *see* 42 U.S.C. § 10222(a)(5)(B), "by the mid-1990s, the Department of Energy made clear that it could not meet the 1998 deadline, and it came and

went without the federal government accepting any waste." *Texas v. U.S.*, 891 F.3d 553, 555–56 (5th Cir. 2018).

In 2008, the Department of Energy finally submitted its license application for the Yucca Mountain repository to the Commission. *In re Aiken Cnty.*, 725 F.3d 742, 258 (D.C. Cir. 2013). But the Commission "shut down its review and consideration" of the application. *Id.* By its own admission, the Commission had no intention of reviewing the application, *id.*, even though the Nuclear Waste Policy Act mandates a decision be made within three years of submission. *See* 42 U.S.C. § 10134(d).

In light of the delays and controversy, the Obama Administration decided to halt the work on the Yucca Mountain repository. BRC REPORT at vi. The Obama Administration instead formed the Blue Ribbon Commission on America's Nuclear Future, which concluded that a consent-based approach to siting nuclear waste storage facilities would be preferred to the Yucca Mountain policy. *See id.* at vii–x.

Spent nuclear fuel continues to accumulate at reactor sites across the country. Some estimates suggest the U.S. inventory of spent nuclear fuel may exceed 200,000 metric tons by 2050. BRC REPORT at 14. The commercial nuclear power industry as a whole is estimated to generate between 2,000 and 2,400 metric tons of spent nuclear fuel each year. *Id.* And there are thousands of metric tons of spent fuel in various sites where commercial reactors no longer operate. *Id.*

### B.

After the Blue Ribbon Commission embraced a consent-based approach for siting nuclear waste storage facilities, the governments of Texas and New Mexico expressed support for establishing facilities within the states. Then-Governors Rick Perry of Texas and Susana Martinez of New Mexico wrote letters supporting the establishment of facilities within their

respective states.  And Andrews County—a rural community located near the Texas-New Mexico border—passed a resolution in support of siting a spent nuclear fuel facility there.

Based in part on these expressions of support, Waste Control Specialists, LLC applied to the Commission for a license to operate a consolidated interim storage facility for high-level spent nuclear fuel in Andrews County. Andrews County is located within the Permian Basin, one of the country's largest oil basins and a top global oil producer.

The Commission began its environmental review of the proposed facility in accordance with the National Environmental Policy Act.  *See* 42 U.S.C. § 4321 *et seq.*  But the application anticipated that the Department of Energy would take title to the spent nuclear fuel.  Some stakeholders challenged the legality of that provision as prohibited by the Nuclear Waste Policy Act.  Waste Control Specialists then asked the Commission to suspend its review.

Approximately a year later, Interim Storage Partners, LLC—a partnership between the original applicant, Waste Control Specialists, and another company—asked the Commission to resume its review of the now-revised license application.  In its summary report on the scoping period, the Commission noted that it had received comments expressing concerns that the facility would become a *de facto* permanent disposal facility and that the license would be illegal under existing regulations.  The Commission responded that such comments were outside the scope of the environmental impact statement.

In December 2019, the Atomic Safety and Licensing Board—the independent adjudicatory division of the Commission—terminated an adjudicatory proceeding regarding the license application.  Before the proceeding was terminated, Fasken timely filed five contentions alleging that the

Commission violated the National Environmental Policy Act and its own regulations. The Board denied each one. The following month, Fasken filed a motion to reopen the record along with a motion to amend a previously filed contention. The Board denied the motions.

The Commission published a draft environmental impact statement in May 2020. The Commission received approximately 2,527 unique comments on the draft environmental impact statement, and many opposed the facility. One comment was a letter from Texas Governor Greg Abbott urging the Commission to deny the license application because of the lack of a permanent repository and the importance of the Permian Basin to the nation's energy security and economy. The Texas Commission on Environmental Quality submitted a comment that the licensing lacks public consent and doesn't properly account for the possibility that Texas would become the permanent solution of spent nuclear fuel disposal if the permanent repository isn't developed by the expiration of the facility's 40-year license term.

Fasken also submitted various comments. Its comments noted the uniqueness of the Permian Basin, the danger of transporting spent nuclear fuel to the facility, the lack of community consent, and the possibility that the facility could become a *de facto* permanent facility. Based on the draft environmental impact statement, Fasken also filed a second motion to reopen the adjudicatory proceeding. The Board once again denied the request.

The Commission issued the final environmental impact statement in July 2021. It recommended the license be issued, and noted that concerns regarding Yucca Mountain and the need for a permanent repository fell outside its scope. In an appendix, the Commission responded to timely comments, including those from Petitioners. The Commission responded to concerns that the facility would become a *de facto* permanent repository by noting the application was only for a temporary facility.

