# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔉𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔣𝔱𝔥 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

_____

No. 21-60743

_____

STATE OF TEXAS; GREG ABBOTT, GOVERNOR OF THE STATE OF
TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY;
FASKEN LAND AND MINERALS, LIMITED; and
PERMIAN BASIN LAND AND ROYALTY OWNERS,

*Petitioners*,

*v.*

NUCLEAR REGULATORY COMMISSION;
UNITED STATES OF AMERICA,

*Respondents*.

_____

**OPPOSITION TO PETITION FOR REHEARING EN BANC BY
PETITIONERS FASKEN LAND AND MINERALS, LTD. and PERMIAN
BASIN LAND AND ROYALTY OWNERS**

_____

ALLAN KANNER
Attorney
ANNEMIEKE M. TENNIS
Attorney
Kanner & Whiteley, L.L.C.
701 Camp Street
New Orleans, LA. 70130
a.kanner@kanner-law.com
a.tennis@kanner-law.com
(504) 524-5777

## CERTIFICATE OF INTERESTERED PERSONS

No. 21-60743

*State of Texas*
*v.*
*Nuclear Regulatory Commission*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.     Petitioners

    a.    State of Texas

    b.    Greg Abbott, Governor of Texas

    c.    Texas Commission on Environmental Quality

    d.    Fasken Land and Minerals, Ltd.

    e.    Permian Basin Land and Royalty Owners

2.     Counsel for Petitioners

    a.    Michael Abrams, Office of Attorney General, State of Texas

    b.    Ryan Baasch, Office of Attorney General, State of Texas

    c.    Henry Carl Myers, Office of Attorney General, State of Texas

    d.    Lanora Christine Pettit, Office of Attorney General, State of Texas

      e.      Allan Kanner, Kanner & Whiteley, L.L.C.

      f.      Annemieke M. Tennis, Kanner & Whiteley, L.L.C.

      g.      Monica Renee Perales, Fasken Land & Minerals

3.      Respondents

      a.      United States Nuclear Regulatory Commission

      b.      United States of America

4.      Counsel for Respondents

      a.      Andrew P. Averbach, U.S. Nuclear Regulatory Commission

      b.      Marian L. Zobler, U.S. Nuclear Regulatory Commission (retired)

      c.      Brooke P. Clark, U.S. Nuclear Regulatory Commission

      d.      Todd Kim, U.S. Department of Justice

      e.      Jennifer Scheller Neumann, U.S. Department of Justice

      f.      Justin Heminger, U.S. Department of Justice

5.      Respondent-Intervenor

      a.      Interim Storage Partners, LLC

      b.      Orano CIS, LLC

      c.      Orano USA, LLC

      d.      Orano SA, owned by government of France, Mitsubishi, and Japan Nuclear Fuel

      e.      Waste Control Specialists, LLC

f.    Fermi Holdings, Inc.

g.    J.F. Lehman & Co.

h.    Nuclear Energy Institute, Inc.

6.    Counsel for Respondent-Intervenor

a.    Brad Fagg, Morgan, Lewis & Bockius LLP

b.    Ryan K. Lighty, Morgan, Lewis & Bockius LLP

c.    Tim P. Matthews, Morgan, Lewis & Bockius LLP

d.    Paul D. Clement, Clement & Murphy, PLLC

e.    Mariel A. Brookins, Clement & Murphy, PLLC

f.    Andrew C. Lawrence, Clement & Murphy, PLLC


*/s/ Allan Kanner*
Allan Kanner

*Counsel for Petitioners*
*Fasken Land & Minerals, Ltd. and*
*Permian Basin Land & Royalty Owners*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTERED PERSONS .................................................. i

TABLE OF CONTENTS .......................................................................... iv

TABLE OF AUTHORITIES ...................................................................... v

STATEMENT OF THE CASE ................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................... 3

ARGUMENT ....................................................................................... 4

   I.   NOTHING IN THE PANEL'S OPINION WARRANTS *EN BANC* REVIEW .......................................................................... 4