The following September, the Texas Legislature passed H.B. 7. The statute makes it illegal to "dispose of or store high level radioactive waste" in Texas. Governor Abbott sent a letter to the Commission with a copy of H.B. 7. He reiterated that "the State of Texas has serious concerns with the design of the proposed ISP facility and with locating it in an area that is essential to the country's energy security." The next day, Fasken submitted an environmental analysis critiquing various aspects of the final environmental impact statement.

A few days later, the Commission issued the license.

Texas and Fasken have now petitioned this court for review of the license. Texas asks that the license be set aside. And Fasken asks that we suspend all further activities on the facility and remand to the Commission for a hard look analysis. While this case was pending before this court, Fasken and others who sought but were denied intervention in the agency adjudication had a petition for review pending before the D.C. Circuit appealing the denials of their intervention. *See Don't Waste Michigan v. NRC*, 2023 WL 395030 (Jan. 25, 2023). The petition was denied in January 2023. *Id.* at *1. Interim Storage Partners, LLC intervened in this case to represent its interests.

## II.

We begin with jurisdiction. The Commission challenges this court's jurisdiction to hear the petitions for review for lack of both constitutional standing and statutory standing. We consider each argument in turn and find neither succeeds.

## A.

As a preliminary matter, the Commission suggests that Petitioners forfeited constitutional standing by failing to argue it in their opening briefs. We disagree.

No. 21-60743

Neither Petitioner argued constitutional standing beyond their general jurisdictional statements. Generally, a petitioner is required "to present specific facts supporting standing through citations to the administrative record or affidavits or other evidence attached to its opening brief, *unless standing is self-evident*." *Sierra Club v. EPA*, 793 F.3d 656, 662 (6th Cir. 2015) (emphasis added, quotation omitted). A petitioner may reasonably believe standing to be self-evident when "nothing in the record alerted [the] petitioners to the possibility that their standing would be challenged." *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). That's the case here.

From the earliest stages of this proceeding, the Commission has challenged jurisdiction on statutory standing grounds only. It twice moved to dismiss, but neither motion challenged constitutional standing. Accordingly, Petitioners could reasonably assume it was self-evident. *Cf. Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 n.4 (5th Cir. 2019) ("overlook[ing] Petitioners' decision to include only a cursory discussion of standing because . . . they had a good-faith (though mistaken) belief that standing would be both undisputed and easy to resolve"). And—once constitutional standing was challenged—both Petitioners provided well-developed legal arguments with citations to the record and evidence to show their standing. Petitioners haven't forfeited constitutional standing.

The "irreducible constitutional minimum" of standing requires that Petitioners "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The causation elements of the constitutional standing analysis are easily met: Petitioners' alleged injuries directly result from the issuance of the license (traceability), and an order from this court could vacate the license (redressability). So only injury in fact is at issue.

No. 21-60743

The Commission argues that the licensing and eventual operation of the storage facility doesn't injure either Texas or Fasken. We disagree. Because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," we may proceed even if only one of the Petitioners has standing. *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006). But here both Petitioners successfully assert an injury resulting from the license.

Texas meets the injury-in-fact requirement because the license preempts state law. Texas has "a sovereign interest in the power to create and enforce a legal code." *Tex. Off. of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (quotation omitted) (holding that Texas has standing to challenge the FCC's assertion of authority over an aspect of telecommunications regulation that the State believed it controlled). And we have held that the preemption of an existing state law can constitute an injury. *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015). "A state has standing based on a conflict between federal and state law if the state statute at issue regulates behavior or provides for the administration of a state program, but not if it simply purports to immunize state citizens from federal law." *Id.* (cleaned up). Here the issuance of the license and resulting operation of the facility directly conflicts with H.B. 7.

The Texas Legislature has enacted legislation that prevents the storage of high-level radioactive waste, including spent nuclear fuel, within the State except at currently or formerly operating nuclear power reactors. The legislation also amends Texas statutes to add that "a person, including the compact waste disposal facility license holder, may not dispose of or store high level radioactive waste in this state." Tex. Health & Safety Code § 401.072. Although a non-binding, declaratory state statute would not be enough to confer standing, here there's an enforceability conflict between the license and operation of the facility, which authorizes storage of

high-level radioactive waste in Texas, and H.B. 7, which proscribes such storage. *Cf. Virginia v. Sebelius*, 656 F.3d 253, 270 (4th Cir. 2011) (a state statute that is merely a "non-binding declaration [and] does not create any genuine conflict . . . creates no sovereign interest capable of producing injury-in-fact"). That's enough for Texas to assert an injury.