      A. The Panel Correctly Determined That the NRC Lacks Statutory Authority to Issue the License. ................................................. 5

      B. The Opinion does not Create a Circuit Split. ........................... 6

      C. The Panel Correctly Determined That the NWPA Does Not Permit the License. ................................................................ 8

   II.  THE PANEL OPINION IS CONSISTENT WITH *WEST VIRGINIA* AND OTHER MAJOR QUESTION DOCTRINE PRECEDENT. .............. 10

   III. APPLICATION OF THE FIFTH CIRCUIT'S *ULTRA VIRES* EXCEPTION DOES NOT WARRANT *EN BANC* REVIEW. .................... 13

CONCLUSION ..................................................................................... 17

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ................... 19

# TABLE OF AUTHORITIES

## Cases

*ACLU v. FCC,*
  774 F.2d 24 (1st Cir. 1985) ....................................................................... 14

*Aids Ass'n for Lutherans v. U.S. Postal Serv.,*
  321 F.3d 1166 (D.C. Cir. 2003) ................................................................ 13

*Bullcreek v. NRC,*
  359 F.3d 536 (D.C. Cir. 2004) ............................................... 2, 6, 7, 9, 10

*Clark & Reid Co. v. U.S.,*
  804 F.2d 3 (1st Cir. 1986) ......................................................................... 14

*Gage v. AEC,*
  479 F.2d 1214 (D.C. Cir. 1973) ................................................................ 15

*In the Matter of Interim Storage Partners LLC (WCS Consolidated Interim
  Storage Facility),*
  90 NRC 31 (Aug. 23, 2019) ...................................................................... 15

*King v. Burwell,*
  576 U.S. 473 (2015) ................................................................................... 12

*Leedom v. Kyne,*
  358 U.S. 184 (1958) ................................................................................... 13

*Massachusetts v. NRC,*
  878 F.2d 1516 (1st Cir. 1989) ................................................................... 14

*Nat'l Ass'n of State Util. Consumer Advocs. v. FCC,*
  457 F.3d 1238 (11th Cir. 2006) ................................................................ 14

*NRDC v. NRC,*
  823 F.3d 641 (D.C. Cir. 2016) .................................................................. 14

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
  461 U.S. 190 (1983) ..................................................................................... 6

*Reytblatt v. NRC,*
  105 F.3d 715 (D.C. Cir. 1997) .................................................................. 14

v

*Skull Valley Band of Goshute Indians v. Nielson,*
    376 F.3d 1223 (10th Cir. 2004) ...................................................... 2, 6, 7

*W. Pac. R. Corp. v. W. Pac. R. Co.*,
    345 U.S. 247 (1953) ...............................................................................4

*Water Transp. Ass'n v. ICC*,
    819 F.2d 1189 (D.C. Cir. 1987) ..........................................................15

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ............................................................ 2, 11, 12

## Statutes

42 U.S.C. § 2011 ...........................................................................................1
42 U.S.C. § 2013 ...........................................................................................5
42 U.S.C. § 10101 .........................................................................................1
42 U.S.C. § 10131(a)(7) ..............................................................................12
42 U.S.C. § 10162 .........................................................................................8
42 U.S.C. § 10222(a)(5) ...............................................................................8
42 U.S.C. §§ 10161-10169 ...........................................................................7

## Rules

Fed. R. App. P. 35 .................................................................................4, 17

## Regulations

10 C.F.R. § 72.3 ............................................................................................8

## Other Authorities

Blue Ribbon Commission Report (Jan. 2012) ...........................................10

Cong. Rsch. Serv., *Civilian Nuclear Waste Disposal,* (Sept. 17, 2021) .................12

NRC, NUREG-1714, Final Environmental Impact Statement for the
    Construction and Operation of an Independent Spent Fuel Storage
    Installation on the Reservation of the Skull Valley Band of Goshute
    Indians and the Related Transportation Facility in Tooele Co ..............7

Nuclear Energy Insider, *US Waste Storage Development Hinges on Political Push,*
    (Nov. 2015) .........................................................................................10

## STATEMENT OF THE CASE

Neither Respondents nor Intervenor have met the stringent requirements for *en banc* review. The panel's unanimous opinion does not conflict with Supreme Court or Fifth Circuit precedent. Respondents and Intervenor fail to identify a single new authority or exceptional issue, and instead merely rehash arguments that were rejected by the panel. Moreover, their arguments against finding a "major question" are contravened by their position that the nation's nuclear waste management policies constitute "exceptional issues."