Fasken also has standing based on its proximity to radioactive materials. To establish injury in an environmental case, there's a "geographic-nexus requirement." *Biological Diversity*, 937 F.3d at 538. "The Supreme Court has ruled that geographic remoteness forecloses a finding of injury when no further facts have been brought forward showing that the impact in those distant places will in some fashion be reflected where the plaintiffs are." *Id.* (cleaned up). *See also id.* at 540 ("when a person visits an area for aesthetic purposes, pollution interfering with his aesthetic enjoyment may cause an injury in fact," if "the aesthetic experience was actually offensive to the plaintiff"). Fasken has provided evidence of its members' geographic proximity to the facility. Some of Fasken's members own land within four miles of the facility, draw water from wells beneath the facility, drive within a mile of the facility, use rail lines the facility would use, and travel on highways within a few hundred feet of the rail lines that transport spent nuclear fuel to the facility. In the context of radioactive materials, such proximity is sufficient to establish injury. *See Duke Power Co. v. Caroline Env't Study Grp., Inc.*, 438 U.S. 59, 74 (1978) ("[T]he emission of non-natural radiation into appellees' environment would also seem a direct and present injury."). *See also Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir. 2004) (finding a petitioner living 18 miles from Yucca Mountain had standing); *Kelley v. Selin*, 42 F.3d 1501, 1509 (6th Cir. 1995) (finding petitioners who "own[] land in close proximity to . . . the proposed site for spent fuel storage" had "alleged sufficient injury to establish standing").

PBLRO also has associational standing. "Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members." *Biological Diversity*, 937 F.3d at 536 (quoting *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)). Each of those elements is met. First, some of its members have an injury because they live, work, or regularly drive close the facility. And as we've already noted, *see supra*, the causation elements are met. Next, "the germaneness requirement is undemanding and requires mere pertinence between the litigation at issue and the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (quotations omitted). This factor is easily met because PBLRO was created specifically to oppose the facility. Last, there's no reason to believe that PBLRO is unable to represent its members' interests without their individual participation. *See id.* at 551–53 (noting this prong usually isn't met when the relief sought is damages for individual members or the claim requires fact-intensive-individual inquiry).

**B.**

Petitioners seeking to challenge a final order from the Commission also need standing under the Administrative Orders Review Act, generally known as the Hobbs Act. *See Reytblatt v. NRC*, 105 F.3d 715, 720 (D.C. Cir. 1997) ("[T]he Hobbs Act requires (1) 'party' status (i.e., that petitioners participated in the proceeding before the agency), and (2) aggrievement (i.e., that they meet the requirements of constitutional and prudential standing).") (citation omitted).

The Hobbs Act vests "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or determine the validity of . . . final orders of the"

Commission on the federal courts of appeals. 28 U.S.C. § 2342. (The Act actually refers to the Atomic Energy Commission. But the Energy Reorganization Act of 1974 abolished that agency and transferred its licensing and related regulatory functions to the Nuclear Regulatory Commission. *See* 42 U.S.C. § 5841(a), (f).)

Under the Act, "[a]ny party aggrieved by the final order may . . . file a petition to review the order in the court of appeals wherein venue lies." 28 U.S.C. § 2344. Courts "have consistently held that the phrase 'party aggrieved' requires that petitioners have been parties to the underlying agency proceedings, not simply parties to the present suit." *ACA Int'l v. FCC*, 885 F.3d 687, 711 (D.C. Cir. 2018). *See also Am. Trucking Ass'ns v. ICC*, 673 F.2d 82, 84 (5th Cir. 1982) (per curiam) ("The word 'party' is used in a definite sense in the [Hobbs Act], and limits the right to appeal to those who actually participated in the agency proceeding."). The Commission argues that neither Texas nor Fasken has standing under the Hobbs Act because neither is a "party aggrieved."

"To be an aggrieved party, one must have participated in the agency proceeding under review." *Wales Transp., Inc. v. ICC*, 728 F.2d 774, 776 n.1 (5th Cir. 1984). Here, both Petitioners participated in the agency proceeding—Texas commented on its opposition of the issuance of the license and Fasken attempted to intervene and filed contentions. But according to the Commission, neither form of participation is sufficient to confer party status under the Hobbs Act.