The panel correctly determined that the Nuclear Regulatory Commission ("NRC") lacks statutory authority to issue the *sui generis* consolidated interim storage facility ("CISF") Materials License No. NMS-2515 to Interim Storage Partners, LLC ("License"). The opinion textually analyzed the Atomic Energy Act of 1954 ("AEA"), 42 U.S.C. § 2011, *et seq.,* and concluded that NRC's disparate authority to regulate spent nuclear fuel ("SNF") constituents could not justify issuance of the License for consolidated storage of SNF at a facility hundreds of miles from the generating reactor. Further, the panel found that issuing such a license contradicted Congressional policy expressed in the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10101, *et seq.*

There is no inter-circuit conflict created by the panel's opinion meriting *en banc* review. The sister circuit opinions relied on by Respondents and Intervenor

conducted no statutory analysis of the NRC's authority under the AEA, nor did they directly address the legal issues presented here. Moreover, the purely-private facility at issue in those opinions is materially and factually distinguishable from the would-be hybrid public/private CISF in this case.

While the sister circuit opinions pre-date any definitive Supreme Court guidance on the major question doctrine, the panel's opinion correctly followed *West Virginia v. EPA,* 142 S. Ct. 2587 (2022). The authority asserted by the NRC in licensing CISFs implicates the major question doctrine because it is an attempt to re-write the nation's nuclear waste management policies, which has enormous political and economic consequences. Even the cited sister circuit opinions recognize there is no explicit delegation of authority for the NRC to regulate the storage of SNF. *Bullcreek v. NRC,* 359 F.3d 536, 538 (D.C. Cir. 2004) ("[T]he AEA does not specifically refer to the storage or disposal of spent nuclear fuel . . . ."); *Skull Valley Band of Goshute Indians v. Nielson,* 376 F.3d 1223, 1232 (10th Cir. 2004) (adopting *Bullcreek* without any meaningful analysis). Given the lack of any clear delegation of such a broad and impactful authority, the NRC's assumption of such authority violates the doctrine.

Finally, consistent with Fifth Circuit binding precedent and the underlying principles favoring judicial review of agency actions exceeding the agency's statutorily delegated authority, the panel applied this Court's *ultra vires* exception

to find jurisdiction. As Respondents concede, this aspect of the panel decision merely "reinforc[es] an existing circuit split" and does not raise any precedential-setting or exceptional issues warranting *en banc* review.

## FACTUAL AND PROCEDURAL BACKGROUND

The panel's opinion provides the relevant facts surrounding the five-year administrative proceeding leading to the NRC's issuance of the License, Op. 6-7,[1] which included a revision of the application from anticipating that the United States Department of Energy ("DOE") would take title to the SNF to a hybrid scenario allowing either the DOE or private entities to take title of the SNF, after multiple parties, including Fasken, challenged the legality of the initial application.[2] Five months after it rejected every attempt to intervene and terminated the adjudicatory proceeding, the NRC published its draft Environmental Impact Statement ("EIS") and notice soliciting public comments. Fasken participated throughout, presenting five contentions and two motions to reopen the record—all of which were denied by the NRC—as well as participating in public meetings and submitting comments. The NRC issued the License, leading Fasken

---

[1] Citations to "Op." refer to the panel's slip opinion attached to the Petitions for Rehearing.

[2] The NRC ultimately concluded in its Scoping Summary Report that any challenges to the title holder issue, raised by Fasken and many others, were outside the scope of its review.

to petition this Court for judicial review, which was granted, and the panel properly

vacated the License.