The Commission argues that Texas doesn't have party status because "participating in the appropriate and available administrative procedures is the statutorily prescribed prerequisite to invocation of the Court's

No. 21-60743

jurisdiction," and submitting comments doesn't accord with the degree of formality of the proceedings in this license adjudication.[2]

The Commission takes a different approach with Fasken. It argues that, as a party denied intervention, Fasken may only challenge the order denying it intervention. From the Commission's perspective, if a putative intervenor has failed to obtain party status, it can't later seek review of the final judgment on the merits.

The plain text of the Hobbs Act merely requires that a petitioner seeking review of an agency action be a "party aggrieved." 28 U.S.C. § 2344. The

---

[2] In the alternative, the Commission argues that "even if this Court were to determine that dismissal of [Texas's] Petition for Review is not required as a matter of jurisdiction, the same result is nonetheless required as a matter of non-jurisdictional, mandatory exhaustion." Not so. The Commission relies on *Fleming v. USDA*, which held that "even nonjurisdictional exhaustion requirements . . . forbid judges from excusing non-exhaustion" and that "if the government raises [such an] exhaustion requirement, the court must enforce it." 987 F.3d 1093, 1099 (D.C. Cir. 2021). But neither the Hobbs Act nor the Atomic Energy Act impose a mandatory exhaustion requirement. The Commission's argument implicitly equates the exhaustion requirements in the Horse Protection Act and the Prison Litigation Reform Act—both of which are discussed in *Fleming*—to the Hobbs Act and Atomic Energy Act. These statutes aren't comparable. Both the Horse Protection Act and the Prison Litigation Reform Act have explicit exhaustion requirements. *See* 7 U.S.C. § 6912(e) ("[A] person shall exhaust all administrative appeal procedures established by the Secretary [of Agriculture] or required by law before the person may bring an action in a court of competent jurisdiction."); 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such an administrative remedies as are available are exhausted."). But neither the Hobbs Act nor the Atomic Energy Act do. *See* 28 U.S.C. § 2344 (no exhaustion requirement); 42 U.S.C. § 2239(b) (same).

It's also worth noting that caselaw suggests that so long as the petitioner is a "party aggrieved" and the basis for the challenge was brought before the agency by *some* party—*even if* not the by the petitioner—that's enough for the case to move forward. *See Reytblatt*, 105 F.3d at 720–21; *Cellnet Commc'n, Inc. v. FCC*, 965 F.2d 1106, 1109 (D.C. Cir. 1992). It'd make little sense to interpret the Hobbs Act as imposing an exhaustion requirement while allowing a petitioner to bring a claim it did not itself bring before the agency.

text makes no distinction between different kinds of agency proceedings. *See Gage v. AEC*, 479 F.2d 1214, 1218 (D.C. Cir. 1973). Nor does it suggest that a petitioner who went through the procedures to intervene in an adjudication can't be a party aggrieved. In fact, it's clear that the function of the "party aggrieved" status requirement is to ensure that the agency had the opportunity to consider the issue that petitioners are concerned with. *See*, *e.g.*, *id.* at 1219 ("The 'party' status requirement operates to preclude direct appellate court review without a record which at least resulted from the factfinder's focus on the alternative regulatory provisions which petitioners propose.") (emphases omitted).

In sum, the plain text of the Hobbs Act requires only that a petitioner have participated—in some way—in the agency proceedings, which Texas did through comments and Fasken did by seeking intervention and filing contentions. But caselaw suggests that's not enough.

Precedent from other circuits suggests that neither Texas nor Fasken are parties aggrieved for Hobbs Act purposes. The D.C. Circuit has read the Hobbs Act to contemplate participation in "the appropriate and available administrative procedures." *Id.* at 1217. And it has interpreted this to mean that the "degree of participation necessary to achieve party status varies according to the formality with which the proceeding was conducted." *Water Transp. Ass'n v. ICC*, 819 F.2d 1189, 1192 (D.C. Cir. 1987). *But see ACA Int'l*, 885 F.3d at 711–712 (noting that in at least some limited circumstances commenting may be enough in certain non-rulemaking proceedings). The D.C. Circuit and at least one other circuit apply this heightened participation requirement. *See Ohio Nuclear-Free Network v. NRC*, 53 F.4th 236, 239 (D.C. Cir. 2022); *Alabama Power Co. v. ICC*, 852 F.2d 1361, 1368 (D.C. Cir. 1988). *See also State ex rel. Balderas v. NRC*, 59 F.4th 1112, 1117 (10th Cir. 2023). The D.C. Circuit has also said that, when an agency requires intervention, those who sought but were denied intervention lack standing to seek judicial

No. 21-60743

review. *Water Transp. Ass'n*, 819 F.2d at 1192. *See also NRDC v. NRC*, 823 F.3d 641, 643 (D.C. Cir. 2016) ("To challenge the Commission's grant of a license renewal . . . a party must have successfully intervened in the proceeding by submitting adequate contentions under [the Commission's regulations].").