## ARGUMENT

## I.    NOTHING IN THE PANEL'S OPINION WARRANTS *EN BANC* REVIEW.

*En banc* review is an extraordinary procedure that is "not favored" and is

warranted only when a panel decision conflicts with a decision of the Supreme

Court or this Court, or involves questions of "exceptional importance." Fed. R.

App. P. 35(a) and (b). The issues raised by Respondents and Intervenor are:

- whether the AEA grants the NRC authority to license a CISF for the storage of SNF away from a reactor;

- whether the Supreme Court's major question doctrine should apply to this case; and

- whether this Court's *ultra vires* exception should apply to allow judicial review of agency actions in exceedance of their authority.

These issues do not involve questions of exceptional importance supporting *en*

*banc* review. The arguments for exceptional importance largely rest on alleged

inter-circuit conflicts but, as discussed *infra*, the cited inter-circuit conflicts are not

conflicts at all. Moreover, the Fifth Circuit's Internal Operating Procedures do not

identify inter-circuit conflicts as meriting *en banc* review. This Court wields an

incredible amount of discretion in determining what merits straining limited

judicial resources for *en banc* review. *W. Pac. R. Corp. v. W. Pac. R. Co.*, 345 U.S.

247, 259 (1953) ("[E]ach Court of Appeals is vested with a wide latitude of discretion to decide for itself just how that power shall be exercised."). That discretion should not be exercised here.

### A.     The Panel Correctly Determined That the NRC Lacks Statutory Authority to Issue the License.

As the panel correctly held, there is nothing in the text of the AEA or its historical context supporting the NRC's authority to issue the License. *See* Op. 18-25. The panel's thorough analysis of the enumerated authorizations in the AEA (provisions authorizing NRC to license possession of SNF constituents for specified uses and those authorizing licensing of production and utilization facilities) demonstrated the comparative absence of authority to license storage (a non-use) of SNF at a private away-from-reactor CISF. Op. 18-20. Respondents' reference to catch-all authority to issue licenses "for such other uses as the Commission determines to be appropriate to carry out the purposes of [the AEA]" is equally unavailing given that the only statutory purpose proffered by Respondents is "maximizing the generation of electricity from nuclear material" (Resp. Pet. 14), a far cry from nuclear waste management, which is not among the AEA's enumerated purposes. *See* 42 U.S.C. § 2013. Rather, that is the purpose of the NWPA which, as discussed *infra*, does not authorize the NRC to issue licenses for the type of CISF at issue here.

5

### B.   The Opinion does not Create a Circuit Split.

Respondents and Intervenor erroneously argue that the panel opinion created a circuit split that "invalidates a core and vital statutory authority the Commission has exercised for many decades." Resp. Pet. 12; *see* Intervenor Pet. 16. As the panel aptly noted, neither of the "unpersuasive" sister circuit opinions directly addressed the legal issue presented here nor undertook any textual analysis of the NRC's authority under the AEA. Op. 20-22. The issue on appeal in *Bullcreek* was "whether § 10155(h) of the [NWPA] repealed or superseded the authority of the [NRC] under the [AEA]." 359 F.3d at 537. Rather, the *Bullcreek* court *assumed* NRC authority to license for private away-from-reactor storage, recognizing that "the AEA does not specifically refer to the storage or disposal of [SNF]." *Id.* at 538. As the panel found, "[*Bullcreek*] doesn't actually address what authority the Commission had under the [AEA]." Op. 21. And the *Skull Valley* court merely adopted *Bullcreek*'s conclusion, expressly choosing not to "revisit the issues surrounding the [NRC]'s authority to license away-from-reactor storage facilities." *Skull Valley,* 376 F.3d at 1232.

Furthermore, in assuming an *implicit* authority under the AEA, the sister circuit opinions themselves rely on inapposite cases regarding different issues that were "irrelevant to the question before" the panel. Op. 21; *see Bullcreek,* 359 F.3d at 538 (citing, *e.g., Pac. Gas & Elec. Co. v. State Energy Res. Conservation &*

*Dev. Comm'n,* 461 U.S. 190, 207 (1983)). But *Pacific Gas* and the other cases cited in *Bullcreek* focused on preemption and the role of states in the nuclear policy scheme; the NRC's AEA authority to license storage and disposal of SNF was not at issue. Nor was it directly at issue in *Bullcreek*, as discussed above.