The D.C. Circuit embraces readings of the Hobbs Act that impose an extra-textual gloss by requiring a degree of participation not contemplated in the plain text of the statute. We think the fairest reading of the Hobbs Act doesn't impose such additional requirements. But we ultimately don't need to resolve that tension, because the Fifth Circuit recognizes an exception to the Hobbs Act party-aggrieved status requirement that's dispositive of this issue here.

This circuit recognizes an *ultra vires* exception to the party-aggrieved status requirement. In *American Trucking Associations, Inc. v. ICC*, this court noted "two rare instances" where a "person may appeal an agency action even if not a party to the original agency proceeding"—(1) where "the agency action is attacked as exceeding [its] power" and (2) where the person "challenges the constitutionality of the statute conferring authority on the agency." 673 F.2d at 85 n.4 (quotation omitted).[3]

_____

[3] The Commission's various arguments that this exception isn't applicable are unavailing. It's true that we've recognized the exception is "exceedingly narrow." *Merchants Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 922 (5th Cir. 1993). And it's also true that other circuits have refused to adopt it. *See Balderas*, 59 F.4th at 1123–24; *Nat'l Ass'n of State Util. Consumer Advocs. v. FCC*, 457 F.3d 1238, 1250 (11th Cir. 2006); *Erie-Niagara Rail Steering Comm. v. STB*, 167 F.3d 111, 112–13 (2d Cir. 1999); *In re Chicago, Milwakee, St. Paul & Pac. R.R.*, 799 F.2d 317, 334–35 (7th Cir. 1986). But the exception remains good law in this circuit. Neither the Commission nor the court have identified any case overturning the exception. And to the extent that the Commission claims the exception was mere dicta in *American Trucking*, that argument fails because we've since applied the

No. 21-60743

This exception only allows us to reach those portions of the Petitioners' challenges that argue the Commission acted beyond its statutory authority. *See Wales Transp.*, 728 F.2d at 776 n.1 (allowing petitioner to proceed despite not having participated in the agency proceeding on only those claims that challenged the agency's authority under the statute). Accordingly, we must consider which, if any, of the Petitioners' challenges fall within that category.

Texas makes three merits arguments: (1) the Commission lacks the statutory authority to license the facility; (2) the license issuance violated the Administrative Procedure Act; and (3) the Commission violated the National Environmental Policy Act by failing to assess the risks of a potential terrorist attack. The first argument falls within the exception. It attacks the Commission for licensing a facility without the authority to do so under the Atomic Energy Act, and in conflict with the Nuclear Waste Policy Act.

Fasken makes four merits arguments: (1) the Commission violated the National Environmental Policy Act and Administrative Procedure Act by allowing a licensing condition that violates the Nuclear Waste Policy Act; (2) the Commission's assumptions about when the permanent repository will be operational are arbitrary and capricious; (3) the Commission adopted an unreasonably narrow purpose statement; and (4) the Commission violated the National Environmental Policy Act and Administrative Procedure Act by

———————————————

exception in *Wales Transportation, Inc. v. ICC*, 728 F.2d 774, 776 n.1 (5th Cir. 1984). Under our circuit's rule of orderliness, we are bound to follow *American Trucking* and *Wales Transportation* because they haven't been overturned by the en banc court. The Commission is also wrong in suggesting the exception is limited to challenges of ICC orders. While it's true that both *American Trucking* and *Wales Transportation* involved challenges to ICC orders, neither case limits the exception's application to the ICC. *See Am. Trucking*, 673 F.2d at 85 n.4 (referring to agency proceedings, not ICC proceedings); *Wales Transp.*, 728 F.2d at 776 n.1 (same).

No. 21-60743

accepting the applicant's unreasonable site selection. The first of these challenges falls within the exception. Fasken's argument centers on the contention that the Commission acted beyond its statutory authority by issuing a license with a condition expressly prohibited by the Nuclear Waste Policy Act.

## III.

The Commission has no statutory authority to issue the license. The Atomic Energy Act doesn't authorize the Commission to license a private, away-from-reactor storage facility for spent nuclear fuel. And issuing such a license contradicts Congressional policy expressed in the Nuclear Waste Policy Act. This understanding aligns with the historical context surrounding the development of these statutes.