Finally, the panel's opinion involved materially distinguishable facts from the private fuel storage facility at issue in the sister circuit opinions. Unlike the purely-private facility in *Bullcreek* and *Skull Valley*,[3] the License authorizes a hybrid public/private scheme where DOE would take title and transport SNF to a privately-operated facility, contrary to the NWPA. Respondents rely on *Bullcreek* in arguing that the NRC's authority under the AEA and NWPA was "a legislative compromise permitting public and private storage programs to exist in parallel" (Resp. Pet. 17), but neither *Bullcreek* nor *Skull Valley* considered a hybrid public/private facility like this one or the NRC's attempted end-run around the NWPA, as the panel did here.[4] Rather than create a conflict, the unanimous panel

---

[3] The facility in *Bullcreek* and *Skull Valley* was initially developed as a DOE-operated Monitored Retrievable Storage ("MRS") facility pursuant to NWPA. *See* 42 U.S.C. §§ 10161-10169; NRC, NUREG-1714 at 1-7. After the deadline for federal interim storage passed, it became a purely private venture and was never constructed.

[4] Respondents criticize the panel for being unable to cite to AEA or NWPA provisions that restrict the NRC's authority to regulate storage of SNF. Resp. Pet. 17. But the sister circuit opinions they rely on also fail to cite any AEA or NWPA provisions *granting* NRC the authority to license away-from-reactor storage of SNF. There is none. *See Bullcreek,* 359 F.3d at 538 (assuming an *implicit* authority); *Skull Valley,* 376 F.3d at 1232 (adopting *Bullcreek*).

7

opinion starkly contrasts with the sister circuit opinions which fail to provide any textual analysis and address different questions of law and fact.

### C.    The Panel Correctly Determined That the NWPA Does Not Permit the License.

The panel correctly determined that issuance of the License "contradicts Congressional policy expressed in the [NWPA]." Op. 18. It is undisputed that the NWPA prohibits DOE from taking title to commercial SNF, and that such a radical upheaval of the nation's current nuclear waste management policies would require a re-writing of the NWPA. *E.g.,* 42 U.S.C. § 10222(a)(5)(A) (prohibiting DOE from taking title to commercial SNF until "commencement of operation of a [permanent] repository").

Respondents point to NRC's 10 C.F.R. Part 72 regulations and discussion in *Bullcreek* to argue that the panel "compounded its interpretative errors" under the AEA with its NWPA analysis. Resp. Pet. 16. But the Part 72 regulations are completely silent as to the NRC's authority to license a hybrid public/private away-from-reactor CISF. In fact, CISFs are not even mentioned in the Part 72 regulations. *Cf.* 42 U.S.C. § 10162 (authorizing DOE alone to construct and operate a Monitored Retrievable Storage ("MRS") facility for SNF); 10 C.F.R. § 72.3 (defining Independent Spent Fuel Storage Installations ("ISFSI")). However, the facility at issue here is neither an ISFSI nor an MRS, but rather something altogether different—a hybrid public/private "CISF", a term that is not even

8

defined in the Part 72 regulations, much less authorized. As written, the NWPA and Part 72 regulations authorize specific and extremely limited options for off-site storage of commercial SNF (one of which is now time-barred). They allow nothing else.

Further, the panel concluded that the NWPA does not permit the NRC to issue the License (Op. 25), not that it forbids the NRC from issuing the License, as Respondents argue. Resp. Pet. 17. Respondents misconstrue the panel's findings to argue that the opinion directly conflicts with *Bullcreek*. Resp. Pet. 17. Actually, the panel opinion supports *Bullcreek*: "[Section 10155(h) of the NWPA] ensured that DOE would not take over a private facility to fulfill DOE's obligations under the NWPA." *Bullcreek*, 359 F.3d at 539. Yet that is precisely what the NRC authorized by allowing a condition for DOE to contract with the privately licensed facility based on speculation that the NWPA may later change. *See* Fasken Br. 25 (NRC acknowledging that conditions of the License would allow ISP to take advantage of "future changes" in the law).