## A.

Under the Atomic Energy Act, the Commission retains jurisdiction over nuclear plant licensing and regulation. *See* 42 U.S.C. § 5842. It has authority to regulate the construction and operation of nuclear power plants. *See* 42 U.S.C. §§ 2011–2297h-13. *See also Union of Concerned Scientists*, 735 F.2d at 1438–39 (summarizing the two-step licensing procedure for nuclear power plant operation).

The Act also confers on the Commission the authority to issue licenses for the possession of "special nuclear material," *see* 42 U.S.C. § 2073, "source material," *see id.* § 2093, and "byproduct material," *see id.* § 2111. *See also* 42 U.S.C. §§ 2014(aa), (z), (e) (defining each term, respectively). Special nuclear material, source material, and byproduct material are constituent materials of spent nuclear fuel. *See Bullcreek v. NRC*, 359 F.3d 536, 538 (D.C. Cir. 2004). The Commission argues that, because it has authority to issue licenses for the possession of these constituent materials, that means it has broad authority to license storage facilities for spent nuclear fuel.

No. 21-60743

But this ignores the fact that the Act authorizes the Commission to issue such licenses only for certain enumerated purposes—none of which encompass storage or disposal of material as radioactive as spent nuclear fuel.

Sections 2073 and 2093 specify that licenses may be issued for various types of research and development, *see* 42 U.S.C. §§ 2073(a)(1)–(a)(2), 2093(a)(1)–(a)(2). It also permits such other uses that the Commission either "determines to be appropriate to carry out the purposes of th[e] chapter," *id.* § 2073(a)(4), or "approves . . . as an aid to science and industry," *id.* § 2093(a)(4). Principles of statutory interpretation require these grants be read in light of the other, more specific purposes listed—namely for certain types of research and development. *Cf. U.S. v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("When Congress provides specific statutory obligations, we will not read a 'catchall' provision to impose general obligations that would include those specifically enumerated.").

Both these sections also allow the agency to issue licenses "for use under a license issued pursuant to section 2133 of th[e] title." *Id.* 42 U.S.C. §§ 2073(a)(3), 2093(a)(3) (same). Section 2133 details the Commission's authority to issue licenses for "utilization or production facilities for industrial or commercial purposes." *Id.* § 2133(a). Utilization and production have specific definitions under the statute. *See id.* §§ 2014 (cc) (defining utilization facilities); 2014(v) (defining production facilities). And the definitions of utilization and production facilities are about nuclear reactors and fuel fabrication or enrichment facilities—not storage or disposal, as the Commission admits in its briefing. *See id.* Neither § 2073 nor § 2093 confers a broad grant of authority to issue licenses for any type of possession of special nuclear material or source material.

The same is true for § 2111. That section authorizes the Commission "to issue general or specific licenses to applicants seeking to use byproduct

material for research or development purposes, for medical therapy, industrial uses, agricultural uses, or such other useful applications as may be developed." *Id.* § 2111(a). It also specifies conditions under which certain types of byproduct material may be disposed. *Id.* § 2111(b). And the types of byproduct material covered by § 2111(b) emit radiation for significantly less time than spent nuclear fuel.

That section cross-references the definition of byproduct materials in § 2014(e)(3)–(4), which refers to radium-226 and other material that "would pose a threat similar to the threat posed by . . . radium-226 to the public health and safety." That's important because some of the isotopes in spent nuclear fuel have much longer half-lives than radium-226. The "intensity of radiation from radioactive materials decreases over time" and the "time required for the intensity to decrease by one-half is referred to as the 'half-life.'" NRC, Frequently Asked Questions (FAQs) Regarding Radium-226 § A.1, https://scp.nrc.gov/narmtoolbox/radium%20faq102008.pdf. Radium-226 has a half-life of 1600 years. *Id.* Spent nuclear fuel, on the other hand, is composed of a variety of radioactive isotopes of elements produced in the nuclear fission process. NRC, Radioactive Waste Backgrounder 1, https://www.nrc.gov/docs/ML0501/ML050110277.pdf. Some of these isotopes—strontium-90 and cesium-137—have half-lives of about 30 years. But others "take much longer to decay." *Id.* One of these isotopes is plutonium-239, which "has a half-life of 24,000 years"—fifteen times that of radium-226. *Id.* There's no plausible argument that spent nuclear fuel, which contains radioactive isotopes with half-lives much longer than radium-226, is the type radioactive material contemplated in the disposal provision in § 2111(b).

So these provisions do not support the Commission's claim of authority. In response, the Commission and Interim Storage Partners, LLC point to two cases from sister circuits. Both are unpersuasive.