Finally, Intervenor's and amici's complaints that the panel's opinion "upsets settled expectations" in the nuclear industry (Intervenor Pet. iv; NEI Amicus Br. 1; Holtec Amicus Br. 5-6, 11-13) ignore the fact that the License would have equally disruptive effects on the oil and gas business in the Permian basin, a "top global oil producer." Op. 6. The argument is also belied by public concessions from the

9

NRC, the nuclear industry, and stakeholders alike that changes to the NWPA would be necessary for the development of consolidated away-from-reactor interim storage for SNF. *See, e.g.,* Blue Ribbon Commission Report (Jan. 2012) at vii, *available at:* https://www.energy.gov/ne/articles/blue-ribbon-commission-americas-nuclear-future-report-secretary-energy (recognizing large-scale transport and consolidated storage of SNF requires legislative action to amend the NWPA) (last visited Dec. 11, 2023); Nuclear Energy Insider, *US Waste Storage Development Hinges on Political Push,* (Nov. 2015) (Holtec representative commenting "CISFs should be either completely decoupled from Yucca Mountain or used as a transition.").

The panel's discussion of the NWPA properly supports its conclusion that the AEA does not authorize the NRC to issue the License, and it creates no conflict or exceptionally important question justifying *en banc* rehearing.

## II.     THE PANEL OPINION IS CONSISTENT WITH *WEST VIRGINIA* AND OTHER MAJOR QUESTION DOCTRINE PRECEDENT.

Rather than constituting a conflict with the Supreme Court's major question doctrine precedent, as suggested by Respondents and Intervenor (Resp. Pet. 18; Intervenor Pet. 14-18), the panel's determination that nuclear waste management is a major question is consistent with *West Virginia*, particularly given that sister circuits have confirmed that the NRC lacks clear Congressional authorization to issue licenses for private away-from-reactor storage of SNF. *Bullcreek*, 359 F.3d at

538. Indeed, it is uncertain whether *Bullcreek* and *Skull Valley* would be similarly decided today in light of *West Virginia*.

In *West Virginia*, the Court explained that the major question doctrine is implicated when the "history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." 142 S. Ct. at 2608 (cleaned up). Disagreeing with the panel's application of the doctrine, Intervenor suggests a conflict, arguing that five "prerequisites" for the doctrine are not present here.[5] Intervenor Pet. 14-18.

Intervenor argues that the doctrine does not apply due to the lack of any "newness" in the NRC's License. Intervenor Pet. 14-15. As explained above, the NRC's licensing of the *sui generis* hybrid private/public CISF is unprecedented. Intervenor is also wrong about the lack of an "ancillary nature" or "obscure[ity]" of the law NRC invokes. Intervenor Pet. 16. While the Part 72 regulations have existed for decades, the NRC has never used its authority to license an CISF involving DOE or created a hybrid ISFSI/MRS.

---

[5] *West Virginia* does not contain "prerequisites," much less those identified by Intervenor. The doctrine is flexible and evolving, and other than the "history and the breadth" and the "economic and political significance" of the authority asserted, the Supreme Court has not identified specific factors or indicia to consider.

The panel's opinion is also consistent with *West Virginia* because NRC's asserted authority has enormous political significance. *See West Virginia,* 142 S. Ct. at 2608. The NWPA itself states that the question of where to store the nation's nuclear waste is a "*major subject*[] of public concern." 42 U.S.C. § 10131(a)(7) (emphasis added). And as noted, Intervenor admits that hybrid private/public CISFs would require amendment of the NWPA. Contrary to Intervenor's assertions (Intervenor Pet. 16-17), Congress has considered but declined to enact the authority NRC attempts to assert. Since 2015, Congress has considered nearly 30 measures addressing storage/disposal of commercial nuclear waste, one of which would have even authorized DOE to enter into contracts with private storage facilities. *See* Cong. Rsch. Serv., *Civilian Nuclear Waste Disposal* at 19-27, 37 (Sept. 17, 2021). Congress' declination to enact that authority implicates the major questions doctrine. *See West Virginia*, 142 S. Ct. at 2621 n.4 (Gorsuch, J., concurring) (elaborating upon the relevance of failed enactments in the major questions analysis).