No. 21-60743

In *Bullcreek v. NRC*, the D.C. Circuit denied petitions for review of the Commission's Rulemaking Order and held that the Nuclear Waste Policy Act did "not repeal or supersede the [Commission]'s authority under the Atomic Energy Act to license private away-from-reactor storage facilities." 359 F.3d at 537–38. The D.C. Circuit essentially assumed that the Atomic Energy Act had granted the Commission authority to license away-from-re-actor storage facilities, despite explicitly recognizing that the Act "does not specifically refer to the storage or disposal of spent nuclear fuel." *Id.* at 538. Rather than focus on the text of the statute, it merely noted that "it has long been recognized that the [Atomic Energy Act] confers on the [Commission] authority to license and regulate the storage and disposal of such fuel." *Id.* But none of the cases the D.C. Circuit cited provide a textual analysis of the Atomic Energy Act and whether it allows away-from-reactor spent nuclear fuel storage. Each of those cases dealt with separate questions of preemption and the role of states in this scheme. *See generally Pac. Gas. & Elec. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983); *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103 (3d Cir. 1985); *Illinois v. Gen. Elec. Co.*, 683 F.2d 206 (7th Cir. 1982). They are irrelevant to the question before us.

So the D.C. Circuit provided no textual basis for its assumption that the statute authorized the Commission to issue such licenses. *See id.* (discussing the Atomic Energy Act). *Bullcreek* may be correct that the Nuclear Waste Policy Act didn't repeal portions of the Atomic Energy Act since "repeals by implication are not favored," but it doesn't actually address what authority the Commission had under the Atomic Energy Act. *Morton v. Mancari*, 417 U.S. 535, 549 (1974).

The other case the Commission cites—*Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223 (10th Cir. 2004)—is just as unhelpful. It merely relies on *Bullcreek* to "not revisit the issues surrounding the

21

[Commission]'s authority to license away-from-reactor [spent nuclear fuel] storage facilities." *Skull Valley*, 376 F.3d at 1232. It too assumes the Commission's authority without analyzing the statute.

## B.

Moreover, the Commission's argument cannot be reconciled with the Nuclear Waste Policy Act.

Spent nuclear fuel wasn't a concern in the 1940s and 1950s when the Atomic Energy Act was passed and amended. "Prior to the late 1970's, private utilities operating nuclear reactors were largely unconcerned with the storage of spent nuclear fuel." *Idaho*, 945 F.2d at 298. "It was accepted that spent fuel would be reprocessed." *Id.* "In the mid-70's, however, the private reprocessing industry collapsed for both economic and regulatory reasons." *Id.* "As a consequence, the nuclear industry was confronted with an unanticipated accumulation of spent nuclear fuel, inadequate private facilities for the storage of the spent fuel, and no long term plans for managing nuclear waste." *Id. See also* BRC REPORT at 20 (noting these problems and describing passage of the Act as "mark[ing] the beginning of a new chapter in U.S. efforts to deal with the nuclear waste issue"). This led Congress to pass the Nuclear Waste Policy Act in 1982.

The Nuclear Waste Policy Act provides a comprehensive scheme to address the accumulation of nuclear waste. Congress recognized that "Federal efforts during the [prior] 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal ha[d] not been adequate" and that "State and public participation in the planning and development of repositories is essential in order to promote public confidence in the safety of disposal of such waste and spent fuel." 42 U.S.C. § 10131(a)(3), (6). "The Act made the federal government responsible for permanently disposing of spent nuclear fuel and high-level radioactive waste produced by civilian

No. 21-60743

nuclear power generation and defense activities." *Nat'l Ass'n of Regul. Util. Comm'rs v. DOE*, 680 F.3d 819, 821 (D.C. Cir. 2012). *See also* 42 U.S.C. § 10131(a)(4) ("[T]he Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment.").

The Act also tasked the Department of Energy with establishing "a repository deep underground within a rock formation where the waste would be placed, permanently stored, and isolated from human contact." *Nat'l Ass'n of Regul. Util Comm'rs*, 680 F.3d at 821. *See also* 42 U.S.C. §§ 100133–34 (tasking the Energy Secretary with site characterization and public hearing duties related to the Yucca Mountain site selection). Yucca Mountain was chosen as the only suitable site for the repository when the Act was amended in 1987. *See* 42 U.S.C. § 10172 (selection of Yucca Mountain site). But the project stalled, even though the Nuclear Waste Policy Act "is obviously designed to prevent the Department [of Energy] from delaying the construction of Yucca Mountain as the permanent facility while using temporary facilities." *Nat'l Ass'n of Regul. Util. Comm'rs v. DOE*, 736 F.3d 517, 519 (D.C. Cir. 2013) (citing 42 U.S.C. § 10168(d)(1)).