Finally, *West Virginia* noted that the "economic significance" of an agency action may implicate the doctrine. *Id.* at 2608. Courts have generally considered an agency action to be of economic significance if it requires "billions of dollars in spending." *King v. Burwell*, 576 U.S. 473, 485 (2015). Intervenor's application estimates operating costs over the License term to exceed $1 billion, even

excluding construction costs (approximately $170 million). And this says nothing of licenses for future facilities. DOE annually collects approximately $750 million dollars for long-term disposal of civilian nuclear waste, and the governments' planned permanent repository (Yucca Mountain) would have cost $97 billion dollars.

The panel opinion properly applied *West Virginia*. *En banc* review is not appropriate with respect to the panel's major question doctrine discussion.

## III.  APPLICATION OF THE FIFTH CIRCUIT'S *ULTRA VIRES* EXCEPTION DOES NOT WARRANT *EN BANC* REVIEW.

A circuit split existed on this Court's narrow *ultra vires* exception well before this case and, although Respondents suggest this Circuit is an outlier on this issue, the Supreme Court and sister circuits also permit equitable jurisdiction and review for agency actions that exceeds statutory authority or are unconstitutional. *E.g.*, *Leedom v. Kyne*, 358 U.S. 184, 190 (1958); *Aids Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (noting for ultra vires actions, "courts are normally available to reestablish the limits . . . [of] authority").

Furthermore, although the panel found it unnecessary to decide the proper interpretation of the Hobbs Act's "party aggrieved" requirement, its inclination to reject requirements not in the plain text of the statute (particularly requirements that would allow the agency to limit judicial review of its actions by denying party status) would not have been an outlier either. Op. 16. While Respondents cite

authorities from the D.C. and Tenth Circuits, *e.g., NRDC v. NRC*, 823 F.3d 641,

643 (D.C. Cir. 2016) (requiring successful intervention to achieve "party

aggrieved" status), other circuits do not follow that precedent. *E.g., Massachusetts

v. NRC*, 878 F.2d 1516, 1520 (1st Cir. 1989) (noting that requiring successful

intervention for "party aggrieved" status is "circular . . . [t]he NRC cannot now

claim that by refusing to grant the Commonwealth's requests to become a party,

the NRC's decisions are beyond review"); *Clark & Reid Co. v. U.S.*, 804 F.2d 3, 6

(1st Cir. 1986) (Courts do "not equate the regulatory definition of a 'party' in an

[agency] proceeding with the participatory party status required for judicial review

under the Hobbs Act."). Additionally, several circuits have also indicated that

submission of comments is sufficient participation. *Nat'l Ass'n of State Util.

Consumer Advocs. v. FCC*, 457 F.3d 1238, 1250 (11th Cir. 2006) ("Because the

State Utility Regulators participated in the proceedings by submitting comments . .

. [they] have independently established their status as 'party aggrieved.'"); *ACLU

v. FCC*, 774 F.2d 24, 25 (1st Cir. 1985) (finding certain organization not to be

"party aggrieved" because it failed to file comments or petition for

reconsideration); *see Reytblatt v. NRC*, 105 F.3d 715, 720 (D.C. Cir. 1997)

("Petitioners clearly meet ["party" status under the Hobbs Act] because each

participated in the Commission's informal rulemaking by filing comments on the

proposed rule.").