In addition to the establishment of the permanent repository, *see* 42 U.S.C. §§ 10131–10145, the Nuclear Waste Policy Act also established other measures to deal with spent nuclear fuel.[4]

_____

[4] All these measures are subject to the proviso in 42 U.S.C. § 10155(h), which states that "nothing in this chapter shall be construed to encourage, authorize, or require the private or Federal use, purchase, lease, or other acquisition of any storage facility located away from the site of any civilian nuclear power reactor and not owned by the Federal Government on" the date of enactment.

One is temporary storage. *See id.* §§ 10151–10157. The Act places "primary responsibility for providing interim storage of spent nuclear fuel" on "the persons owning and operating civilian nuclear power reactors." *Id.* § 10151(a)(1). It tasks the Commission and the Secretary of Energy to "take such actions as . . . necessary to encourage and expedite the effective use of available storage, and the necessary additional storage, *at the site* of each civilian nuclear power reactor." *Id.* § 10152 (emphasis added). *See also id.* § 10153 ("The establishment of such procedures shall not preclude the licensing . . . of any technology for the storage of civilian spent nuclear fuel *at the site* of any civilian nuclear power reactor.") (emphasis added). It further tasks the Secretary of Energy with "provid[ing] . . . capacity for the storage of spent nuclear fuel from civilian nuclear power reactors." *Id.* § 10155(a)(1). Moreover, the Act provides that "the Federal Government has the responsibility to provide . . . not more than 1,900 metric tons of capacity for interim storage of spent nuclear fuel for civilian nuclear power reactors that cannot reasonably provide adequate storage capacity" where it is necessary for the "continued, orderly operation of such reactors." *Id.* § 10151(a)(3). Moreover, the Act provides that "the Federal Government has the responsibility to provide . . . not more than 1,900 metric tons of capacity for interim storage of spent nuclear fuel for civilian nuclear power reactors that cannot reasonably provide adequate storage capacity" where it is necessary for the "continued, orderly operation of such reactors." *Id.* § 10151(a)(3). Here, the license permits storage of at least 5,000 and as much as 40,000 metric tons of nuclear waste.

The other measure is monitored retrievable storage. *See id.* § 10161–10169. *See also id.* § 10101(34) (defining "monitored retrievable storage facility"). Under the statute, "[t]he Secretary [of Energy] is authorized to site, construct, and operate one monitored retrievable storage facility subject to the conditions described [in the relevant sections of statute]." *Id.* § 10162(b).

No. 21-60743

And one of those conditions is that "[a]ny license issued by the Commission for a monitored retrievable storage facility under [the statute] shall provide that . . . construction of such facility may not begin until the Commission has issued a license for the construction of a repository [i.e., Yucca Mountain]." *Id.* § 10168(d)(1).

Reading these provisions together makes clear that the Nuclear Waste Policy Act creates a comprehensive statutory scheme for addressing spent nuclear fuel accumulation. The scheme prioritizes construction of the permanent repository and limits temporary storage to private at-the-reactor storage or at federal sites. It plainly contemplates that, until there's a permanent repository, spent nuclear fuel is to be stored onsite at-the-reactor or in a federal facility.

In sum, the Atomic Energy Act doesn't authorize the Commission to license a private, away-from-reactor storage facility for spent nuclear fuel. And the Nuclear Waste Policy Act doesn't permit it. Accordingly, we hold that the Commission doesn't have authority to issue the license challenged here.

When read alongside each other, we find these statutes unambiguous. And even if the statutes were ambiguous, the Commission's interpretation wouldn't be entitled to deference.

Last year, the Supreme Court directed that, "[w]here the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted" and whether there are "reason[s] to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607–08 (2022) (quotations omitted) (adopting the major questions doctrine).

No. 21-60743

Disposal of nuclear waste is an issue of great "economic and political significance." *Id.* at 2608. What to do with the nation's ever-growing accumulation of nuclear waste is a major question that—as the history of the Yucca Mountain repository shows—has been hotly politically contested for over a half century. Congress itself has acknowledged that "high-level radioactive waste and spent nuclear fuel have become major subjects of public concern." 42 U.S.C. § 10131(a)(7) (findings section of the Nuclear Waste Policy Act). "A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to *clear* delegation from that representative body." *West Virginia*, 142 S. Ct. at 2616 (emphasis added). Here, there's no such clear delegation under the Atomic Energy Act. And the Nuclear Waste Policy Act belies the Commission's arguments to the contrary.

\* \* \*

We grant the petitions for review, vacate the license, and deny the Commission's motions to dismiss.