14

The panel would have been justified in finding jurisdiction regardless of the *ultra vires* exception, given Fasken's extensive participation in the NRC's proceedings.[6] Contrary to Respondents' attempt to gloss the meaning of "party aggrieved", the panel's opinion applying the plain text of the Hobbs Act logically (and fairly) determined that Fasken satisfied the participation requirement by seeking to intervene and filing contentions. Op. 14-15; *see Gage v. AEC*, 479 F.2d 1214, 1219 (D.C. Cir. 1973) (noting that the purpose of the participation requirement is to avoid direct appellate review without a record developed from the agency's initial consideration of petitioners' arguments); *see also Water Transp. Ass'n v. ICC*, 819 F.2d 1189, 1193 (D.C. Cir. 1987) ("[P]arty status has been found when the petitioner has made a full presentation of views to the agency.") (citations omitted).

Fasken's participation in the proceeding and presentation of its views cannot be denied. Fasken initially challenged the legality of the ISP (and Holtec) applications which were premised on the DOE taking title and transporting SNF in violation of the NWPA. The NRC unfairly transformed Fasken's objection into a contention. *See* 90 NRC 31, 43 (citing Order of the Secretary at 2–3 (Oct. 29,

---

[6] While unnecessary for its conclusion, the panel also correctly rejected Respondents' arguments regarding non-jurisdictional exhaustion requirements under the Hobbs Act and the AEA, and cited caselaw supporting Fasken as a Hobbs Act "party aggrieved." Op. 14 n.2.

2018)). In total, Fasken filed five timely contentions alleging NRC violations and challenging the legality of the CISF, which were each denied and dismissed. Fasken Br. 15. Fasken also twice moved to reopen the record with new material information. *Id.* The first was based on ISP's delayed disclosure of information requested by the NRC. The second was based on NRC's draft EIS disclosing, for the first time, that rural communities in Texas and New Mexico would be responsible for emergency services and first responder coverage in the event of a radiological incident (versus DOE as in the initial application and as required under the NWPA). *Id.* at 16-17. However, Fasken was denied each time.

In addition to participating throughout the adjudicatory proceeding, Fasken presented its challenges during NRC's public meetings, and following the termination of the adjudicatory proceeding Fasken timely submitted comments and factual evidence vocalizing omissions and flaws as to the un- or inadequately-analyzed transportation impacts, safety risks, and costs and benefits in the NRC's draft EIS and final EIS. *Id.* at 18. While the NRC arbitrarily excluded Fasken's opposition at every stage, it cannot be said that the agency was denied the opportunity to consider Fasken's views or develop the record on these issues.

Moreover, even if the panel had found Fasken to be a "party aggrieved", it would not have created a circuit split necessitating *en banc* review, as the circuit split already existed. "If a panel decision simply joins one side of an already

existing conflict, a rehearing *en banc* may not be as important because it cannot avoid the conflict." Fed. R. App. P. 35 advisory committee's note.

Accordingly, the panel's application of the *ultra vires* exception does not warrant *en banc* review.

## CONCLUSION

For the reasons set forth herein, Respondents' and Intervenor's petitions for rehearing *en banc* should be denied.

Dated: December 11, 2023              Respectfully submitted by:

**KANNER & WHITELEY, LLC**

*/s/ Allan Kanner*
Allan Kanner, Esq.
Annemieke M. Tennis, Esq.
701 Camp Street
New Orleans, Louisiana 70130
(504) 524 - 5777
a.kanner@kanner-law.com
a.tennis@kanner-law.com
*Counsel for Petitioners Fasken Land and Minerals, Ltd. and Permian Basin Land and Royalty Owners*

## CERTIFICATE OF SERVICE

I certify that on 11th day of December 2023, I electronically filed the foregoing upon counsel for the parties in this action by filing the document electronically through the CM/ECF system.

*/s/ Allan Kanner*
Allan Kanner

*Counsel for Petitioners Fasken Land and Minerals, Ltd. and Permian Basin Land and Royalty Owners*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I certify that this document complies with the type-volume limit of because it contains 3805 words, excluding the parts of the document exempted under Fed. R. App. P. 32(f).

I certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in 14-point Time New Roman, a proportionally spaced font.

Dated:  December 11, 2023                    */s/Allan Kanner*
                                              Allan Kanner

                                              *Counsel for Fasken Land and*
                                              *Minerals, Ltd. and Permian Basin*
                                              *Land and Royalty Owners*